# EXHIBIT A

1

1                    UNITED STATES DISTRICT COURT

2                    SOUTHERN DISTRICT OF INDIANA

3                       INDIANAPOLIS DIVISION

4

5    ----------------------------------------
     MARY E. LENTZ,                          :
6                                            :
               Plaintiff,                    :
7                                            :
          vs.                                :    CAUSE NO.
8                                            :    1-PO1-0662C
     CINCINNATI INSURANCE CO., a subsidiary  :
9    of Cincinnati Financial Corporation,    :
     DAVE J. BALZANO, MARK J. HULLER,        :
10   JAMES BENOSKI, TIM TIMMEL and           :
     BRUCE FISHER,                           :
11                                           :
               Defendants.                   :
12   ----------------------------------------

13

14        DEPOSITION OF:    MARY E. LENTZ

15        TAKEN:           By the Defendants
                           Pursuant to Agreement and Notice
16
          DATE:            September 30, 2002
17
          TIME:            Commencing at 9:08 a.m.
18
          PLACE:           Frost, Brown, Todd, L.L.C.
19                         2200 PNC Center
                           201 East Fifth Street
20                         Cincinnati, Ohio  45202

21        BEFORE:          Patricia A. Walterman, RPR
                           Notary Public - State of Ohio
22

23

24

8

```
 1              MR. SUTHERLIN:  I think she said she's not

 2      sure.

 3      A.      You mean on this particular case or any case?

 4      Q.      Well, you said typically you would ask that the

 5      checks be put in the safe, and I'm saying typically you

 6      didn't ask for the release documents to be put in the safe,

 7      did you?

 8      A.      Typically, no.

 9      Q.      Look at No. 16, Hare versus Roberds.  In the

10      last paragraph, you say, "I will update this with all the

11      checks in the safe."  What all -- what are you referring to,

12      "all the checks in the safe"?

13      A.      Well, it appears on this case, CIC settled for

14      $12,000 and State Farm settled for $2500, and again, if I

15      was waiting on releases and I didn't want checks in the

16      files on settlements or judgment, I would put those checks

17      in the back, in the back.

18      Q.      In the safe?

19      A.      In the safe.

20      Q.      Because you wanted them to be secure, right?

21      A.      Yes, and we wanted to know where they were.

22      Q.      Have you ever lied to Mark Huller, Miss Lentz?

23      A.      Not to my knowledge, no.

24      Q.      Have you ever lied to Al Matheny?
```

9

1       A.    No.

2       Q.    Have you ever lied to Dave Balzano?

3       A.    No.

4       Q.    Have you ever lied to any management

5 representative of Cincinnati Insurance Company?

6       A.    Not to my knowledge, no.

7             (Defendants' Exhibit 2 was marked for

8             identification.)

9       Q.    Can you tell me what's been marked as Exhibit

10 2, Miss Lentz?

11      A.    This is a February 23rd, 2000, ten-page letter

12 from Roger Makley to Gary Schaengold and Joan Brenner, who

13 Gary Schaengold was the chairman of the certified grievance

14 committee for the Dayton Bar Association, and Joan Brenner

15 was the investigator on the ethics complaint filed by Mark

16 Huller against me.

17      Q.    And Mr. Makley was who?

18      A.    My attorney at the time.

19      Q.    Mr. Makley writes in this letter, I'm looking

20 at the third paragraph, "Mr. Huller further alleges that Ms.

21 Lentz admitted diverting funds totaling approximately

22 $2,450.00 of which she retained between $900.00 and

23 $1,000.00 upon deposit in her personal bank account."  Do

24 you see that?

1       A.      Yes.

2       Q.      Can you read the footnote Mr. Makley has

3  written there, footnote 1?

4       A.      "As will hereinafter be explained the total

5  amount was in fact $2,450.70, of which $834.00 remains on

6  deposit in Ms. Lentz' checking account."

7       Q.      Was that accurate?

8       A.      Yes.

9       Q.      Where is that $834 today, Miss Lentz?

10      A.      It is in an interest-bearing CD in my KeyBank

11  account.

12      Q.      And what's the amount today?

13      A.      Approximately $2700.

14      Q.      And whose name is this interest bearing CD?

15      A.      My name, Mary Lentz.

16      Q.      Did you have monies from CIC deposited in any

17  bank other than KeyBank?

18      A.      No.

19      Q.      Where did that $834 come from?

20      A.      The $834 was charges for expenses and costs on

21  one file, and that was Luce, L-u-c-e, versus Clauer,

22  C-l-a-u-e-r.  And they were reimbursed costs for copies of

23  medical records, depositions, binders, depositions in a

24  previous case by Virginia Luce.  It was a pro se dental

17

1    A.    Consumption, yes.

2    Q.    And then the drill was when you went to get a

3 pop from the fridge, you stuck a quarter in the black pouch?

4    A.    Yes.

5    Q.    And you're saying -- when you say Mr. Balzano

6 expensed, what do you mean?

7    A.    Well, my understanding is that -- I don't know

8 how much money would be in that pouch, but he would go buy

9 pop and give the secretary or the person in charge of

10 supplies their receipt for the pop, and there was no

11 allocation for what was in the bag.

12    Q.    What's your allegation, Miss Lentz, that he

13 pocketed what was in the bag, but charged the company for

14 buying the pop; is that what you're saying?

15    A.    Well, I don't know if he pocketed it or put it

16 in an account, but there was no accounting for what was in

17 the bag.

18    Q.    How do you know there was no accounting?

19    A.    Well, I came to find out and understand that

20 the receipt was given, and that went on his expense

21 account.  The entire receipt for all the pop purchased.

22    Q.    You don't have any personal knowledge, do you,

23 of what happened to the money in the black bag?

24    A.    Personal knowledge, no.

18

1    Q.    And your knowledge of the receipt being given,

2    that comes from whom?

3    A.    Paula Ruppert.

4    Q.    And what did Miss Ruppert tell you?

5    A.    Just that.  And also, at one point, Sandra

6    Brauer.

7    Q.    Now, when Mr. Matheny came to talk to you, when

8    Mr. Huller came to talk to you in late '99, early 2000, why

9    didn't you tell them about the pop money and Mr. Balzano?

10    A.    I didn't remember at the time.

11    Q.    And when did you first remember about Mr.

12    Balzano and the pop money?

13    A.    Shortly thereafter, I was -- it could have been

14    within three months of when I was fired or let go.  I wasn't

15    fired until March 10th of 2000.

16    Q.    So three months -- within three months of March

17    of 2000?

18    A.    Within three months of January 3rd of 2000.

19    Q.    And what caused you to remember this?

20    A.    Well, after I was interrogated by Mr. Matheny

21    and talked to by Mr. Huller, and after charges were filed

22    with the ethics committee and to the prosecutor's office,

23    not filed but reported to the prosecutor's office, a lot of

24    things came to light and to mind during that time frame, and

19

1  I was not to speak to anybody at Cincinnati Insurance

2  Company.

3         Q.    What do you mean you were not to speak to

4  anybody at Cincinnati Insurance Company?

5         A.    Well, after I spoke with Mr. Matheny on

6  December 28th, I did not think the investigation was over,

7  and I called him twice to tell him other things that,

8  frankly, I was not comfortable saying in front of Mr.

9  Balzano, and Mr. Matheny did not return my calls.  When I --

10        Q.    Did he -- go ahead.

11        A.    When I spoke with Mr. Huller and was explaining

12 to him what the copy money was, how it was obtained, and

13 what it was used for, and everybody's knowledge of it, I was

14 told that the die had been cast, his hands were tied.  If I

15 had other things to say, I should call Al Matheny, which I

16 did, and he did not return my calls.  When I was told by Mr.

17 Huller that he was going to contact various authorities, I

18 told him I felt the need to have counsel.  At that point,

19 when I retained Roger Makley, all conversations ceased.

20        Q.    You said you called Mr. Matheny twice, when's

21 the first time you called Mr. Matheny?

22        A.    I called him probably the day afterwards, when

23 I talked to Mark Huller.  Or, no, I misspoke, I called him

24 within hours after he left our office, and the next

21

1       A.      It was the company's money.

2       Q.      What do you base that on?

3       A.      Well, I base that on if you're expensing pop or

4  expensing anything and you're getting some of that

5  reimbursed, there seems there would be some reconciliation

6  of what is in the bag and what you are asking to be

7  expensed.

8       Q.      On what date did you first deposit CIC monies

9  in your personal bank account?

10      A.      My understanding from Mr. Balzano, when this

11  whole copy money issue arose, was that these types of costs

12  and expenses for litigation purposes, those monies did not

13  want to be recaptured by the company.  I asked him if the

14  company had a policy or B&T, Berlon & Timmel, had a policy,

15  what was the procedure or mechanism to charge other counsel

16  for copies.  He said, and this was back in March of '98,

17  when he had something similar he was told by home office to

18  cash the check and buy pizza with it, because claims did not

19  want to deal with it.  To answer your question about the

20  first time that I put funds that were rejected by Cincinnati

21  Insurance Company into my account, my best recollection was

22  September of '99.

23      Q.      Now, is there anything other, Miss Lentz, than

24  your best recollection that we could look at to determine

22

1    the date on which you first put CIC monies into your

2    personal banking account?

3         A.    Not that hasn't been produced.

4         Q.    And when you first put monies into your

5    personal banking account from CIC in September of '99, what

6    did you actually put into the bank; was it cash; was it a

7    check?  What did you take to the bank?

8         A.    I took the first check, and without them in

9    front of me, I don't know which one came in first.  There

10   were two checks on the Luce versus Clauer case, and I took

11   the check to the bank, and I -- from the first check I asked

12   for $150 back.  So I don't know if that would be deemed

13   cashing it or deposited it and getting money back, because

14   in previous checks, other than these last two, I took them

15   all to my personal bank account, and my personal bank

16   account acted as a conduit for all of the checks.  I would

17   go cash them and bring the money back to the office.

18        Q.    In September of '99, when you took $150 back,

19   how much did you actually leave in your personal bank

20   account from that first Luce check?

21        A.    496 minus 150.  Is that 346?

22        Q.    And there was a second Luce check?

23        A.    I believe it was on Luce versus Clauer for 538.

24        Q.    And how much -- did you take any of that out?

23

1          A.     Yes, $50.

2          Q.     So the rest was in -- was that 488 or

3  something --

4          A.     Yes.

5          Q.     -- that was in the bank?

6          A.     Yes.

7          Q.     And what was the greatest amount of money, of

8  CIC money, that you had in your personal bank account?

9          A.     Well, at one time, it would have been 838 or

10  834.

11         Q.     It's your testimony that was the greatest

12  amount at any one time that you had in your bank account

13  that belonged to CIC?

14         A.     Yes.

15         Q.     And are you testifying that on only two

16  occasions did you actually leave money in your personal bank

17  account that belonged to CIC, as opposed to simply using

18  your bank account as a conduit?

19         A.     Yes, on those last two checks, those were the

20  only times that I left funds that CIC rejected in my

21  personal bank account.

22         Q.     And the first time was in September; when was

23  the second time?

24         A.     October sometime.

24

1    Q.    What was the balance of your bank account

2  before the deposit of $496 in September of '99?

3    A.    I don't know, without looking at my

4  statements.

5    Q.    And once you left these amounts in your bank

6  account, 496 minus 150, and then the second deposit as well,

7  once you put those in your bank account, they became

8  commingled with your personal funds, didn't they?

9         MR. SUTHERLIN:  To the extent that it calls for

10        a legal conclusion, I'll object, but you may answer

11        the question.

12    A.    Yeah, I wouldn't -- I don't call that

13  commingling.  To me that's a term of art.  They were with my

14  personal funds.

15    Q.    What do you call it?

16    A.    I call that that's just where it was housed.

17    Q.    Housed with your personal funds, right?

18    A.    Yes.

19    Q.    And you didn't tell the bank to keep CIC money

20  separate from your personal funds, did you?

21    A.    No, I didn't.  I didn't see the need to.

22    Q.    And during September, during October, after

23  September and October of '99, you made withdrawals from your

24  personal bank account for personal expenses, didn't you?

1       A.    I don't know without looking, but I can -- I

2  probably did.

3       Q.    And you wrote checks on your personal account

4  following September and October of '99, didn't you?

5       A.    Yes.

6       Q.    And you wrote checks to pay for such things as

7  child care, mortgage and car payments, didn't you?

8       A.    Child care.

9       Q.    What other personal expenses did you write

10  checks to cover in September and October and afterwards,

11  Miss Lentz?

12       A.    Well, thinking back to that time frame, phone,

13  child care, which we already talked about, other household

14  items, probably personal items.

15       Q.    Like what?

16       A.    I don't know, unless you can show me

17  something.  I don't know if I had my hair done or bought

18  clothes, or I don't know.

19       Q.    Do you have cancelled checks from the fall and

20  winter of '99?

21       A.    No.

22       Q.    You don't?

23       A.    No.

24       Q.    Where would they be?

26

1          A.     I don't have them.

2          Q.     Do you know where they are?

3          A.     No.

4          Q.     If I were to try and subpoena them, where would

5    I send that subpoena?

6          A.     Probably KeyBank.

7          Q.     What address?

8          A.     Be the one in Dayton.  They're on Main Street.

9    Or I don't know if a subpoena would go to the home office of

10   KeyBank, which is Society -- I'm sorry, in Cleveland.  Used

11   to be Society Bank.  Now it's KeyBank.

12         Q.     And, Miss Lentz, would you sign a release so I

13   could obtain those cancelled checks from that time period?

14                MR. SUTHERLIN:  On advice of counsel, we'll

15         consider it.

16         A.     If you can provide it to my attorney.

17         Q.     What child care expenses did you have?

18         A.     Day care.

19         Q.     How many children did you have?

20         A.     At the time of these two checks?

21         Q.     Um-hum.

22         A.     Two.

23         Q.     What were their ages?

24         A.     Ellie was one, so Emma was three-and-a-half.

33

1  similar, a claims person or home office, something to that

2  effect, told me they didn't want to deal with it, cash the

3  check and buy pizza with it for the office.  And so that's

4  what I did.  That's what I tried to do.

5        Q.    Now, Miss Lentz, are you rehashing the first

6  conversation or are you saying this is the second

7  conversation?

8        A.    There were two conversations when it all

9  started, the copy money situation.  The first one I believe

10 in March of '98 I asked him if other people charge for

11 copies.  He wasn't 100 percent certain, but yeah, go ahead

12 if they agree to, fine.  And so I had the check made to

13 Cincinnati Insurance Company.  So the second conversation,

14 when I had the check in hand, and I think that one came in

15 May of '98, again, it was on the Luce versus Clauer case.

16       Q.    All right.  So it appears to me that you've now

17 changed the content of the March '98 conversation, and you

18 have now placed that conversation in May.  So let's back up

19 and try this one more time.

20            MR. SUTHERLIN:  Object to the characterization

21       of what she said.

22       Q.    We have two conversations with Mr. Balzano.

23 The first you're testifying occurred in March of '98, right?

24       A.    Yes.

61

1    box or my in box, whatever.  On the 18th floor, I believe

2    there was like a separated bin where people had their mail,

3    but I sort of stuck to the same system, where Paula would

4    open it and put it in my box.

5         Q.    Did you have any personal knowledge of any

6    other lawyer at the Dayton law office asking non-CIC counsel

7    to write checks to reimburse for copying costs payable to

8    the attorney personally?

9         A.    In the Dayton office?

10        Q.    Um-hum.

11        A.    While I was there?

12        Q.    Um-hum.

13        A.    Not while I was there.

14        Q.    Are you aware of any other attorney at the

15   Dayton law office asking people to write checks to reimburse

16   for copying costs payable to the attorney personally at a

17   time when you were not there?

18        A.    Yes.

19        Q.    Who?

20        A.    Well, personal knowledge?  Just through looking

21   at discovery responses in this case, I found out that Joe

22   Kern wrote a letter.

23        Q.    Did you have any knowledge, other than based on

24   what you saw in production and discovery?

72

1      Q.     Who hired you to work at the Dayton office?

2      A.     I interviewed with Dave Balzano, and I'm not

3   real sure how that worked, but he gave the go-ahead, and I

4   talked with and met with Mark Huller and Hank Berlon, so I'm

5   not real sure who hired me.  Dave Balzano was my immediate

6   supervisor, but I guess I'd have to say Mark Huller hired

7   me.

8      Q.     And when you worked at Cincinnati Insurance

9   Company, Dayton law office, did you represent Cincinnati

10   Insurance in subrogation cases?

11      A.     Yes.

12      Q.     Do you remember what subrogation cases you

13   handled on behalf of your client, Cincinnati Insurance

14   Company?

15      A.     The largest one was a case called Henny Penny

16   versus Butler Building and a couple other defendants.

17      Q.     Do you remember any other subrogation cases?

18      A.     I was never in charge of subrogation.  I took

19   over a couple of subrogation cases that Fred left behind

20   when he left in April of '97.  I can't give you names.  I

21   don't know.  One was Wingler, I believe, was a subro case.

22   That's -- it was a handful.  That's all I know.

23      Q.     You said you weren't in charge of subrogation

24   cases; who was in charge of subrogation cases?

73

1      A.      It depended on the time frame.  When I left in

2  January of 2000, I believe that responsibility had been

3  given to Joe Kern a month or month-and-a-half -- yes,

4  sometime in November of '99, I believe.  When Fred came back

5  in September of '97, he was in charge of subrogation.  I'm

6  not -- I don't remember if Don Desseyn -- I believe Don

7  Desseyn did subro cases, as well.

8      Q.      Now, when you represented Cincinnati Insurance

9  as a client in these subrogation cases, did you view your

10 professional or ethical obligations towards CIC any

11 differently than if you were representing its insureds?

12     A.      Can I view my what?  Say that again.

13     Q.      Your ethical obligation towards your client,

14 CIC, did you view that any differently than your obligation

15 to insureds when you represented them?

16     A.      No.

17     Q.      Now, in your complaint, Miss Lentz, paragraph

18 16, you represent that Tim Timmel is the chief financial

19 officer of CIC.  What's your basis for that?

20     A.      That was my understanding, that that's what he

21 was promoted to sometime in '97.

22     Q.      Where did you gain that understanding?

23     A.      Just from being in the company.

24             (Mr. Balzano left the conference room.)

135

1  employment has to end.  And I said, okay, who's looked at

2  it, and that's when he named -- my recollection is that he

3  named the four people that I sued, the individuals, other

4  than Dave Balzano, himself, Jim Benoski, and Bruce Fisher,

5  that's my recollection of the four names he gave me.

6         Q.    I'm sorry, he gave you four names; who?

7         A.    Himself, Jim Benoski, Tim Timmel and Bruce

8  Fisher.  Those are the names I jotted down real quick.

9  That's what I recall.  He said a memo -- well, the sequence

10  of events were, he said do you want to resign or we can

11  terminate you.  And I said, well, I'll resign.  And that's

12  when he said, well, I've been involved with these types of

13  things before, but this is the worst thing I've had to do

14  and have seen, because I have to tell you that we have to

15  notify the authorities.  And I said what authorities.  And

16  he said the police.  And I said the police.  I said what's

17  the charge.  And he said theft.  And I said, Mark, I didn't

18  steal anything.  He said well, Mary, you admitted that those

19  funds were in your account.  And I said yes, I did, and

20  those funds were coming back.  They already started coming

21  back.  And that's when anytime we even broached the subject

22  of what was discussed between me, Dave and Al Matheny, Mark

23  would not talk about.  He didn't want to interfere with the

24  investigation.  And I said this was a misunderstanding, and

138

1   in my account, but they were going to come back, they've

2   already started coming back?

3       A.    Right.

4       Q.    What did you mean when you said they had

5   already started coming back?

6       A.    Well, 200 of it had been brought back.

7       Q.    Are you referring to anything other than that

8   200?

9       A.    No.

10      Q.    Do you have any reason to think that Mr. Huller

11  made his decision to terminate you for any other reason,

12  other than the fact that you had taken company money and put

13  it into your personal bank account?

14      A.    I think that Mark Huller believed a very

15  distorted and dishonest account of what happened in that

16  office.

17      Q.    But do you have any reason to think that -- I

18  understand you think it's distorted, but do you have any

19  reason to say that Mr. Huller didn't truly believe it?

20            MR. SUTHERLIN:  If you know.  Are you

21      speculating -- are you asking her to speculate on

22      what Mr. Huller believed?

23      A.    I don't know what he believed.  Because I don't

24  know what Dave told him.

141

1  files.

2        Q.    Well, let me ask you this way:  Tell me each

3  and every reason you have to assert that Huller, Benoski,

4  Timmel and Fisher collectively determined that your

5  employment should end?

6        A.    Just what I told you; those were the names that

7  he told me.

8        Q.    Do you have any other reason to think that

9  those four people collectively determined that your

10 employment should end?

11       A.    No.

12       Q.    Now, you didn't tell Mr. Balzano that you had

13 put over $800 of CIC's money into your personal bank

14 account, did you?

15       A.    No, I did not.

16       Q.    You didn't tell Mr. Desseyn that, did you?

17       A.    No, I did not.

18       Q.    And you didn't tell Mr. Young that, did you?

19       A.    No, I did not.

20       Q.    You didn't tell Mr. Huller that, did you?

21       A.    No.  Not before the investigation, no.

22       Q.    You didn't tell any CIC employee, did you, that

23 you had over $800 of the company's money in your personal

24 bank account?

142

1         A.     I don't know if I actually told Paula Ruppert

2    that; I don't know.  I don't remember.

3         Q.     With the possible exception of Miss Ruppert,

4    did you tell any employee of CIC that you had over $800 of

5    the company's money in your personal bank account?

6         A.     No.

7         Q.     Why, Miss Lentz, do you think you were fired?

8    What's your belief?

9         A.     I believe I was fired because I was the only

10   woman in that office.  There was a fair amount of friction

11   between Dave and myself, and this copy money thing went on

12   for 18 months, and why everybody got selective memory, I

13   don't know.  I think that when that was brought to light,

14   and after the investigation, that that was used as a pretext

15   to get rid of me.

16        Q.     You say that you don't know why all -- everyone

17   got selective memory, whom --

18        A.     The attorneys, I should say.

19        Q.     Whom are you accusing of getting selective

20   memory?

21        A.     Dave Balzano, Fred Young, and Dave, I guess.

22        Q.     Are you accusing anyone else of selective

23   memory?

24        A.     Julia Gibson and Miss Brauer.

215

1    deposit unless it is made payable to this firm rather than

2    Cincinnati Insurance Company."  Now, you told Mr. McCartney

3    in this letter that they wouldn't accept the check for

4    deposit unless it's made payable to this firm; by that you

5    meant Berlon & Timmel?

6         A.    Right.

7         Q.    Why is it then that you asked him to make the

8    check payable to you, rather than to Berlon & Timmel?

9         A.    Well, first of all, I didn't write this

10   letter.  I didn't see this letter.  My recollection is when

11   we had this conversation, Julia called the bank, and they

12   would not accept a check made to Berlon & Timmel, because

13   Berlon & Timmel -- there was no account there.  They

14   didn't -- Berlon & Timmel didn't exist.  The suggestion was

15   to make the check payable to me care of Berlon & Timmel, so

16   that's what we did.

17        Q.    Your explanation for Miss Gibson's letter,

18   since you were dissociating yourself from it, Miss Gibson's

19   letter saying make the check payable to this firm, what's

20   your explanation for that?

21        A.    First of all, I'm not dissociating myself from

22   anything.  I take responsibility for my actions.  I'm trying

23   to testify honestly, and what I recall is that this was

24   drafted after she spoke with the bank.  I didn't know of any

216

1   way -- certainly, if it could have been made to Berlon &

2   Timmel, I would have done that.  That was her

3   understanding.  She drafted the letter.  I went with her

4   understanding.  I didn't question it.  I'm not dissociating

5   myself with it.

6          Q.    Well, here's the question --

7          A.    All right.

8          Q.    You heard what Miss Gibson said to you

9   allegedly, and yet this letter that goes out with your name

10  at the bottom instructs Mr. McCartney to make the check

11  payable to this firm.  Can you explain that disconnect?

12         A.    No, I can't explain that, because to me, it is

13  payable to me, care of Berlon & Timmel.  I don't -- to me,

14  there really wasn't a disconnect.  That was just my

15  understanding, based on her conversation.

16         Q.    Look at the letter dated July 15th, 1998, same

17  language is used in this letter, isn't it, Miss Lentz?

18         A.    Yes.

19         Q.    And you signed this letter, didn't you?

20         A.    Yes, I did.

21         Q.    Did you read it before you signed it?

22         A.    I don't know.  I'm assuming I did.  But by that

23  time, the mechanism or the procedure that we had operated

24  under was already in effect, and it worked, and I didn't

222

1        Q.      Have you ever seen this document before?

2        A.      Yeah.  I have.

3        Q.      When?

4        A.      Well, it appears -- yeah, I've seen it before,

5   in the course of this litigation, and when I was going

6   through the Luce file, after I was -- after I talked to Al

7   Matheny.  I'm sure I did see it, because all the letters

8   were in the files.  This -- I don't know -- because the

9   admonishment that Berlon & Timmel is an unincorporated

10  association is not down there, either, so I don't know if

11  it's just on plain paper, or if this is another part of a

12  letter, I don't know.

13       Q.      Now, you're instructing counsel to make checks

14  payable to Mary E. Lentz.  When did you change the practice

15  from making it Mary Lentz, care of Berlon & Timmel, to just

16  plain old Mary Lentz?

17       A.      I didn't make that change.

18       Q.      When did the change occur?

19       A.      I don't know that -- it depended on -- I mean,

20  I've looked at that and that didn't -- whether it was made

21  to Mary E. Lentz, care of Berlon & Timmel, or Mary E. Lentz,

22  it didn't change how I used the funds or deposited -- not

23  deposited, cashed the checks.  I think that was a clerical

24  error.  I didn't catch it, but it had nothing to do with how

223

1    I used the copy money.

2        Q.    The question, Miss Lentz, was when that change

3    occurred?

4        A.    I don't know that it was a change, so I can't

5    answer that.

6        Q.    Well, however you choose to characterize it, do

7    you know when people on your behalf ceased asking for checks

8    to be made care of Berlon & Timmel or -- yes, and simply to

9    Mary Lentz?

10       A.    No.

11       Q.    And you're now characterizing it as a clerical

12   error?

13       A.    Yeah.  Well, it didn't change what I did with

14   the copy money.

15       Q.    Were you aware that was happening?

16       A.    I can't say I was aware at the time, no.

17       Q.    Now, you were aware, weren't you, when you

18   received the checks that were made payable to simply Mary

19   Lentz and not representing Berlon & Timmel in any way?

20       A.    Well, sure.  But when I signed -- when I cashed

21   those checks, I signed it Mary E. Lentz.  That's how I

22   signed them, and that's how my bank cashed them, so it

23   didn't make any difference to me, because Berlon & Timmel,

24   there was no account at any bank for Berlon & Timmel.  So it

**TO THE REPORTER:** I have read the entire transcript of my deposition taken on the _30_ day of _September_, 20_02_, or the same has been read to me. I request that the following changes be entered upon the record for the reasons indicated. I have signed my name to the signature page and authorize you to attach the following changes to the original transcript:

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 1 | | Caption incorrect |
| | | US District Ct Southern District |
| | | of Ohio - Western Division |
| | | Case No: 01-CV-599 |
| | | |
| 16 | 9 | Brower not Brauer |
| 18 | 6 | Brower not Brauer |
| 28 | 3 | May of 1996 - not January of 1995 |
| 35 | 3 | Charlena, not Sharlena |
| 37 | 7 | Krebs |
| 52 | 10 | Brower |
| 54 | 3 | Currin not Kern |
| 61 | 22 | Currin |
| 64 | 15 | work not bill 70 hours a week |
| 67 | 2 | Zee, medical |
| 69 | 4 | Yes - for expenses reimbursed to me for mileage |
| 69 | 11 | Smith case not Freeze counsel |
| 70 | 23 | McNair not McHenry |
| 71 | 12 | Silberbusch |
| 71 | 14 | Silberbusch |
| 73 | 3 | Currin not Kern |
| 73 | 16 | No - only CIC wasn't my client - |

_it was my employer_

_Oct 28, 02_
**Date**

**(Signature of Deponent)**

TO THE REPORTER: I have read the entire transcript of my deposition taken on the _30_ day of _Sept_____ , 20_03_ or the same has been read to me. I request that the following changes be entered upon the record for the reasons indicated. I have signed my name to the signature page and authorize you to attach the following changes to the original transcript:

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 81 | 23 | Hileman not Heilman |
| 82 | 12 | Hileman |
| 85 | 7 | Currin |
| 85 | 16 | Brower |
| 85 | 20 | Brower |
| 86 | 15 | Brower |
| 87 | 16 | Dyno not Dino |
| 88 | 10 | Timine not Teminal |
| 90 | 18 | Currin |
| 91 | 20 | October not April |
| 92 | 20 | Currin |
| 93 | 1 | Currin |
| 93 | 6 | Currin |
| 103 | 21 | Corrigan ; Criswald |
| 103 | 23 | Criswald |
| 104 | 1 | Criswald |
| 109 | 8 | Ballato |
| 109 | 9 | Ballato |
| 113 | 7 | Silberbusch |
| 114 | 9 | Charlena |
| 114 | 19 | Charlena |
| 115 | 10 | Charlena |
| 115 | 21 | Charlena |

_Oct 28, 2003_
**Date**

_[signature]_
**(Signature of Deponent)**

**TO THE REPORTER:** I have read the entire transcript of my deposition taken on the 30 day of September , 20 02 , or the same has been read to me. I request that the following changes be entered upon the record for the reasons indicated. I have signed my name to the signature page and authorize you to attach the following changes to the original transcript:

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 115 | 24 | Brower |
| 116 | 7 | Brower |
| 116 | 11 | Charlena |
| 117 | 4 | Brower |
| 119 | 19 | Cumin |
| 120 | 7 | Silberbusch |
| 121 | 13 | Silberbusch |
| 129 | 17 | Brower |
| 132 | 9 | that they were glad |
| 142 | 24 | Brower |
| 142 | 21 | and Brian (not Dave) |
| 143 | 1 | Paula (not Julia) |
| 143 | 17 | Brower |
| 144 | 3 | Cumin |
| 145 | 1 | Cumin |

Oct. 28, 2002

**Date**

**(Signature of Deponent)**

TO THE REPORTER:  I have read the entire transcript of my
deposition taken on the _30_ day of _September_ , 20_02_ or
the same has been read to me.  I request that the following
changes be entered upon the record for the reasons indicated.  I
have signed my name to the signature page and authorize you to
attach the following changes to the original transcript:

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 148 | 3 | Separate? ( I didnt say that |
| 153 | 4 | and statements he may have ~~speculat~~ word - maybe |
|  |  | made to outside people |
| 162 | 16 | Subenbach |
| 164 | 13 | OCRC (not ORRC) |
| 183 | 2 | Reichers |
| 183 | 3 | Reschers |
| 183 | 21 | Reichers |
|  | 20 | Reichers |
| 184 | 9 | Pontzer |
|  | 12 | Reichers |
| 185 | 10 | Reichers |
| 186 | 5 | Reichers |
|  | 13 | Reichers |
| 188 | 3 | Brower |
|  | 15 | Brower |
| 193 | 8 | Ballato |
| 194 | 10 | Ballato |
|  | 13 | Ballato |
|  | 16 | Ballato |
| 195 | 16 | Ballato |
| 196 | 9 | Ballato |
|  | 10 | Ballato |

_10/28/08_
**Date**

_(Signature of Deponent)_

TO THE REPORTER:  I have read the entire transcript of my
deposition taken on the __30__ day of __September__, 20__05__, or
the same has been read to me.  I request that the following
changes be entered upon the record for the reasons indicated.  I
have signed my name to the signature page and authorize you to
attach the following changes to the original transcript:

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 197 | 6 | Ballato |
|  | 10 | Ballato |
|  | 22 | Ballato |
| 198 | 6 | Ballato |
| 199 | 11 | Reichers |
|  | 13 | Reichers |
| 200 | 2 | Ballato |
|  | 4 | Ballato |
|  | 12 | Paula |
| 201 | 13 | copy (not coffee) |
| 204 | 21 | Brower |
| 206 | 2 | ACCO |
| 207 | 6 | Cherletta |
| 209 | 8 | El'Gertha |
| 219 | 4 | brought the money back in |
| 229 | 15 | Reichers |
|  | 21 | Reichers |
| 241 | 1 | Julia |
| 241 | 17 | Julia |
| 242 | 1 | Brower |
| 248 | 3 | Cumin |
| 249 | 6 | Currin |
| 262 | 3 | Epilepsy (not Western) Association |

__10/18/0__
__Date__

(Signature of Deponent)

TO THE REPORTER:  I have read the entire transcript of my deposition taken on the _30_ day of _Sept_ , 20_02_, or the same has been read to me.  I request that the following changes be entered upon the record for the reasons indicated.  I have signed my name to the signature page and authorize you to attach the following changes to the original transcript:

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 266 | 11 | Brower |
| 271 | 22 | Chuparkoff |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

10/28/02
Date

(Signature of Deponent)