UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **MARY E. LENTZ,** | : | Case No.: 01-CV-599 |
| | : | |
| Plaintiff, | : | (Judge Watson) |
| | : | |
| v. | : | **DEFENDANTS' MOTION *IN LIMINE* TO BAR** |
| | : | **ANY EVIDENCE OR REFERENCES** |
| | : | **RELATED TO THE NET WORTH OF** |
| | : | **DEFENDANTS AND/OR REGARDING** |
| | : | **CONDUCT THAT HAS NO NEXUS TO THE** |
| | : | **HARM ALLEGED BY PLAINTIFF** |
| **CINCINNATI INSURANCE** | : | |
| **COMPANY, et al.** | : | |
| | : | |
| Defendants. | : | |

Defendants Cincinnati Insurance Company ("CIC") and David Balzano ("Balzano") (collectively "Defendants") move this Court, pursuant to Federal Rules of Evidence ("FRE") 401, 402, and 403, for orders barring Plaintiff from presenting to the jury (1) evidence and argument regarding the net worth or financial status of Defendant CIC or the compensation of any of their executives and officers, (2) evidence and argument that seeks to punish Defendants for conduct that has no nexus to the specific harm alleged by Plaintiff, including evidence or argument that seeks to punish Defendants for alleged discrimination occurring outside of Ohio. Such evidence and argument concerning punitive damages is barred by the Supreme Court's decision in *State Farm Mutual Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) and other authorities.

        Respectfully submitted,

        *s/ Deborah S. Adams*
        Deborah S. Adams (0005607)
        Jack B. Harrison (0061993)
        Frost Brown Todd LLC
        2200 PNC Center
        201 East Fifth Street
        Cincinnati, OH 45202-4182
        (513) 651-6800 (telephone)
        dadams@fbtlaw.com
        jharrison@fbtlaw.com
        Trial Attorneys for Defendants

**MEMORANDUM IN SUPPORT**

I.     **INTRODUCTION AND FACTUAL BACKGROUND**

In this case, Plaintiff Mary Lentz ("Lentz"), an attorney formerly employed in the Dayton law office of the Cincinnati Insurance Company ("CIC"), alleges that CIC discriminated against her on the basis of her gender when it terminated her upon learning that she had taken funds belonging to CIC and placed them in her personal bank account, using them for her personal expenses. She also alleges that David Balzano ("Balzano"), the managing attorney of the Dayton law office and her immediate supervisor, tortiously interfered with her employment relationship with CIC and intentionally caused her extreme emotional distress by passing on to his supervisor, Mark Huller, a secretary's notice to him that Lentz was seeking direct reimbursement to her personally of CIC funds spent on copies.

The relevant facts are undisputed as a matter of record:

- Mark Huller ("Huller"), Manager of the Trial Division of CIC's Legal Department, hired Mary Lentz to work as an attorney in CIC's Dayton law office in April 1997. (Lentz dep. at 72; Complaint at 11, 18.) Lentz represented not only CIC's insureds in litigation, but also CIC itself on subrogation matters in some cases. (Lentz at 72-73.) In those cases in which CIC was Lentz's client, her ethical obligations were exactly the same as her ethical obligations to any other client. (Lentz at 73.)

- Beginning in March 1998, Lentz began charging non-CIC attorneys involved in her cases for copies of documents she provided in discovery. (Complaint at 33, 34; Lentz at 33.) Lentz requested that non-CIC counsel reimburse her for such copies with checks made payable not to CIC, but to Mary Lentz c/o Berlon and Timmel[1] and then simply to Mary Lentz. (Lentz at 215-216, 222-223.) Lentz alleges that she cashed the checks, kept the cash in the office and used the cash for office purposes such as group lunches.

- In September 1999, Lentz, pursuant to her practice, received a reimbursement check from other counsel for copies paid for by CIC. The check was for $496.00. Lentz admits that the funds belonged to CIC (Lentz at 151, 209.) and that she deposited $346.00 from that check in her own personal bank account. (Lentz at 21-22.) In October 1999, there was a second reimbursement check for copies

---

[1] At that time, attorneys employed by CIC's Dayton office practiced under the name Berlon & Timmel.

- paid for by CIC. Of that, she deposited $488.00 in her own personal bank account. (Lentz at 23.)

- Lentz deposited these funds in her personal bank account in September and October without any notice to or permission from CIC. (Lentz at 141-142.)

- Lentz commingled or "housed" those CIC monies with her personal funds and took no steps to separate CIC monies from her own. (Lentz at 24.)

- As of September 30, 1999, after the first deposit of $346.00 of CIC money into Lentz's personal bank account, her balance was only $382.32. During September and October 1999, she made withdrawals from her personal account for personal expenses. (Lentz at 24-25.) She faced childcare expenses of $200 – $250 per week. (Lentz at 27; bank statement attached as Ex. 1 to Motion for Summary Judgment.)

- In December 1999, Sandy Brower, secretary to Balzano, informed Balzano that Lentz's correspondence revealed that Lentz asked that copy reimbursement checks be made payable to Lentz personally. (Balzano at 119-120.)

- Balzano passed on Brower's concern to his supervisor, Mark Huller. (Balzano at 121.)

- Huller requested an investigation, which was done by CIC's internal investigation unit. (Matheny 61-64; Huller 267.)

- In December 1999, Lentz admitted to the CIC investigator and to Huller that she had placed CIC money in her own bank account. (Lentz at 8-9, 17-19.)

- Lentz told the investigator that she knew what she had done was wrong and asked whether she would be "fired, disbarred or arrested." (Matheny at 103-104.)

- Because Lentz placed CIC money in her bank account, Huller placed Lentz on inactive status in January 2000 and terminated her in March 2000. (Huller at 177-179; 182; 189; 192; 210-213; 261.)

- Although Lentz admits that the money belongs to CIC, it remains even today in her possession. (Lentz at 10.)

- Other than Lentz, no other CIC attorney took CIC money, commingled it with his/her own money, and used the money as though it were his/her own. (Lentz at 14.)

**II.    ARGUMENT**

Defendants seek to exclude the following categories of inadmissible and prejudicial argument and evidence:

(1)   evidence and argument regarding the net worth or financial status of Defendants or the compensation of any of CIC's executives and officers; and

(2)   evidence or argument that seeks to punish Defendants for conduct that has no nexus to the specific harm alleged by plaintiff, including evidence or argument that seeks to punish Defendants for alleged discrimination occurring outside of Ohio.

As the U.S. Supreme Court has repeatedly held, the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution imposes substantive limits on punitive damages and on the related evidence that may be admitted at trial. *State Farm Mutual Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003). To pass constitutional muster, a punitive damages determination must be based on three criteria: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damage award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm*, 538 U.S. at 418 (*citing BMW of North America v. Gore*, 517 U.S. 559, 575 (1996)); *accord, Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 121 S. Ct. 1678, 1684-85 (2001).

In *State Farm*, the Supreme Court restated that "the most important" of these factors "is the degree of reprehensibility of the defendant's conduct." "[P]unitive damages should only be

awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *State Farm*, 538 U.S. at 419 (*citing BMW*, 517 U.S. at 575); *accord, Cooper*, 121 S. Ct. at 1684 (application of these factors assures that the punitive damages award will not be "grossly disproportional to the gravity of . . . defendant['s] offenses").

    **A.**    **Plaintiff's evidence and argument regarding the net worth or financial status of defendants or the compensation of any of CIC executives and officers is not admissible.**

This Court should exclude from the entire trial any evidence or argument regarding Defendant CIC's net worth, capitalization, profits, wealth or financial condition, as well as the compensation of any of its executives and officers, and should instruct the jury not to consider such factors. Under the United States Constitution, such factors may not be employed to increase any punitive damages that would otherwise be awarded.

The United States Supreme Court in *State Farm* squarely held that "[t]he wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award." *Id.* at 427-28. Further, the Supreme Court held that the court's reliance on "State Farm's enormous wealth" bore "no relation to the award's reasonableness or proportionality to the harm" because the defendant's "assets . . . had little to do with the actual harm suffered by the [plaintiffs]," and that this reliance was nothing more than an improper attempt "to defend a departure from well-established constraints on punitive damages." *Id.*

Even based on Supreme Court authority prior to *State Farm*, evidence or arguments of a defendant's wealth is inadmissible. In interpreting prior authority, Seventh Circuit Judge Frank Easterbrook (sitting as a district court judge) granted a motion in limine to exclude evidence of the defendants' wealth, noting that "the Supreme Court did not treat the defendant's wealth as

relevant." *Pivot Point Intl'l v. Charlene Products, Inc.*, 932 F. Supp. 220, 223 (N.D. Ill. 1996). In fact, Judge Easterbrook stated that basing punitive damages on the defendants' wealth would call into question "the courts' commitment to do equal justice to the rich and the poor." *Id.*

In making business decisions, corporate entities, through their executives and officers, balance expected benefits of particular conduct against the risks of that conduct. That calculus is the same regardless of whether the corporation is large or small, and irrespective of the compensation given to the executive or officer. Thus, the deterrence rationale does not support treating large and small corporations or well-compensated executives and officers differently. Kenneth Abraham & John C. Jeffries, *Punitive Damages and the Rule of Law: The Role of the Defendants' Wealth*, 18 J. Legal Stud. 415, 418 (1989).

In addition, the U.S. Supreme Court has pointed out that reliance upon a corporate defendant's financial condition may result in excessive punishment by appealing to the jury's bias against corporations. *State Farm*, 538 U.S. at 427-28 ("'[Wealth] provides an open-ended basis for inflating awards when the defendant is wealthy'") (citation omitted); *Honda Motor Co. v. Oberg*, 512 U.S. 415, 432 (1994) (The presentation of evidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big business); *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 464 (1993) (plurality opinion) (emphasis on wealth of wrongdoer increased the risk that the award may have been influenced by prejudice against large corporations). As Justice O'Connor aptly remarked, "[c]orporations are . . . unlikely to be viewed with much sympathy . . . jurors naturally think little of taking a large sum of money out of what appears to be an enormously larger pool of wealth." *TXO*, 509 U.S. at 491 (O'Connor, J., dissenting). To discuss the income or net worth of a large corporation -- which may be hundreds of millions or billions of dollars -- creates a distorted frame of reference

for the jury that is likely to unfairly prejudice its judgment about the appropriate size of the punitive award.

In short, the governing constitutional principle for assessing punitive damages is whether the punishment fits the wrong. Under controlling Supreme Court authority, that principle applies alike to rich and poor, large and small. It would violate fundamental constitutional principles to permit a jury to punish a defendant not for its actual wrongful conduct, but for being a large and successful company. As the Alabama Supreme Court stated in *BMW of North America, Inc. v. Gore*, 701 So.2d 507, 514 (Ala. 1997), on remand from the U.S. Supreme Court, "where a defendant has not committed an act that would warrant a large punitive damages award, such an award should not be upheld . . . merely because the defendant has the ability to pay it."

  **B.**  **Plaintiff's evidence and argument that seeks to punish Defendants for conduct that has no nexus to the specific harm alleged by Plaintiff is not admissible**

Constitutional law prohibits Plaintiff from offering evidence or arguments to the jury that the Defendants should be punished for conduct that has no nexus to the specific harm alleged by plaintiff – her termination after CIC discovered that she had been taking CIC's money and placing it with her personal funds in her personal bank account. In any determination of punitive damages, the jury should be allowed to consider only the conduct affecting Plaintiff Lentz's termination in the event Lentz is awarded compensatory damages. *State Farm*, 538 U.S. at 420-23.

In *State Farm*, the Supreme Court laid down the relevant standard: to be probative on the issue of punitive damages, the defendant's conduct "must have a nexus to the specific harm suffered by the plaintiff." *Id*. at 422. It is improper, the Court held, to assess punitive damages "to punish and deter conduct that bore no relation to the [plaintiffs'] harm . . . A defendant should

be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business. Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis . . . ." *Id*. at 423. Accordingly, the Supreme Court held, it was improper for the state court to base a punitive award on the aggregate harm to non-parties rather than the specific harm to the plaintiff. *Id*. Likewise, it was improper for the state court to consider State Farm's "nationwide policies rather than . . . the conduct direct[ed] toward the [plaintiff]." *Id*. at 420. *See also MIC Life Ins. Co. v. Hicks*, 825 So. 2d 616, 623 (Miss. 2002) (emphasizing that punitive damages must bear a reasonable relationship to "the harm to the victim," and refusing to consider the "hypothetical aggregate of harm to persons not before this Court.").

      As the U.S. Supreme Court explained in *State Farm*, if a jury were permitted to render an award designed to punish the defendant for its conduct without a nexus to the specific harm alleged by plaintiff, then others could also recover punitive damages for those same activities — "creat[ing] the possibility of multiple punitive damages awards for the same conduct." 538 U.S. at 423; s*ee also Racich v. Celotex Corp.*, 887 F.2d 393, 398 (2d Cir. 1989) ("the multiple imposition of punitive damages for the same course of conduct may raise serious constitutional concerns, in the absence of any limiting principle"); *Juzwin v. Amtorg Trading Corp.*, 718 F. Supp. 1233, 1235-36 (D.N.J. 1989) (observing that multiple awards of punitive damages violate the defendant's due process rights).

      Here, Plaintiff will likely seek to introduce evidence or make reference to alleged conduct without any nexus to the specific harm alleged. For example, Plaintiff will likely seek to discuss misleading and false statistics regarding the number of female members of the Board

of Directors and officers at CIC, other allegations of individual or companywide discrimination or other wrongdoing, including, but not limited to other litigation involving CIC in which plaintiff's counsel has appeared, alleged conduct and statements of Balzano that have no relation to Plaintiff, and companywide wealth, net worth or profits. *E.g.*, see Complaint at ¶¶10, 15, 29, 30, 31, 32. Such evidence is designed only to inflame the jury in an effort to unjustifiably increase the amount of any punitive damages awarded. Such evidence would also serve to mislead and confuse the jury as to the issues before it. Because such evidence has no nexus to Plaintiff's claimed injury in this case, it cannot be offered or considered by the jury in connection with punitive damages.

      **C.     Plaintiff's evidence and argument that seeks to punish Defendants for alleged discrimination occurring outside of Ohio is not admissible.**

Supreme Court precedent mandates the exclusion, at all stages of the trial, of evidence or reference to defendants' wealth, including net worth, and the compensation of its officers and executives, for yet another reason. Defendant CIC's wealth and the compensation of its officers and executives is the product of its business as a whole, overwhelmingly consisting of conduct that is not challenged as wrongful. As the Supreme Court ruled in *State Farm*, *BMW* and *Cooper*, it is improper for a jury to consider a defendant's lawful conduct in its consideration of punitive damages.

In *State Farm*, the Court held that it was improper for the lower court to consider the defendant's lawful out-of-state conduct in assessing punitive damages. 538 U.S. at 420-23. Similarly, in *BMW*, the Supreme Court held that it was unconstitutional for a state's jury to base a punitive damage award on the defendant's nationwide conduct, particularly in light of the fact that much of the conduct outside of the state was lawful where it occurred. The Court held that Alabama could not "punish BMW for conduct that was lawful where it occurred and that had no

impact on Alabama or its residents," nor could it "impose sanctions on BMW in order to deter conduct that is lawful in other jurisdictions." *BMW*, 517 U.S. 559, 573 (1996). And in *Cooper*, the Supreme Court stated that the punitive damages determination could not be sustained if it was based in part on the defendant's lawful copying of an unpatented product. *Cooper*, 121 S.Ct. 1678, 1688 (2001).

Based upon these principles, the court in *Ace v. Aetna Life Insurance Co.*, 40 F. Supp. 2d 1125, 1133 (D. Alaska 1999), held that it is improper for a state court to consider the wealth of the defendant generated from operations outside the forum. Citing the Supreme Court's decision in *BMW*, the Court explained:

> If it is assumed that [defendant's] behavior in other jurisdictions warrants punishment, . . . then it is the other jurisdictions whose citizens have been injured which have an interest in imposing punishment commensurate with the activities inside their borders. On the other hand, if it is assumed that [defendant] has not engaged in similarly blameworthy activity in other jurisdictions, there is even less justification for imposing a penalty whose size is established on the basis of wealth created from activities outside Alaska, for they were not culpable.

*Id.*

### III.     CONCLUSION

For the reasons set forth above, the Court should grant Defendants' motion to exclude from trial in this action, evidence and argument: (1) regarding the net worth or financial status of Defendants or the compensation of any of CIC's executives and officers and (2) that seeks to punish Defendants for conduct that has no nexus to the specific harm alleged by Plaintiff.

                Respectfully submitted,

                *s/ Deborah S. Adams*
                Deborah S. Adams (0005607)
                Jack B. Harrison (0061993)
                Frost Brown Todd LLC
                2200 PNC Center
                201 East Fifth Street
                Cincinnati, OH 45202-4182
                (513) 651-6800 (telephone)
                dadams@fbtlaw.com
                jharrison@fbtlaw.com
                Trial Attorneys for Defendants

**CERTIFICATE OF SERVICE**

      I hereby certify that on April 22, 2005, a copy of the foregoing, Defendant CIC's Motion *in Limine* to Bar Any Evidence or References Related to the Net Worth of Defendants and/or Regarding Conduct That Has No Nexus to the Harm Alleged by Plaintiff, was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system and copies will be mailed via U.S. Mail to those parties who are not served via the Court's electronic filing system, if any. Parties may access this filing through the Court's system.

                                                s/ *Deborah S. Adams*
                                                Deborah S. Adams (0005607)
                                                Jack B. Harrison (0061993)
                                                Frost Brown Todd LLC
                                                2200 PNC Center
                                                201 East Fifth Street
                                                Cincinnati, OH 45202-4182
                                                (513) 651-6800 (telephone)
                                                dadams@fbtlaw.com
                                                jharrison@fbtlaw.com
                                                Trial Attorneys for Defendants

CinLibrary 0011523.0480059 1481082v.1