## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| MARY E. LENTZ, | ) | Cause No. 1:01-cv-599-MHW |
| | ) | |
| Plaintiff, | ) | (Judge Watson) |
| | ) | |
| v. | ) | |
| | ) | |
| CINCINNATI INSURANCE | ) | |
| COMPANY, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSE AND OBJECTIONS TO DEFENDANTS' MOTIONS *IN LIMINE*

Plaintiff Mary Lentz, by counsel, makes one Response to Defendants' several Motions *In Limine* which have been submitted via this Court's CM/ECF system and which are thereby numbered on the electronic docket as documents 97-103 and 105-106.  Plaintiff addresses each motion or issue separately in her attached Memorandum In Support, which is attached to this Response.[1]

The Defendants have chosen to include one boilerplate factual summary of the case which is repeated identically in the memoranda for each Motion in Limine.  Overall, Plaintiff notes that many of the alleged "facts undisputed as a matter of record" were apparently not important enough for the Defendants to previously raise in the submitted Findings of Fact and Conclusions of Law (filed on March 6, 2003).  Furthermore, several of the most salient listed

---

[1] Defendants have submitted nine (9) separate Motions in Limine.  Even omitting eight of the nine identical case introduction/summaries, Defendants have now submitted fifty-six (56) pages of supporting argument on these Motions alone.  Plaintiff objects to this tactic as over-burdensome for both the parties and for this Court.

1

facts are actually very much in dispute, or have been vigorously distorted by counsel's choice of presentation.

As for the pending Motions In Limine, Plaintiff objects to Defendants' reliance on facts that were not previously set forth in the Findings of Fact and Conclusions of Law.   Plaintiff further objects to the last minute submission of the Affidavit of Mark Huller, which is attached to CM/ECF document 105.  The subject matter of that affidavit – ending in the termination of a similarly-situated male in February of 2002 – had concluded long before Defendant's Motion for Summary Judgment (filed on Nov. 4, 2002) or later Reply brief (filed on Feb. 18, 2003).  Submission of the affidavit at this point is inappropriate.

Responses and objections to Defendants' Motions In Limine are set forth in the attached Memorandum in Support.

Respectfully Submitted,

s/[Michael K. Sutherlin]
Michael K. Sutherlin
Nicholas D. Conway
Attorneys for Plaintiff
Michael K. Sutherlin & Associates, P.C.
P.O. Box 441095
Indianapolis, IN  46244-1095
(317) 634-6313
FAX (317) 631-8818

s/[Lynn D. Pundzak]
Lynn D. Pundzak
Attorney for Plaintiff

## <u>TABLE OF CONTENTS</u>

I. INTRODUCTION AND FACTUAL BACKGROUND................................................. 5

II. DEFENDANTS' LISTED "FACTS" WHICH ARE ERRONEOUSLY LABELED AS "UNDISPUTED"................................................................................................ 9

III. PLAINTIFF'S SPECIFIC RESPONSES AND OBJECTIONS TO DEFENDANTS' MOTIONS IN LIMINE ....................................................................................... 11

**1. Response to Document 97:  Motion in Limine to Bar Witnesses from Offering Evidence contrary to the Evidence they Provided to CIC at the Time of the Termination Decision** ....................................................................... 11

**2. Response to Document 98: Motion in Limine to Bar Irrelevant and Misleading Statistical Evidence or References** ................................................. 12

**3. Response to Document 99: Motion in Limine to Bar Any Evidence and/or References Related to Punitive Damages** ....................................... 14

**4. Response to Document 100:  Motion in Limine to Bar any Evidence or References Related to the Net Worth of Defendants and/or Regarding Conduct that has no Nexus to the Harm Alleged by Plaintiff** ....................................................... 15

A. <u>Statistics regarding the number of female members of the Board of Directors and Officers at CIC.</u> ............................................................. 16

B. <u>Other allegations of companywide discrimination and wrongdoing including but not limited to [the Rochlin litigation].</u> ........................................... 16

C. <u>Alleged conduct and statements of Balzano.</u> .................................... 17

D. <u>Companywide wealth, net worth, or profits.</u> ..................................... 18

**5. Response to Document 101:  Motion in Limine to Bar References to the Rochlin Litigation** ..................................................................................... 18

**6. Response to Document 102:  Motion in Limine to Bar References to the Equal Pay Act or any claims Related to Salary and/or Promotion** ............................... 20

**7. Response to Document 103:  Motion in Limine to Bar Any Evidence or Reference to Alleged Conduct of David Balzano Unrelated in Time or Subject to the Claims Made by Plaintiff** .......................................................................... 20

A. <u>Balzano's Discriminatory Acts and Remarks are Admissible Under FRE 404(b), 401, 402, and 403</u> ................................................................. 21

B. The Evidence Characterized by Defendant as "Plaintiff's Lay Opinion" Is Admissible Under FRE 701(b). ........................................................... 22

**8. Response to Document 105:  Motion in Limine to Bar Improper "Similarly Situated" and Related Evidence AND Affidavit of Mark Huller** ................. 23

**9. Response to Document 106:  Motion in Limine to Bar Evidence of Mark Huller's Contacts with the Dayton Bar Association and the Montgomery County Prosecutor's Office** ....................................................................................... 26

IV. CONCLUSION .................................................................................................. 28

<u>**MEMORANDUM IN SUPPORT**</u>

**I.    INTRODUCTION AND FACTUAL BACKGROUND**

Plaintiff Mary Lentz filed a Complaint on May 10, 2001 against her previous employer Cincinnati Insurance Company ("CIC"), and against various management personnel of CIC.   A motion for summary judgment was filed by Defendants,  Ms. Lentz made her reply, and this Court made its ruling on the motion on Sept. 21, 2004.  The following claims are now set for trial: (1) that CIC discriminated against Ms. Lentz in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) et. seq. by  failing to promote her when she was as qualified or more qualified than her male counter parts who were promoted; (2) that CIC terminated her based on knowingly false allegations and not taking any other disciplinary action against her male coworkers for participating in the same or similar alleged conduct; and (3) that Defendant David Balzano violated the Ohio common laws of intentional interference with a business relationship and intentional infliction of emotional distress by making false allegations about Lentz which was a direct cause of her termination from CIC.

While there are many undisputed facts, the Plaintiff retains the right to present those facts to the jury in order to provide context and background for the jury to understand the circumstances of the pretextual termination.  Hence, following is a statement of the facts and issues of fact and law which the Plaintiff intends to present:

- Plaintiff Mary Lentz was hired by Cincinnati Insurance Company (CIC) as in-house counsel in its Dayton office in 1997. (Lentz Dep. at 71-72)  She was hired by Mark Huller, Manager of the Trial Division of CIC's legal department. (Lentz at 72) Defendant Dave Balzano, CIC's managing attorney for the Dayton office, was her immediate superior.  (Lentz at 72)

- Lentz occasionally received checks from opposing counsel or co-counsel to reimburse the Dayton office for copying costs.  (Lentz at 21)  CIC had no written policy stating what an attorney should do with these checks or upon collecting any copy money.  (Balzano at 76;

Huller at 93)  Nevertheless, Balzano told CIC attorneys that such checks were to be cashed and used for office functions. (Desseyn at 53-54; Lentz at 32-33)  Balzano himself paid for at least one office lunch with such money and participated in several others. (Lentz at 37 and 51; Desseyn at 48; Ruppert Aff. ¶ 6; Bascom at 30, 33, and 36)

- The parties are in dispute over whether the copy money checks were to be made out to CIC or to the individual attorney; the parties are further in dispute as to whether CIC even viewed the money as its property or simply abandoned it to the discretion of the individual attorney.

- It is undisputed that Lentz deposited two copy money checks totaling $1034 into her checking account in Sept.-Oct. 1999 (Lentz at 21-23).  Lentz took out $200 of that money for office functions immediately (Lentz at 138, 151).  Lentz testifies that she intended all of the money was to be used for office functions but that she and her secretary were afraid to leave such a large amount of cash in her secretary's drawer at the office, where such cash had been kept up to that time. (Ruppert Aff. ¶ 11, Lentz at 55, 151, 138, 237-238)  The Defendants dispute the testimony of Lentz's intentions.

- Defendant CIC characterizes Lentz's actions as "commingling" funds.  Plaintiff Lentz contends that there was no policy on copy reimbursement money and that CIC further allowed "commingling" of funds in other areas; for instance, it is undisputed that CIC gave staff attorneys $600 at the start of their employment for expenses, to be returned at the end of employment, and attorneys kept the expense advance in their own account, not in a company account and to be used as the individual attorney saw fit.  (Lentz at 136; Huller at 189-191)

- Lentz was put on inactive status in January 2000 and was terminated in March 2000. (Huller at 177-170, 182, 189, 192, 210-213, 261)  Defendants allege that this was due to the alleged "commingling." (*Id.*)  Plaintiff Lentz's assertion that her termination was instead actually a result of gender discrimination forms one of the bases of this lawsuit.

- Prior to her termination, Lentz believed that Balzano refused to give her adequate support on complex cases, although Balzano requested and received such support for his own complex cases. (Lentz at 85-88, 40, and 143)  Balzano indicated that he was unhappy as Office Manager of the Dayton office and that he wanted to work at CIC headquarters in Cincinnati. (Lentz at 76-77; Bascom at 41)  Lentz therefore sought the position of office manager.  (Lentz at 77)

- Lentz learned that CIC was already talking to CIC attorney Steven Fogle about taking over as office manager in Dayton.  Lentz scheduled a phone appointment with Huller to discuss the matter.  (Lentz at 77)  Lentz complained to Huller about Balzano's lack of cooperation.  (Huller at 113)

- At the end of a heated discussion with Balzano in early November, 1999, Lentz said that she would call CIC's home office and would "let them know what goes on in this office." (Lentz at 140)  Balzano brought the copy money issue to Huller's attention within one

month after the November discussion. (Lentz at 143) In this report to Huller, Balzano omitted the fact that he knew the origins and uses of the copy money and that he participated in lunches purchased with the money. (Lentz at 136, 139; Ruppert Aff. ¶ 13) Despite it being his practice to take notes during all telephone conferences and meetings, Huller could not recall whether he had ever taken notes in conversations with Balzano over the course of two years. He produced no notes. (Huller at 29 and 328)

- Allen Matheny of CIC's Special Investigations Unit met with Mark Huller for ten minutes to learn about the allegations against Lentz. (Matheny at 54, 61, 64) Huller gave Matheny some of Lentz's letters; Matheny took no notes nor taped the conversation, contrary to his usual practice. (Matheny at 54, 61, 64)

- Matheny and Balzano interviewed Lentz on December 28, 1999. It was agreed that Matheny would conduct the interview while Balzano took notes. (Matheny at 82, 86) He did not tape the conversation. Matheny did not attempt to determine what happened to all the checks. (Matheny at 105) Matheny did not find it significant that Paula Ruppert, Lentz's secretary, corroborated that the copy money was used for pizza and other office activities. (Matheny at 108-109) Lentz may have explained to Matheny why she had the check made payable to her (due to her bank's request), but Matheny did not think that was "salient." (Matheny at 131) At the time of Lentz's investigation, all members of the Special Investigations Unit were men, and to this day its twenty-two members are all men. (Matheny Dep., p. 38)

- Matheny and Greg Lewis talked with several of Lentz's coworkers and confirmed that everyone knew about the copy money and that one such copy money case involved Fred Young as counsel, and the cover letter with a copy money check was also addressed to him. (Ex. 6 in Plaintiff's Memo Contra Defendant's Summary Judgment Motion) Matheny never determined whether there was a written CIC procedure on what to do with copy money. (Matheny at 132) Matheny stated that it was not his function to determine if Lentz was attempting to be surreptitious in her cashing of checks. (Matheny at 145) Matheny professed ignorance of what CIC's legal department did and of the $600 CIC gave staff attorneys for expenses or how it was accounted; also Matheny was unfamiliar with the accounts the Dayton office used for operational purposes. (Matheny at 73, 85; Huller at 85) Shortly after his interview with Lentz, Matheny discussed the interview with Huller, but had not yet prepared a written report. Matheny also discussed the interview with Benoski. (Matheny at 119 and 117)

- Huller told Lentz that her employment had to end during a meeting on Dec. 29, 1999. Huller told Lentz this despite not having a written report from Matheny. Lentz reiterated that Balzano initially told her how to use the copy money and that he, and the entire office, about the copy money and participated in the lunches. (Lentz at 14-19, 134-135, and 139) Huller told Lentz that she could either resign or be terminated. Although Lentz was told that her employment with CIC had to end on December 29, 1999, she was not officially terminated until March 10, 2000. (Lentz at 135, 18)

- Huller refused to investigate Balzano's involvement any further despite knowing that several people in the Dayton office, other than Lentz and Balzano, knew about the copy money. (Lentz dep., p. 139 and p. 140; Huller dep. pp. 243-247, 274) Huller knew that several people in the Dayton office, other than Lentz and Balzano, knew about the copy money. (Huller dep., p. 274) Huller did not want to discuss that fact with Lentz. (Huller dep., p. 240) Huller did not talk to any witnesses other than Dave Balzano when he visited the Dayton office to terminate Lentz on December 29, 1999. (Huller dep., p. 182) Huller first testified that he decided to terminate Lentz after receiving verbal and written reports from the Special Investigation Unit, but later conceded, after being confronted with a dated email, that he did not have a written report at the time he terminated Lentz. (Huller dep., p. 192-193, 255, 258)

- CIC, through Huller, reported Lentz to the Dayton Bar Association Ethics Committee on January 26, 2000, as well as the Dayton Prosecutor's office. (Lentz dep., p. 139; Ex. 5 to Pltf's Memo Contra Def's S. J. Motion) Huller deliberately withheld exculpatory evidence from several witnesses, such as Donald Desseyn and other staff personnel evidencing that Balzano knew about the copy money and agreed with Lentz's handling of it. (Desseyn dep., p. 52-54; Ex. 5 to Pltf's Memo Contra Def's S. J. Motion) Huller admits that he did not know how Lentz had spent any money. (Huller dep., p. 212)

- The Ethics Committee found that Lentz did not violate any ethical rules. (Ex. 8 to Pltf's Memo Contra Def's S. J. Motion) The Dayton Prosecutor's office also declined to press charges against Lentz. Don Kaiser, a law clerk during the relevant time period, stated that it was widely known that copy money was used for office lunches. (Kaiser Aff. ¶ 7-8) Kaiser specifically recalled that Balzano stated that one lunch was paid for by copy money. (*Id.*) Kaiser was not contacted by Matheny or Huller regarding the allegations against Lentz or the use of the copy money. (Kaiser Aff. ¶ ¶ 7-10)

- Balzano did not have a high opinion of women. (Lentz dep., p. 113) Balzano refused to allow a female employee to return on a part-time basis while the employee was on maternity leave, and recommended that CIC rehire a male attorney, Fred Young. (Lentz dep., pp. 113-114) Balzano recommended rehiring Young despite knowing that Young previously left CIC shortly after being accused of a sexual harassment allegation. (Lentz dep., pp. 114-115)

- Another CIC attorney, Tom Ballato, a male employee who began working as an attorney at CIC's Dayton officer shortly after Lentz was terminated, was caught by a female CIC employee, Shelly Bascom, looking at pornography on a CIC computer during company time, but he was not terminated. (Lentz dep., p. 193; Bascom dep., p. 70) Ballato falsified his time slips, forcing more work upon Bascom. (Bascom dep., p. 76) Bascom was shocked, angry, and upset that Ballato was not terminated, or at the very least, transferred from the Dayton office and that CIC seemed to be allowing this behavior. (Bascom dep., p. 86)

- Huller told Bascom that CIC believed in giving people second chances, and he offered Bascom counseling to help her work with Ballato. (Lentz dep., pp. 97-98; Bascom dep.,

p. 89, 91, 95).  Bascom felt that either Huller or CIC was making excuses for Ballato's behavior and that they felt his behavior was of no consequence.  (Bascom dep., p. 95) Bascom questioned how Ballato's "stealing" CIC's money by billing for time while he was viewing pornography was any different than the accusations leveled against Lentz. (Bascom dep at 90-92, 103)

- On the advice of counsel, Ms. Lentz has maintained the $600.00 and she admits it must be returned to Cincinnati Insurance Company as it was an advance for expenses.  Ms. Lentz also has maintained $834.00 which were the remaining funds not used for office expenses.

- The Defendant, CIC, has a history and practice of discriminating against women. (Complaint. EEOC charge, Lentz dep)

- Mary Lentz is entitled to punitive damages based on income and net worth of Defendants.

- The law firm of Berlon & Timmel was charged by the Dayton Ethics Committee with engaging in the unauthorized practice of law; the Defendant, CIC, in response dissolved the firm name.

## II.    DEFENDANTS' LISTED "FACTS" WHICH ARE ERRONEOUSLY LABELED AS "UNDISPUTED"

In the memoranda attached to each of Defendants' Motions in Limine, Defendants cite to one repeated set of facts which it labels as "undisputed." ("Introduction and Factual Background" of Memorand[a] in Support, Documents 97-103, 105-106)  Unfortunately, this label is inaccurate in several important instances.  Furthermore, many of the cited facts were apparently not important enough to be listed in Defendants' filed Findings of Fact and Conclusions of Law [FoFs/CoL], which were filed subsequent to all summary judgment briefings.  Plaintiff Lentz will refer to the bulleted factual "points" sequentially.

In the first bulleted point, the entire latter half of the statements (beginning with "Lentz represented not only…") were not brought up in the FoFs/CoL.  In the second bulleted point, the final sentence is not cited at all.

In the third bulleted point, Defendants' claim that "Lentz admits that the funds belonged to CIC (Lentz at 151, 209.)" Defendants have misstated the record. Page 209 does not support the cited statement at all. As for page 151, Plaintiff expressly did *not* say that the funds belonged to CIC. Defendants have taken the statement out of context. Only one page earlier on page 150, Ms. Lentz testified, "Based on my understanding, that those were funds that CIC either rejected or did not want to recapture." Plaintiff goes on to testify that she has put aside $2600 of possibly disputed money for an implied jury decision on whether she owes any or all of that money to CIC. (*Id*.)

In the sixth ("As of September 30, 1999…") and fourteenth ("Other than Lentz, no other CIC attorney took CIC money… and used the money as though it were her own.") bulleted points, Defendants engage in naked speculation by making a leap from facts to conjecture. Defendants accurately show one deposit in Lentz's bank balance at a singular point in time; Plaintiff does not dispute the factual accuracy of this. Defendants go on to point out that Lentz had expenses which she paid at a later point in time; this too, Plaintiff does not dispute. Nevertheless, Defendants take these facts to show that Lentz was therefore spending "CIC's" money (even though ownership of the funds is a disputed fact in itself); see Defendants numerous statements to this effect: Document 106 at 4 ("…Huller reported her conversion of CIC funds…"); Document 97 at 4-5 ("she…used those CIC finds to pay her personal expenses"); Document 105 at 6 ("Lentz took CIC's money, placed it in her bank account and spent it.").

*The factual record simply does not support Defendant's statements*. Defendants fail to discuss whether payroll or other deposits were being made to Lentz's personal account. Defendants fail to show Lentz's bank balance dipping below the amount of the now-disputed funds, even though Defendants' counsel has herself admitted that bank records for that time were

produced; *see* Defense counsel's statements from the Deposition of Mary Lentz at 31; *see also* Plaintiff's Responses to Defendants' Document Production Requests.  If at any time the balance of Lentz's bank became less than the amount of funds from the copy reimbursement checks, Defendants would presumably just state the fact and cite the evidence.  They cannot state as such, because the evidence shows the opposite.  Defendants' 'undisputed facts' are actively morphed into flatly untrue statements to mislead the Court into thinking that the facts show something which they do not, which is dishonest and overtly corrosive to the Court's understanding of the case and to the entire judicial process.

## III.    PLAINTIFF'S SPECIFIC RESPONSES AND OBJECTIONS TO DEFENDANTS' MOTIONS IN LIMINE

### 1.    Response to Document 97:  Motion in Limine to Bar Witnesses from Offering Evidence contrary to the Evidence they Provided to CIC at the Time of the Termination Decision

Defendants seek to exclude any evidence offered at trial regarding Ms. Lentz's alleged misconduct which is contrary to or in addition to the evidence provided during interviews conducted at the time of her alleged misconduct and the termination decision.  Defendants cite to Federal Rules of Evidence 401, 402, and 403.

Defendants' motion is based on the assumption that many facts of the case are undisputed. This is not correct.  For instance, Defendants assert repeatedly that Lentz was unique in her alleged misconduct (Memorandum in Support of Document 97 at 4, 5, 8).  However, comparable alleged misconduct of other similarly situated CIC employees may not have been known to Plaintiff or other interviewed employees at the time of the interviews, but nevertheless has been established to have been known by the relevant decision-maker(s) at the time.  For instance, Plaintiff may not have been aware of all the comparable actions of Donald Desseyn or even of Mr. Balzano himself at the time she was interviewed, and yet this evidence is clearly relevant

and is not at all prejudicial in the meaning of FRE 403.  Furthermore, some comparable actions

had not occurred by the time of the interview.  For instance, the subsequent gross misconduct by

the attorney who replaced Ms. Lentz, Tom Ballato, initially lead only to "counseling" and a

warning.  It would be absurd to reject this evidence as it is clearly probative of how Defendants

handled perceived infractions differently depending on gender, even though Plaintiff could not

possibly have presented that evidence at the time of the interviews.

Finally, Defendants have again failed to grasp that Lentz's depositing of copy

reimbursement money into her bank account was not then and is not now the end of the story,

although they desperately attempt to portray this to be the case (Memorandum / Document 97 at

7).  Plaintiff has presented more than ample evidence that CIC treated men more favorably even

when they indulged in same, similar, or even worse conduct.  Plaintiff therefore objects to this

Motion in Limine in its entirety.

**2.  Response to Document 98: Motion in Limine to Bar Irrelevant and Misleading Statistical Evidence or References**

Defendants seek to exclude at trial any mention of the factual statistics first alleged in Ms.

Lentz's Complaint and later developed through testimony.  Statistics appear in the Complaint as

follows:

25.  There are 47 attorneys in the house counsel program, only 8 of whom are women.
26.  At the time Ms. Lentz filed her EEOC complaint, there was only one female managing attorney.
27.  At the time Ms. Lentz filed her EEOC complaint, there were no female officers in the entire trial division of CIC's legal department, yet there were 11 male officers in the trial division.
28.  Ms. Lentz's immediate supervisor was male, as are all persons superior to him in CIC.
29.  Of the 53 senior officers in CIC, only 2 are women, and out of 124 total Officers of CIC, only 13 are women.
30.  Based upon information and belief, the women employees who have been promoted to "Officer" were employed by CIC for a greater number of years than their male counter parts before being elected "Officer".

31.    There are no female executive Officers at CIC, and there are no female Directors or Officers of the parent Corporation.

Defendants apparently move to exclude only paragraphs 27 through 31 (See Def.'s Memorandum/Document 98 at 5), based on FRE 401, 402, and 403, and the notion of the "common 'statistical fallacy.'" Defendants are mistaken; the statistics are neither irrelevant nor prejudicial, nor would their admission be based on any fallacious assumption.

Federal appellate courts have found that statistical disparities alone may prove intent. *See* EEOC v. O & G Spring And Wire Form Specialty Company, 38 F.3d 872, 876-877 (7th Cir. 1994) cert. denied 513 U.S. 1198 (1995) ( "[Defendant argues] that statistical evidence alone cannot prove intentional discrimination… [The Defendant's] arguments… have been firmly rejected by the Supreme Court and this circuit. Int'l Brotherhood of Teamsters v. United States, 431 U.S. 324, 339-40 n. 20 (1977))   Plaintiff is perfectly willing to admit that "of course, statistics, like any evidence, are not irrefutable; strong statistics may prove a case on their own, while shaky statistics may be insufficient unless accompanied by additional evidence. (*Id*.) (citations omitted).

One federal district court in Daines v. Mankato, 754 F. Supp. 681 (D. Minn. 1990) held:

The Court finds that plaintiff's statistical evidence supports an inference of discrimination. Minimally, the fact that no women were appointed into the officials and administrators category "is surely the kind of fact which could cause a reasonable trier of fact to raise an eyebrow.' The Eight Circuit has asserted that "quantitative evidence [used as circumstantial evidence] does not need to reach the degree of certainty required of plaintiffs who present no proof of discrimination besides a statistical pattern." *Id*. at 698-699 [citations omitted].

In other words, statistical evidence can be relevant to an inference of causation in Title VII discrimination cases, but must most often be supplemented with additional non-statistical evidence. This is exactly the kind of situation currently before this Court.   Plaintiff offered her statistics to show the environment of the CIC workplace:  one that is *in fact* controlled, for the

most part, by men.  Supplementing this are the numerous facts (disputed or not) of differing treatment between similarly-situated men and women.  The statistical evidence is not some scientific abstraction but is a direct and easily observable view of the CIC workplace.   The evidence is factual, probative, relevant, and not unfairly prejudicial.

The statistics offered by Plaintiff were filed with her Complaint to the Ohio Civil Rights Commission and have been available to the Defendants in the years since that time. Furthermore, Complaint paragraphs 26, 27, 28, and 31 were admitted by Defendants in their Answer.  Defendants seem to forget this in attacking the statistics' validity (Memorandum/Document 98 at 5).  If Defendants cared to attack this evidence prior to a Motion in Limine, they could have done so; they have not.  Plaintiff therefore opposes this Motion in Limine in its entirety.

### 3.    Response to Document 99: Motion in Limine to Bar Any Evidence and/or References Related to Punitive Damages

In this Motion in Limine Defendants request that the court bar any evidence supporting the Plaintiff's claims for punitive damages against both CIC and David Balzano.  It is advisable to note what the present motion is and what it is not.  This is a Motion in Limine; it is not a dispositive motion.

42 U.S.C. § 1981a(b)(1) dictates when awards of punitive damages in Title VII cases can be sought:  when the employer has engaged in intentional discrimination and has done so "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." (*Id*.)  As for the state law claims, the Defendants cite to <u>Preston v. Murty</u>, 32 Ohio St. 3d 334 (1987) as the applicable standard, and Plaintiff does not now dispute this assertion.

Defendant CIC states that "Plaintiff lacks sufficient evidence…" to meet the Title VII standard (Memorandum/Document 99 at 4). Defendant Balzano then claims that "Plaintiff cannot… meet either prong" of Ohio's standards (*Id*. at 8).

Sufficiency of evidence and evaluating elements of a claim bases of a summary judgment motion (FRCP 56) or a judgment as a matter of law (FRCP 50), not a motion in limine. A summary judgment motion requires party briefings and a ruling of the Court; a judgment as a matter of law can take place only after evidence is presented to a jury. In either case, Defendants' notion of making this argument in a Motion in Limine is misplaced. There is a difference between presenting evidence which might support a jury finding for punitive damages and actually presenting that option to the jury. For these reasons, this Motion in Limine should be denied.

**4. Response to Document 100: Motion in Limine to Bar any Evidence or References Related to the Net Worth of Defendants and/or Regarding Conduct that has no Nexus to the Harm Alleged by Plaintiff**

In the first portion of this Motion in Limine Defendants seek to bar references related to the net worth of Defendants. Plaintiff objects to this. Such evidence is typically presented once it is decided that the issue of punitive damages will be submitted to a jury, and Plaintiff has already shown above that Defendant's motions to disallow punitive damage evidence is untimely and misplaced.

Plaintiff also opposes parts of the second portion of Defendants' Motion in Limine which seeks to bar what Defendants term "conduct that has no nexus to the specific harm alleged by plaintiff." Defendants have given several examples of what is meant by this; Plaintiff will address these examples in turn:

A.        Statistics regarding the number of female members of the Board of
          Directors and Officers at CIC.

This example is repetitious of Defendant's Motion in Limine which is electronically

docketed as document 98.  Plaintiff reasserts her objections and arguments made in response to

that Motion and requests that the motion be denied.

B.        Other allegations of companywide discrimination and wrongdoing
          including but not limited to the Rochlin litigation.

Plaintiff sets forth below that she objects to Defendants' Motions in Limine which seek to

bar references to the Rochlin litigation, and this issue is discussed in Response to Document 101.

As for any other allegations of companywide discrimination or wrongdoing, Plaintiff is

forced to speculate as to what this might mean, and so therefore opposes this portion of the

Motion in Limine.  Plaintiff is aware that there are portions of several of the Defendants'

depositions which show that male CIC attorneys who committed alleged malfeasance were not

treated in the same manner as was Ms. Lentz; i.e., they were not fired or were not referred to an

ethics board or a prosecutor's office.  (*See, e.g.*, Bascom Dep. at 69-70, 92 (Ballato looking at

pornographic pictures of females on company computers and billing for the time); Balzano Dep.

at 79-80 (Balzano using copy reimbursement money to pay for lunch); Desseyn Dep. at 53-54

(Balzano explicitly condoning using copy money and not having it credited in CIC's main office)

; Huller Dep. at 15 (No CIC attorneys other than Lentz reported to outside authorities)).  Part of

the *prima facie* showing of a Title VII discrimination case is to point out non-protected members

being treated more favorably than the Plaintiff for similar conduct, McDonnell Douglas Corp. v.

Green, 411 U.S. 792, 802 (1973). It would therefore be absurd to limit the admissibility of such "other allegations of companywide discrimination or wrongdoing."[2]

       C.                      Alleged conduct and statements of Balzano.

Again, part of this trial will deal with Title VII discrimination and therefore with comparing similarly-situated individuals. To the extent that Balzano's statements encompass these similarly-situated comparators, Defendants' motion must clearly be denied. Furthermore, to the extent that Balzano's actions or statements impact the two remaining state law claims in any way, the motion must still be denied. Balzano is a major player in this case: He is a main player in the Title VII claim and the sole defendant in the two state common law actions. The difference between the way Balzano treated Plaintiff as opposed to others impacts the "outrageous and extreme" and the "serious emotional anguish" prongs (see Conway v. Int'l Ass'n of Heat and Frost Insulators and Asbestos Workers, 209 F.Supp. 731, 761 (N.D. Ohio 2002)) of Lentz's Intentional Infliction of Emotional Distress claim in that it might imply Balzano's awareness of the probable negative results of his actions/statements, and it could show the reasonableness of Lentz's reaction to the situation into which she was thrown when her coworkers were not treated equally.

---

[2] As a sidenote, section C of Defendants' Memorandum (page 10) argues that it is improper for a court to consider the lawful out-of-state conduct in assessing punitive damages. Ms. Lentz is not challenging any lawful conduct of Defendants. Moreover, the entirety of Defendants' argument is dedicated to protecting Defendant CIC as an employer – not David Balzano as an individual. Title VII is a statute enacted by Congress and is binding on all states by the Supremacy Clause of the U.S. Constitution. Any of CIC's violations of Title VII occurring in Ohio would therefore be unlawful in all states. Furthermore, all of the cases cited by Defendant reference punitive damages awarded in state courts or based on state theories of law. Defendants' argument is misplaced for this among other reasons.

D.        Companywide wealth, net worth, or profits.

This example is repetitious of Defendants' prior argument.  Plaintiff has already indicated her response to this example in the first portion of her response to this Motion in Limine.

As shown in Plaintiff's response to the above examples, the portion of Defendant's Motion in Limine that references "conduct that has no nexus to the Harm alleged by Plaintiff" should be denied.

**5.    Response to Document 101:  Motion in Limine to Bar References to the Rochlin Litigation**

Defendants argue that evidence of the *Rochlin* class action litigation should be excluded as irrelevant under Federal Rules of Evidence 401 and 402. Alternatively, Defendants contend that, although relevant, the evidence should be excluded under Rules 403 and 404.

Under FRE 401, evidence is relevant if it has "*any tendency* to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401 (emphasis added). Evidence of a discriminatory atmosphere is relevant in proving pretext because it  "tend[s] to add 'color' to the employer's decision-making processes and to the influences behind the actions taken with respect to the individual plaintiff." Ezold v. Wolf, 983 F.2d 509. 546 (3rd Cir. 1992). In the *Rochlin* case, a class of CIC employees has filed a suit alleging discriminatory practices in pay between genders. Because evidence supporting Plaintiff's claim of such a discriminatory atmosphere goes to the heart of Plaintiff's case it is relevant and therefore admissible.

Defendants argue in the alternative that even though relevant, evidence of the *Rochlin* litigation should be excluded under Rule 403. Evidence is to be excluded under FRE 403 only if "its probative value is *substantially* outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless

presentation of cumulative evidence." Fed. R. Evid. 403 (emphasis added). In this case, evidence that a class of CIC employees has filed a suit alleging gender discrimination in pay supports and lends color to Plaintiff's assertions of a discriminatory atmosphere.

At the same time, the danger of *unfair* prejudice to the Defendants is minimal. Indeed, CIC itself has not found the *Rochlin* litigation so negative as to prevent it from distributing public notice and information regarding the Equal Pay Act litigation in its "Financial Report: Annual Report on Form 10-K 2002" and in a similar notice in 2003. Defendants have not met their burden in showing that the probative value of this evidence is substantially outweighed by any possible prejudicial effect.

Finally, Defendants contend that evidence of the *Rochlin* litigation is impermissible character evidence under FRE 404. This argument is without merit. The purpose of introducing evidence of the *Rochlin* litigation is not to show that CIC is a "bad company" but rather to reinforce Plaintiff's assertions of a discriminatory atmosphere. The inference to be drawn from the evidence is not that CIC "has been sued before, [so] it must deserve to be sued here," Defendants' Memorandum with Document 101 at 7, but to show evidence of a discriminatory atmosphere. Not only would the *Rochlin* litigation add context to the juror's understanding of a generally discriminatory atmosphere based on gender at CIC, the Plaintiff here is actually involved in that litigation. Even if the court believed that the danger of unfair prejudice or confusion were high, any such danger could be alleviated by an instruction to jurors that evidence of other claims is not proof of guilt, but should be considered for the weight it gives to Plaintiff's assertions. Plaintiff therefore opposes this Motion in Limine in its entirety.

**6.   Response to Document 102:  Motion in Limine to Bar References to the Equal Pay Act or any claims Related to Salary and/or Promotion**

As discussed above, Plaintiff opposes Defendants' motion seeking to bar references to Lentz' Equal Pay Act claim.

Furthermore, Plaintiff also opposes Defendants' Motion in Limine to bar references related to Plaintiff's salary and to the salary of any position for which she applied and for which she was denied based on alleged discrimination.  As the Court is aware, Lentz's Title VII claim includes a failure to promote theory among others; *see* Complaint at 10-11.  Clearly, therefore, the salary of Ms. Lentz as well as the salary for the position to which she was denied (or the salary of any person who held the position around the time of the denial) is relevant and must be admitted for the purpose of showing damages.

**7.   Response to Document 103:  Motion in Limine to Bar Any Evidence or Reference to Alleged Conduct of David Balzano Unrelated in Time or Subject to the Claims Made by Plaintiff**

In this Motion in Limine, Defendants move the Court to bar evidence of "other bad acts," "stray remarks," or "lay opinions" of David Balzano which are asserted to be unrelated to the claims of Plaintiff.  Defendants object under FRE 401-403, 404(b), and 701(b).

Specifically, Defendants object to the following testimony:

- Balzano's refusal to allow a female attorney to return part-time after maternity leave
- Balzano's recommendation to rehire Fred Young despite Balzano's knowledge of Young having previously let CIC shortly after a sexual harassment allegation
- Balzano's finding a court official to sign an affidavit confirming that a female secretary who had missed work for jury duty actually did not show up for jury duty or had been released early
- Balzano questioning Lentz's secretary (Paula Ruppert) as to whether she "was engaging in the unauthorized practice of law"
- Lentz's belief that Balzano does not have a high opinion of women
- Lentz's belief that Balzano had displayed animosity to female employees in the past

- Balzano's unwillingness to carry his share of the caseload in the Dayton CIC office

(Memorandum/Document 103 at 4-5)

A.    Balzano's Discriminatory Acts and Remarks are Admissible Under FRE 404(b), 401, 402, and 403

Defendants lay out the test for 404(b) admissibility (Memorandum/Document 103 at 6), which the Plaintiff accepts as accurate.   Nevertheless, Defendants fail to properly analyze the facts of this case under that test, or to the other cases that are cited.

Plaintiff's evidence here is directed mainly towards showing the gender animus of Balzano.  This is particularly relevant in an indirect evidence employment discrimination case, where an actor's intentions must be inferred from that actor's actions.  Case law heavily supports this proposition.  See, e.g. Robinson v. Runyon, 149 F.3d 507, 512 (6th Cir.1998) (holding that evidence showing that co-employees circulated a fake employment application incorporating racial stereotypes was relevant where the plaintiff showed that upper management knew of the application, but did not condemn it); Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1249 (6th Cir.1995) (holding that repeated racial slurs by two owners constituted evidence that the plaintiff's termination might have been racially motivated); Ezold v. Wolf, 983 F.2d 509 at 546 (3rd Cir. 1992) ("[P]roof of a discriminatory atmosphere may be relevant in proving pretext since such evidence 'does tend to add "color" to the employer's decision-making processes and to the influences behind the actions taken with respect to the individual plaintiff.' " (citations omitted)).

Furthermore, "Although remarks made by an individual who has no authority over the challenged employment action are not indicative of discriminatory intent, the statements of managerial-level employees who have the ability to influence a personnel decision are relevant." Johnson v. Kroger Co., 319 F.3d 858 at 868 (6th Cir. 2003), citing to Ercegovich v. Goodyear

Tire & Rubber Co., 154 F.3d 344 at 354-55 (6th Cir. 1998) (concluding that the plaintiff presented a genuine issue of material fact as to whether the manager in question was involved in the employer's decision to eliminate the plaintiff's position without giving him the opportunity to transfer elsewhere).

All of the evidence opposed by Defendant above falls under the holdings of these cases. Balzano's attitudes, actions, and remarks show a discriminatory atmosphere that is clearly relevant to Plaintiff's Title VII claim as well as to both of her state law claims.  Furthermore, Plaintiff has shown that Balzano's opinions and statements played heavily into Mark Huller's decision-making process.  For these reasons, this part of Defendants' Motion in Limine should be denied.

B.    The Evidence Characterized by Defendant as "Plaintiff's Lay Opinion" Is Admissible Under FRE 701(b)

Federal Rule of Evidence 701(b) is designed to "provide assurances against the admission of opinions which would merely tell the jury what result to reach." Hester v. BIC Corp., 225 F.3d 178 at 182 (2nd Cir. 2000) (citations omitted) However, "[t]he fact that the lay opinion testimony bears on the ultimate issue in the case does not render the testimony inadmissible." Lightfoot v. Union Carbide Corp., 110 F.3d 898 at 911 (citing Fed.R.Evid. 704(a) and United States v. Rea, 958 F.2d 1206, 1214-15 (2d Cir.1992)).

The citations provided by Defendants reveal that their argument is not applicable here. Citing to an unpublished Indiana district court decision, Defendants quote: "701(b) bars lay opinion testimony that amounts to a *naked speculation* concerning the motivation for a defendant's adverse employment decision…" (Memorandum/Document 103 at 10, citing to Nwanna v. Ashcroft, 2003 U.S. Dist. LEXIS 22213 at *9-11 (S.D. Ind. 2003)) (emphasis added) Ms. Lentz has not offered naked speculation; she has given supporting testimony and factual

background to support her statement.  Confirming this understanding of FRE 701(b) is the next

cited statement of Defendant: "The Sixth Circuit Court of Appeals has cautioned that an

employee's subjective perception that she has suffered discrimination, *in the absence of objective*

*evidence substantiating such perception*, does not constitute probative evidence of such

discrimination." (Memorandum/Document 103 at 10, citing to *Mayberry v. Endocrinology-*

*Diabetes Associates*, 926 F. Supp. 1315 at 1323 (D.Tenn. 1996)  Again, the argument is

inapplicable here:  Ms. Lentz's statements are made in the context of supporting objective

evidence, which she has discussed throughout this Response.

It is anticipated that the testimony of Ms. Lentz, Shelly Bascom, and Paula Ruppert will

reach these issues at trial.  Because their testimony regarding Balzono is probative, relevant, and

helpful to the jury's understanding of the case, Plaintiff asks that the Court deny Defendants'

Motion in Limine.

### 8. Response to Document 105:  Motion in Limine to Bar Improper "Similarly Situated" and Related Evidence AND Affidavit of Mark Huller

In this Motion, Defendants seek to bar evidence regarding CIC attorney Tom Ballato,

who Plaintiff contends is a similarly-situated male.  Defendants also attempt to submit an

affidavit of Mark Huller regarding Mr. Ballato.

Plaintiff again objects to the submission of Huller's affidavit, which relates only to Mr.

Ballato; see Affidavit of Mark Huller, Document 105.  Plaintiff presented her evidence regarding

Ballato in her Summary Judgment Response at pages 16-17 (filed on Dec. 23, 2002).  In their

reply brief filed on Feb. 18, 2003 Defendants chose to respond to this evidence with only a two-

sentence paragraph asserting that the Ballato evidence was "hearsay" and that his violations were

"simply not tantamount" to Lentz's alleged violations (SJ Reply Brief at 6).  Defendants had an

opportunity to present their evidence at that time and did not.  The summary judgment stage of

this proceeding is over (see Order denying Motion for Leave to File Renewed Motion for

SJ/Document 104) and the Court should not have to evaluate the appropriateness of a "similarly-

situated" designation now, since Defendants deemed it unnecessary to make their arguments at

the appropriate time.

Nevertheless, even if the Court does wish to consider legal argument, the legal standard

set out by Defendants is incorrect.  Defendants cite to a Florida district court decision which

states, "[a] comparator's misconduct [must] be nearly identical to prevent courts from second-

guessing reasonable decisions…," Mizell v. Miami-Dade Cty, Fla., 342 F.Supp.2d 1084, 1090.

This, however, is not an accurate statement of the law.

The correct view of Title VII is that leeway in making comparisons is the language of the

law.  Employers across the country have attempted to argue the opposite and have been turned

down by the courts, as in Alexander v. Fulton County, Ga., 207 F.3d 1303 (11th Cir. 2000):

> Defendants claim that the term "similarly situated"… requires the "same or nearly
> identical conduct." Again, we disagree. Although susceptible to manipulation, the
> phrase "similarly situated" is the correct term of art in employment discrimination
> law.

(Id. at  1333) (citations omitted)  See also Hogan v. State of Connecticut Judicial Branch, 220

F.Supp.2d 111 (D.Conn. 2002) (stating that "[t]his standard requires a reasonably close

resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a

showing that both cases are identical.  In other words… of comparable seriousness.") (internal

punctuation and citations omitted).

Furthermore, in a case from this circuit, Hall v. State Farm Ins. Co., 18 F.Supp.2d 751

(E.D.Mich. 1998), the district court disallowed the kind of legal side-stepping which the

Defendants propose here, holding in a ruling on summary judgment:

> The Defendants contend that these individuals are not similarly situated to Hall, and are thus inappropriate to the relevant Title VII and ELCRA analysis, because none of them engaged in (1) deliberate acts of misconduct that were designed to conceal irregularities in the claim files under their supervision, or (2) conduct which demonstrated a lack of honesty or trustworthiness. However, the Defendants have attempted to define the relevant comparison too narrowly. Hall need only identify other similarly situated non-minority employees who engaged in misconduct of comparable seriousness. See <u>Mitchell</u>, 964 F.2d at 582-83 & n. 5; <u>McDonald v. Santa Fe Trail Transp. Co.</u>, 427 U.S. 273, 283 n. 11 (1976) (precise equivalence in culpability not required). This mandate does not require Hall to identify misconduct of an identical quality, as the Defendants argue.

(*Id.* at 767)  The district court went on to observe that when the employer admitted that the disputed comparator had indeed engaged in "misconduct" – which was sufficiently egregious enough that the company required the comparator to attend remedial seminars and to seek professional counseling, among other things – it was disingenuous to suggest that there was simply no way to make a comparison, particularly in light of the plaintiff having offered innocent explanations for her alleged misconduct.  This is a *mirror image* of the situation now before this Court; Defendants have admitted that Tom Ballato misbehaved ("Lentz and Ballato both misbehaved…;" Memorandum/Document 105 at 6) and that the misbehavior was egregious enough for Huller to put Ballato on warning status and to have his computer monitored (Huller Affidavit at ¶ 9).  Mary Lentz has offered an innocent explanation for any alleged misconduct.  As in <u>Hall,</u> it is clear that even if the Court is ready to make a factual determination in a Motion in Limine, the Defendants' motion must still be denied, because Tom Ballato is a similarly-situated male outside of Ms. Lentz's protected class.  Plaintiff therefore objects to this Motion in Limine.

25

9. **Response to Document 106: Motion in Limine to Bar Evidence of Mark Huller's Contacts with the Dayton Bar Association and the Montgomery County Prosecutor's Office**

In their final Motion in Limine, Defendants seek to bar evidence of the actions of Mark Huller in reporting Plaintiff Lentz to the Dayton Bar Association and to the Montgomery County Prosecutor's Office. Since this evidence is clearly relevant both in terms of Defendants' different treatment between the genders and in terms of damages, and because the evidence is not unfairly prejudicial, Plaintiff opposes this motion in its entirety.

Initially, Defendants argue that the reporting of Lentz to the bar association and to the prosecutor's office has no bearing on Lentz's tort claims against Balzano since the actual reporting was made by Huller. (Memorandum/Document 106 at 5) However, Defendants fail to discuss that it was Balzano who brought the alleged matters to Huller's attention, and who distorted the facts of the matter into a version that unfairly portrayed Lentz as a criminal. These facts play directly into Plaintiff's tort claims against Balzano and are a direct causal link to her damages. Clearly Defendants argument lacks merit.

Defendants next claim that the Ohio Code of Professional Responsibility mandated Huller's actions and that those actions would therefore be (1) confusing and misleading (Memo/Document 106 at 6) to a jury and (2) absolutely privileged against a civil action (*Id*. at 7). Defendants are wrong on both counts.

First, a jury can understand a rule that mandates reporting of misconduct. Huller and other CIC management had not reported male CIC attorneys for misconduct that was similar, comparable, or worse than the conduct alleged of Ms. Lentz. CIC's intentions in reporting Lentz – and only Lentz – to the bar association and to the prosecutor's office are therefore a question of fact. It is in the province of the jury to decide if Huller (1) actually believed that he was

obligated to report Lentz; (2) actually believed the facts as presented to him by Balzano; and, most importantly, (3) actually conducted an investigation of any depth which would have allowed him to honestly believe the story that he presented to the bar association and to the prosecutor's office.  It is also up to a jury to determine whether one factor in Huller's reporting activities was gender discrimination.

Defendants next attempt to argue that Ohio law provides absolute immunity and absolute privilege as to Huller's reports.  (Memorandum/Document 106 at 7) (citing to Hecht v. Levin, 613 N.E.2d 585 (Ohio 1993) and M.J. DiCorpo, Inc. v. Sweeney, 634 N.E.2d 203 (Ohio 1994)). However, the cases which Defendants claim supports this proposition are cases from the Ohio state courts.  The claim in which Huller is involved is a federal claim, and it goes towards showing disparate treatment.  The reporting of Lentz also clearly encompasses showing foreseeable damages.

This is a Federal Rule of Evidence; the federal rules are not concerned with questions of state law.  Huller's reports to the bar association and to the prosecutor remain directly related to the question of whether Ms. Lentz was treated differently than male CIC attorneys and would be admitted as relevant on that issue.

Finally, Defendants argue that FRE 404(b) bars the evidence of Huller's reports. (Memorandum/Document 106 at 8) Defendants' argument is absolutely inapplicable here.

Federal Rule of Evidence 404(b) is entitled "*Other* crimes, wrongs, or acts." (emphasis added)  The first portion of the rule reads, "Evidence of *other* crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." (FRE 404(b)) (emphasis added)  As stated in Weissenberger's Federal Evidence: 2002 Courtroom Manual, an "other act" is "simply any act which is not part of the operative facts or

episode of the case…" (<u>Federal Evidence</u> at 67)  Defendants' claim (that Huller's reports are not

a part of this case) is absurd.  Even if this were an "other" act, this evidence would be admissible

to show Huller and CIC's intent to discriminate against Lentz and/or the absence of mistake.

(FRE 404(b))  For these reasons, Plaintiff opposes this Motion in Limine in its entirety.

## IV.    <u>CONCLUSION</u>

For all of the reasons given above, Plaintiff opposes all of Defendants' Motions in

Limine except those portions specifically unopposed.  Plaintiff respectfully requests that the

Court therefore deny the pending Motions as outlined above.

Respectfully Submitted,

<u>s/[Michael K. Sutherlin]</u>
Michael K. Sutherlin
Attorney for Plaintiff

### CERTIFICATE OF SERVICE

I hereby certify that on May 23, 2005, a copy of the foregoing was filed electronically.

Notice of this filing will be sent to the following parties by operation of the Court's electronic

filing system. Parties may access this filing through the Court's system.

Deborah S. Adams
Jack B. Harrison
FROST BROWN TODD, LLC
2200 PNC Center
201 East Fifth Street
Cincinnati, OH 45202
dadams@fbtlaw.com
jharrison@fbtlaw.com

s/[Michael K. Sutherlin]
Michael K. Sutherlin
Attorney for Plaintiff

s/[Lynn D. Pundzak]
Lynn D. Pundzak
Attorney for Plaintiff

MICHAEL K. SUTHERLIN & ASSOCIATES
P.O. Box 441095
Indianapolis, IN 46244-1095
Phone: (317) 634-6313
Fax: (317) 631-8818
msutherlin@michaelsutherlin.com