# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

MARY E. LENTZ     : Case No.: 01-CV-599
          :
    Plaintiff,  : Judge Watson
          :
    v.     :
CINCINNATI INSURANCE  :
COMPANY AND DAVID BALZANO :
          :
    Defendants. :

## JOINT PROPOSED FINAL PRETRIAL ORDER

This matter is before the Court pursuant to Rule 16 of the Federal Rules of Civil Procedure.

## I. APPEARANCES:

For Plaintiff(s):

    Lynn D. Pundzak
    Suite 999
    Second National Bldg.
    830 Main Street
    Cincinnati, OH 45202
    Telephone: (513) 564-9999
    Facsimile:  (513) 345-4703

    Michael K. Sutherlin
    Nicholas Conway
    Michael K. Sutherlin & Associates
    P.O. Box 441095
    Indianapolis, IN 46244-1095
    Telephone: (317) 634-6313
    Facsimile:  (317) 631-8818

For Defendant(s):                Deborah S. Adams
                                 Jack B. Harrison
                                 Frost Brown Todd LLC
                                 2200 PNC Center
                                 201 East Fifth Street
                                 Cincinnati, OH 45202
                                 (513) 651-6800
                                 dadams@fbtlaw.com
                                 jharrison@fbtlaw.com

## II.   NATURE OF ACTION AND JURISDICTION:

A.   This is an action for sex discrimination (Title VII) against Defendant
Cincinnati Insurance Company, for intentional interference with a business
relationship and the intentional infliction of emotional distress against
Defendant David Balzano.  Cincinnati Insurance Company also has a
counterclaim against Plaintiff Mary Lentz for conversion.

B.   The jurisdiction of the Court is invoked under Title 28, United States Code,
§§1331, 1343(a)(3) and (a)(4), and §1367.

C.   The jurisdiction of the Court is not disputed.

## III.   TRIAL INFORMATION:

A.   The estimated length of trial is 5 days.

B.   Trial to Jury will begin on June 6, 2005.

## IV.   GENERAL NATURE OF THE CLAIMS OF THE PARTIES

### PARTIES

Plaintiff / Counterclaim Defendant:          Mary Lentz

Defendants / Counterclaim Plaintiff:         Cincinnati Insurance
                                             Company
                                             David Balzano

## A.   PLAINTIFF'S STATEMENT OF THE CASE

### 1.   General Nature of the Claims of the Parties:

Plaintiff Claims: The Plaintiff, Mary Lentz, claims that she was wrongfully
discharged by Cincinnati Insurance Company when her immediate supervisor,

David Balzano, lied about his knowledge of the use of copy money. The termination was pretextual and Mary Lentz was the only female attorney in the Beacon & Timmel Dayton office employed by a company that has a history of discriminating against women. Mary Lentz also has claims against David Balzano for willfully and deliberately lying about the circumstances of her using copy money knowing that it could lead and eventually did lead to her termination. He failed to intervene and acknowledge that he gave directions to her, participated in the use and benefits of copy money, and gave approval for this conduct.

2.    **Special Damages:**

Lost wages based upon projected income of salary, bonuses and benefits at Cincinnati Insurance Company compared to actual income after termination:

Projected Pay and Benefits CIC:

| Year | Salary | Bonus | Total | Actual Income | Pay Difference |
|------|--------|-------|-------|---------------|----------------|
| 2000 | $63,749.50 | $3,500 | $67,249.50 | $22,365.00 | $44,884.50 |
| 2001 | $68,000.00 | $3,500 | $71,500.00 | $27,507.56 | $43,992.44 |
| 2002 | $73,000.00 | $3,500 | $76,500.00 | $41,179.76 | $35,320.24 |
| 2003 | $78,000.00 | $3,500 | $81,500.00 | $56,446.89 | $25,053.11 |
| 2004 | $82,000 | $3,500 | $85,500.00 | $57,181.83 | $28,318.17 |

**Total:**    **$382,249.50 - $204,681.04 = $177,568.46**

On the advice of counsel, Ms. Lentz has maintained the $600.00 and she admits it must be returned to Cincinnati Insurance Company as it was an advance for expenses. Ms. Lentz also has maintained $834.00 which were the remaining funds not used for office expenses. Both of these funds were withheld on advice of counsel and are in trust.

3.    **Issues of Fact and Law:**

While there are many facts which are undisputed, the Plaintiff will still have to present them to the jury in order to provide a context and background for the jury to understand the circumstances of the pretextual termination. Hence, the following is a statement of the facts and issues of fact and law which the Plaintiff intends to present:

- Plaintiff Mary Lentz was hired by Cincinnati Insurance Company (CIC) as in-house counsel in its Dayton office in 1997. (Lentz Dep. at 71-72) She was hired by Mark Huller, Manager of the Trial Division of CIC's legal department. (Lentz at 72) Defendant Dave Balzano, CIC's managing attorney for the Dayton office, was her immediate superior. (Lentz at 72)

- Lentz occasionally received checks from opposing counsel or co-counsel to reimburse the Dayton office for copying costs. (Lentz at 21) CIC had no written policy stating what an attorney should do with these checks or upon collecting any copy money. (Balzano at 76; Huller at 93) Nevertheless, Balzano told CIC attorneys that such checks were to be cashed and used for office functions. (Desseyn at 53-54; Lentz at 32-33) Balzano himself paid for at least one office lunch with such money and participated in several others. (Lentz at 37 and 51; Desseyn at 48; Ruppert Aff. ¶ 6; Bascom at 30, 33, and 36)

- The parties are in dispute over whether the copy money checks were to be made out to CIC or to the individual attorney; the parties are further in dispute as to whether CIC even viewed the money as its property or simply abandoned it to the discretion of the individual attorney.

- It is undisputed that Lentz deposited two copy money checks totaling $1034 into her checking account in Sept.-Oct. 1999 (Lentz at 21-23). Lentz took out $200 of that money for office functions immediately (Lentz at 138, 151). Lentz testifies that she intended all of the money was to be used for office functions eventually but that she and her secretary were afraid to leave such a large amount of cash in her secretary's drawer at the office, where such cash had been kept up to that time. (Ruppert Aff. ¶ 11, Lentz at 55, 151, 138, 237-238) The Defendants dispute the testimony of Lentz's intentions.

- Defendant CIC characterizes Lentz's actions as "commingling" funds. Plaintiff Lentz contends that there was no policy on copy reimbursement money and that CIC further allowed "commingling" of funds in other areas; for instance, it is undisputed that CIC gave staff attorneys $600 at the start of their employment for expenses, to be returned at the end of employment, and attorneys kept the expense advance in their own account, not in a company account and to be used as the individual attorney saw fit. (Lentz at 136; Huller at 189-191)

- Lentz was put on inactive status in January 2000 and was terminated in March 2000. (Huller at 177-170, 182, 189, 192, 210-213, 261) Defendants allege that this was due to

the alleged "commingling." (*Id.*) Plaintiff Lentz's assertion that her termination was instead actually a result of gender discrimination forms one of the bases of this lawsuit.

- Prior to her termination, Lentz believed that Balzano refused to give her adequate support on complex cases, although Balzano requested and received such support for his own complex cases. (Lentz at 85-88, 40, and 143) Balzano indicated that he was unhappy as Office Manager of the Dayton office and that he wanted to work at CIC headquarters in Cincinnati. (Lentz at 76-77; Bascom at 41) Lentz therefore sought the position of office manager. (Lentz at 77)

- Lentz learned that CIC was already talking to CIC attorney Steven Fogle about taking over as office manager in Dayton. Lentz scheduled a phone appointment with Huller to discuss the matter. (Lentz at 77) Lentz complained to Huller about Balzano's lack of cooperation. (Huller at 113)

- At the end of a heated discussion with Balzano in early November, 1999, Lentz said that she would call CIC's home office and would "let them know what goes on in this office." (Lentz at 140) Balzano brought the copy money issue to Huller's attention within one month after the November discussion. (Lentz at 143) In this report to Huller, Balzano omitted the fact that he knew the origins and uses of the copy money and that he participated in lunches purchased with the money. (Lentz at 136, 139; Ruppert Aff. ¶ 13) Despite it being his practice to take notes during all telephone conferences and meetings, Huller could not recall whether he had ever taken notes in conversations with Balzano over the course of two years. He produced no notes. (Huller at 29 and 328)

- Allen Matheny of CIC's Special Investigations Unit met with Mark Huller for ten minutes to learn about the allegations against Lentz. (Matheny at 54, 61, 64) Huller gave Matheny some of Lentz's letters; Matheny took no notes nor taped the conversation, contrary to his usual practice. (Matheny at 54, 61, 64)

- Matheny and Balzano interviewed Lentz on December 28, 1999. It was agreed that Matheny would conduct the interview while Balzano took notes. (Matheny at 82, 86) He did not tape the conversation. Matheny did not attempt to determine what happened to all the checks. (Matheny at 105) Matheny did not find it significant that Paula Ruppert, Lentz's secretary, corroborated that the copy money was used for pizza and other office activities. (Matheny at 108-109) Lentz may have explained to Matheny why she had the check made payable to her (due to her bank's request), but Matheny did not think that was "salient." (Matheny at 131) At the time of Lentz's investigation, all members of the Special Investigations Unit were men, and to this day its twenty-two members are all men. (Matheny Dep., p. 38)

- Matheny and Greg Lewis talked with several of Lentz's coworkers and confirmed that everyone knew about the copy money and that one such copy money case involved Fred Young as counsel, and the cover letter with a copy money check was also addressed to him. (Ex. 6 in Plaintiff's Memo Contra Defendant's Summary Judgment Motion) Matheny never determined whether there was a written CIC procedure on what to do with

copy money. (Matheny at 132) Matheny stated that it was not his function to determine if Lentz was attempting to be surreptitious in her cashing of checks. (Matheny at 145) Matheny professed ignorance of what CIC's legal department did and of the $600 CIC gave staff attorneys for expenses or how it was accounted; also Matheny was unfamiliar with the accounts the Dayton office used for operational purposes. (Matheny at 73, 85; Huller at 85) Shortly after his interview with Lentz, Matheny discussed the interview with Huller, but had not yet prepared a written report. Matheny also discussed the interview with Benoski. (Matheny at 119 and 117)

- Huller told Lentz that her employment had to end during a meeting on Dec. 29, 1999. Huller told Lentz this despite not having a written report from Matheny. Lentz reiterated that Balzano initially told her how to use the copy money and that he, and the entire office, about the copy money and participated in the lunches. (Lentz at 14-19, 134-135, and 139) Huller told Lentz that she could either resign or be terminated. Although Lentz was told that her employment with CIC had to end on December 29, 1999, she was not officially terminated until March 10, 2000. (Lentz at 135, 18)

- Huller refused to investigate Balzano's involvement any further despite knowing that several people in the Dayton office, other than Lentz and Balzano, knew about the copy money. (Lentz dep., p. 139 and p. 140; Huller dep. pp. 243-247, 274) Huller knew that several people in the Dayton office, other than Lentz and Balzano, knew about the copy money. (Huller dep., p. 274) Huller did not want to discuss that fact with Lentz. (Huller dep., p. 240) Huller did not talk to any witnesses other than Dave Balzano when he visited the Dayton office to terminate Lentz on December 29, 1999. (Huller dep., p. 182) Huller first testified that he decided to terminate Lentz after receiving verbal and written reports from the Special Investigation Unit, but later conceded, after being confronted with a dated email, that he did not have a written report at the time he terminated Lentz. (Huller dep., p. 192-193, 255, 258)

- CIC, through Huller, reported Lentz to the Dayton Bar Association Ethics Committee on January 26, 2000, as well as the Dayton Prosecutor's office. (Lentz dep., p. 139; Ex. 5 to Pltf's Memo Contra Def's S. J. Motion) Huller deliberately withheld exculpatory evidence from several witnesses, such as Donald Desseyn and other staff personnel evidencing that Balzano knew about the copy money and agreed with Lentz's handling of it. (Desseyn dep., p. 52-54; Ex. 5 to Pltf's Memo Contra Def's S. J. Motion) Huller admits that he did not know how Lentz had spent any money. (Huller dep., p. 212)

- The Ethics Committee found that Lentz did not violate any ethical rules. (Ex. 8 to Pltf's Memo Contra Def's S. J. Motion) The Dayton Prosecutor's office also declined to press charges against Lentz. Don Kaiser, a law clerk during the relevant time period, stated that it was widely known that copy money was used for office lunches. (Kaiser Aff. ¶ 7-8) Kaiser specifically recalled that Balzano stated that one lunch was paid for by copy money. (*Id.*) Kaiser was not contacted by Matheny or Huller regarding the allegations against Lentz or the use of the copy money. (Kaiser Aff. ¶ ¶ 7-10)

- Balzano did not have a high opinion of women. (Lentz dep., p. 113)  Balzano refused to allow a female employee to return on a part-time basis while the employee was on maternity leave, and recommended that CIC rehire a male attorney, Fred Young. (Lentz dep., pp. 113-114)  Balzano recommended rehiring Young despite knowing that Young previously left CIC shortly after being accused of a sexual harassment allegation. (Lentz dep., pp. 114-115)

- Another CIC attorney, Tom Ballato, a male employee who began working as an attorney at CIC's Dayton officer shortly after Lentz was terminated, was caught by a female CIC employee, Shelly Bascom, looking at pornography on a CIC computer during company time, but he was not terminated. (Lentz dep., p. 193; Bascom dep., p. 70)  Ballato falsified his time slips, forcing more work upon Bascom. (Bascom dep., p. 76)  Bascom was shocked, angry, and upset that Ballato was not terminated, or at the very least, transferred from the Dayton office and that CIC seemed to be allowing this behavior. (Bascom dep., p. 86)

- Huller told Bascom that CIC believed in giving people second chances, and he offered Bascom counseling to help her work with Ballato. (Lentz dep., pp. 97-98; Bascom dep., p. 89, 91, 95).  Bascom felt that either Huller or CIC was making excuses for Ballato's behavior and that they felt his behavior was of no consequence. (Bascom dep., p. 95)  Bascom questioned how Ballato's "stealing" CIC's money by billing for time while he was viewing pornography was any different than the accusations leveled against Lentz. (Bascom dep at 90-92, 103)

- On the advice of counsel, Ms. Lentz has maintained the $600.00 and she admits it must be returned to Cincinnati Insurance Company as it was an advance for expenses.  Ms. Lentz also has maintained $834.00 which were the remaining funds not used for office expenses.

- The Defendant, CIC, has a history and practice of discriminating against women. (Complaint. EEOC charge, Lentz dep)

- Mary Lentz is entitled to punitive damages based on income and net worth of Defendants.

- The law firm of Beacon & Timmel was charged by the Dayton Ethics Committee with engaging in the unauthorized practice of law; the Defendant, CIC, in response dissolved the firm name.

**B.    DEFENDANTS' STATEMENT OF THE CASE**

    **1.    Uncontroverted Facts**

        The following facts are undisputed as a matter of record based on depositions taken in

this case, as well as the filings made by the Plaintiff, but Defendants have been unable to

secure Plaintiff's agreement as to this:

- Mark Huller ("Huller"), Manager of the Trial Division of CIC's Legal Department, hired Mary Lentz ("Lentz") to work as an attorney in CIC's Dayton law office in April 1997. (Lentz dep. at 72; Complaint at 11, 18.) Lentz represented not only CIC's insureds in litigation, but also CIC itself on subrogation matters in some cases. (Lentz at 72-73.) In those cases in which CIC was Lentz's client, her ethical obligations were exactly the same as her ethical obligations to any other client. (Lentz at 73.) Lentz was provided with a $600.00 advance on an expense account by CIC, with the understanding that these funds would be returned once she ceased being employed by CIC

- Beginning in March 1998, Lentz began charging non-CIC attorneys involved in her cases for copies of documents she provided in discovery. (Complaint at 33, 34; Lentz at 33.) Lentz requested that non-CIC counsel reimburse her for such copies with checks made payable not to CIC, but to Mary Lentz c/o Berlon and Timmel[1] and then simply to Mary Lentz. (Lentz at 215-216, 222-223.) Lentz alleges that she cashed the checks, kept the cash in the office and used the cash for office purposes such as group lunches.

- In September 1999, Lentz, pursuant to her practice, received a reimbursement check from other counsel for copies paid for by CIC. The check was for $496.00. Lentz admits that the funds belonged to CIC (Lentz at 151, 209.) and that she deposited $346.00 from that check in her own personal bank account. (Lentz at 21-22.) In October 1999, there was a second reimbursement check for copies paid for by CIC. Of that, she deposited $488.00 in her own personal bank account. (Lentz at 23.)

- Lentz deposited these funds in her personal bank account in September and October without any notice to or permission from CIC. (Lentz at 141-142.)

- Lentz "housed" those CIC monies with her personal funds and took no steps to separate CIC monies from her own. (Lentz at 24.)

---

[1] At that time, attorneys employed by CIC's Dayton office practiced under the name Berlon & Timmel.

- As of September 30, 1999, after the first deposit of $346.00 of CIC money into Lentz's personal bank account, her balance was only $382.32. During September and October 1999, she made withdrawals from her personal account for personal expenses. (Lentz at 24-25.) She faced childcare expenses of $200 – $250 per week. (Lentz at 27; bank statement attached as Ex. 1 to Motion for Summary Judgment.)

- In December 1999, Sandy Brower, secretary to David Balzano ("Balzano"), informed Balzano that Lentz's correspondence revealed that Lentz asked that copy reimbursement checks be made payable to Lentz personally. (Balzano at 119-120.)

- Balzano passed on Brower's concern to his supervisor, Huller. (Balzano at 121.)

- Huller requested an investigation, which was done by CIC's internal investigation unit. (Matheny 61-64; Huller 267.)

- In December 1999, Lentz admitted to the CIC investigator and to Huller that she had placed CIC money in her own bank account. (Lentz at 8-9, 17-19.)

- Lentz told the investigator that she knew what she had done was wrong and asked whether she would be "fired, disbarred or arrested." (Matheny at 103-104.)

- Because Lentz placed CIC money in her bank account, Huller placed Lentz on inactive status in January 2000 and terminated her in March 2000. (Huller at 177-179; 182; 189; 192; 210-213; 261.)

- Although Lentz admits that the money belongs to CIC, it remains even today in her possession. (Lentz at 10.)

- Other than Lentz, no other CIC attorney took CIC money, commingled it with his/her own money, and used the money as though it were his/her own. (Lentz at 14.)

- CIC's investigation of Lentz's practices with regard to copy reimbursement monies was conducted by Al Matheny, an employee of CIC's Special Investigations Unit.

- From the time of Lentz's hire to the time of her termination, David Balzano was the Managing Attorney of the Dayton law office of CIC. During her employment that position was never vacant.

- Mark Huller terminated Lentz in March 2000.

- To date, Lentz has retained funds belonging to CIC. She has retained copy reimbursement monies and the expense advance of $600.00. The current estimated value of copy reimbursement monies held by Lentz is $2,600.00.

2. **Disputed Facts:**

Defendants dispute the following facts:

1. Defendants dispute as unsupported and irrelevant that Balzano was aware of and approved Lentz's ongoing practice of directing copy reimbursement monies be paid directly to her.

2. Defendants dispute as unsupported and irrelevant that there was any accurate accounting of Lentz's use of reimbursement monies.

3. Defendants dispute as unsupported and irrelevant that other attorneys used the "copy money in the same manner" as Lentz.

4. Defendants dispute as unsupported, inadmissible and irrelevant the allegation that Lentz was directed by a bank to make the checks payable to her.

5. Defendants dispute as unsupported and irrelevant the allegation that Balzano declined to give Lentz litigation support.

6. Defendants dispute as unsupported and irrelevant that Lentz sought the position of Dayton managing attorney.

7. Defendants dispute as unsupported the allegation that Balzano withheld "exculpatory evidence" in the investigation of Lentz's misconduct.

8. Defendants dispute as unsupported and irrelevant the allegation that Balzano refused to allow part-time work by females, or recommended the rehire of a male accused of sexual harassment.

9. Defendants dispute as unsupported and irrelevant the assertion that viewing inappropriate computer images is legally "similar" to an attorney/employee's depositing her employer/client's funds in her own bank account.

Because Defendants believe that these disputed facts are irrelevant to the issues before the Court in this case, they are, for the most part, subject to the nine Motions *in Limine* that Defendants have filed. Defendants assert that to allow evidence to be presented on these collateral issues will lengthen the trial and confuse and mislead the jury.

To the degree appropriate or deemed necessary, Defendants incorporate by reference Defendants' Color Coded Response to Plaintiff's Counter Statement of Facts and Conclusions of Law.

**3.    Claims And Their Elements**

Ms. Lentz is suing under three different theories:  (i) she is suing CIC for sex discrimination under Title VII; (ii) she is suing David Balzano only for tortuous interference with a business relationship with CIC; and (iii) David Balzano only for intentional infliction of emotional distress.

The elements of each claim are as follows:

**Title VII:**

Ms. Lentz must show by a preponderance of the evidence that the nondiscriminatory reasons offered by Cincinnati Insurance Company for terminating her were not its true reasons, but were a pretext for discrimination.  In other words, Ms. Lentz must show that she was not terminated for secretly taking funds belonging to Cincinnati Insurance Company and placing them in her personal bank account, but rather was terminated because she was female.

If Cincinnati Insurance Company honestly believed its stated reason for discharging Ms. Lentz, then liability against Cincinnati Insurance Company cannot be found.

**Intentional Interference with Business Relationship:**

Plaintiff must prove that a person, without possessing a privilege to do so, induced or otherwise caused a third person not to enter into or not to continue a business relationship with another.  A person or entity cannot tortiously interfere in their own business relationship.  A supervisor/employee cannot be held liable for tortiously interfering with the business relationship of a coworker and his employer for actions taken within the scope of his authority.

**Intentional Infliction of Emotional Distress:**

Plaintiff must show that:

1.    Defendant either intended, or should have anticipated, the emotional distress caused by his actions;

2.    Defendant's conduct was "so outrageous in character, and so extreme in degree" that it transgressed all societal bounds of decency and should be regarded as "atrocious" and "utterly intolerable";

3. Defendant's conduct proximately caused the emotional injury to Lentz; and

4. the emotional distress or injury was "serious," such that a reasonable person could not bear it.

**Defendants' Defenses**

Defendants deny any violation of law. Lentz was not terminated because she is female. Defendant CIC had a legitimate, non-discriminatory reason for its termination of Lentz: she took CIC money, placed it in her own bank account, and spent it for her personal expenses. No other CIC attorney – male or female – did that. Lentz has not shown and cannot show that this reason was false or insufficient to motivate her discharge.

David Balzano did not "interfere" with Lentz's employment at CIC. Balzano had nothing whatsoever to do with the decision to terminate Lentz. Whatever actions were undertaken by him were taken within the scope of his employment.

Finally, Lentz has no claim for emotional distress for several reasons. First, it is a defamation claim in disguise and is barred by the one-year statute of limitations. Second, Balzano's reporting of his concerns of how a subordinate was obtaining and using company funds to his supervisor does not rise to the level of outrageous or barbaric conduct necessary to support this claim. Third, Lentz cannot show that Balzano's conduct proximately caused her any emotional injury that the law would recognize. Fourth, Lentz cannot establish that she suffered severe emotional distress beyond what a reasonable person could bear.

**CIC's Counterclaim**

Defendant CIC has filed a counterclaim against Plaintiff Lentz for conversion of funds.

4. **Defendants' Statement of Applicable Propositions of Law:**

A. In order to prove intentional infliction of emotional distress, Lentz must show: "(1) defendant [Balzano] intended to cause [Lentz] emotional distress or knew or should have known his actions would result in serious emotional distress to [her]; (2) defendant's [Balzano's] conduct was outrageous and extreme; (3) defendant's actions proximately caused [Lentz's] emotional injury; and (4) plaintiff suffered serious emotional anguish," such as a reasonable person could not bear.

B. An employee's termination, in and of itself, does not, as a matter of law, rise to the level of extreme and outrageous conduct.

C.    In order to show tortious interference with a business relationship under Ohio law, Plaintiff must prove that a person [in this case, Balzano], without possessing a privilege to do so, induced or otherwise purposely caused a third person [in this case, CIC] not to enter into or not to continue a business relationship with another [in this case, Lentz].

D.    A person or entity cannot tortiously interfere with their own business relationship.

E.    A supervisor/employee cannot be held liable for tortiously interfering with the business relationship of a coworker and his employer for actions taken by the supervisor/employee within the scope of his authority.

F.    Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

G.    In order to prove a claim of gender discrimination, Lentz must show by a preponderance of the evidence that:

  1)    Cincinnati Insurance Company's explanation for her discharge was not the real reason; **and**

  2)    Cincinnati Insurance Company's real and intentional reason for discharging her was her gender.

**5.    Defendants' Disputed Applicable Propositions of Law:**

The following applicable propositions of law are disputed by Defendants.

A.    Lentz's claim for emotional distress is simply a "disguised defamation" claim and is also time-barred. Lentz's claim for intentional infliction of emotional distress is basically a recapitulation of her defamation claim, in that it is predicated upon the allegation that "Defendants made false and defamatory statements about the Plaintiff as a reason for terminating her," and that the making of these alleged statements was "extreme, outrageous and unjustified." Complaint at ¶ 89.

B.    Even if Lentz's claim for emotional distress is not time-barred, no basis for the claim exists under Ohio law. Under even the broadest reading of what constitutes outrageous conduct, no jury could conclude, based on the undisputed facts set forth above, that the conduct of Balzano constituted conduct that was "'so outrageous in character, and so extreme in degree' that it transgressed all societal bounds of decency and should be regarded as 'atrocious,' and 'utterly intolerable'."

C.    Lentz is unable to offer one shred of factual information that would support a finding as a matter of law that her emotional distress was so serious that a reasonable person would be unable to bear it.

D.    Lentz is unable to offer any evidence that an action by Balzano proximately caused any harm or injury.

E.    Plaintiff's allegations against Balzano – that he tortiously interfered with her employment relationship with CIC (Complaint at ¶¶ 82-83) – are based on actions taken in his professional capacity, not in any personal capacity. Lentz has failed to allege that Balzano took any action toward the Plaintiff that was outside of the scope of his employment. The reporting by Balzano to his supervisor of a report he received from a secretary regarding a subordinate's practice in connection with company funds is certainly within his authority as a CIC supervisor acting in his professional capacity.

F.    Lentz's Title VII claim against CIC fails as a matter of law. In this case, the undisputed facts set forth above show that Lentz took company money and placed it in her own bank account from which she continued to make withdrawals for personal expenses. Lentz is an attorney; such misconduct makes her unqualified as a matter of law.

G.    Lentz cannot make any showing that she was treated less favorably than some similarly situated male. Lentz has admitted that she has no knowledge that any other attorney – male or female – kept company funds in a personal bank account, as she admitted she did.

H.    CIC had "a legitimate, nondiscriminatory reason for its action," in that Lentz was terminated because she had taken funds that belonged to CIC, and not to her, and had placed those funds into her personal banking account without accounting for those funds in any manner. Such conduct provides a sufficient nondiscriminatory reason for the termination of any employee, but in the case of an attorney, that reason is even more compelling.

I.    Lentz offers no facts to "persuade the court that the proffered reason for the employment action is pretext." Lentz did, in fact, take CIC funds and place them in her personal bank account and these facts were the sufficient and motivating factors for CIC's decision to terminate Lentz.

To the degree appropriate or deemed necessary, Defendants incorporate by reference Defendants' Color Coded Response to Plaintiff's Counter Statement of Fact and Conclusions of Law.

- 14 -

C.    **WITNESSES:**

The parties have listed below those persons who will be called or who will be available to testify:

**Plaintiff:**

1)    Mary Lentz: Mary will testify about the wrongful termination and her special damages, as well as the humiliation and mental suffering that she experienced.

2)    Phil Rumme: Phil is Mary's husband and will testify about the emotional harm that was caused by the wrongful termination.

3)    Roger Makley: Roger will testify about Cincinnati Insurance Company's referral to the Dayton Ethics Committee and the Prosecutor's Office which resulted in no finding of ethical violations and no basis for charging Mary Lentz with a crime.  He will also testify about the emotional harm and suffering.

4)    Donald Kaiser: Donald will testify about the widespread practice of using copy money for lunches and special events.

5)    Donald Dessyn: Donald is employed as staff counsel for CIC in the Harrisburg, PA office and will testify about the office practice of using copy money for lunches and about office practices, and structure in general.

6)    Shelly Bascom: Shelly is still an employee with Cincinnati Insurance Company and will testify about how Mary used the copy money for lunches, and the selective investigation conducted by Al Matheny.  Shell will also testify how she was discriminated against compared to other male employees, and, in particular, Mr. Ballato who was found using company equipment to search for pornographic materials and was not disciplined when first reported.

7)    Paula Ruppert: Paula will testify about the copy money practice, the knowledge of all office staff of the practice, and the selective investigation conducted by Al Matheny.

8)    Plaintiff reserves the right to call each of Defendants' witnesses, David Balzano, Mark Huller and Al Matheny.

9)    Plaintiff reserves the right to call additional witnesses as necessary for the purposes of impeachment or rebuttal.

10)    Plaintiff may have rebuttal witnesses.

**Defendants:**

Mark Huller:       Mr. Huller will testify as to his role as the Managing Attorney of the Trial Division of Cincinnati Insurance Company and the role of the Trial Division, his role in hiring Lentz, Lentz's employment with CIC, his decision to terminate Lentz and the reasons for the termination, as well as other areas necessary for rebuttal.

David Balzano:      Mr. Balzano will testify as to his role as the Manager of the Dayton law office of Cincinnati Insurance Company, his supervision of Lentz, and his knowledge of the investigation of Lentz, as well as other areas necessary for rebuttal.

Al Matheny:       Mr. Matheny will testify as to his role as an Investigator in the Special Investigations Unit of Cincinnati Insurance Company and his involvement in the investigation of the conduct of Lentz, as well as other areas necessary for rebuttal.

Defendants also reserve the right to call witnesses in possible rebuttal, including Greg Ziegler and Lisa Love.  Defendants also specifically reserve the right to call a corporate representative witness in possible rebuttal to any evidence related to damages presented by Plaintiff.

**Defendants will move to strike both Mr. Rumme and Mr. Makley from Plaintiff's Witness List because neither was identified as persons with knowledge or as witnesses in Plaintiff's Rule 26 Initial Disclosures or in response to any other discovery request seeking the identity of persons with knowledge or the identification of witnesses. Defendants will move to strike any other witness who was not previously identified.**

D.    **EXPERT WITNESSES:**

  **Plaintiff(s):**        None.

  **Defendant(s):**        None.

E.    **EXHIBITS:**

The parties will offer as exhibits those items listed on appendices hereof prepared in accordance with Section C of the Order Instructing Certain Pretrial and Trial Procedures as follows:

  (1)    Plaintiff Exhibits:  Appendix A
       (Arabic Numerals)

  (2)    Defendant Exhibits:  Appendix B
       (Letters and/or numbers)

The parties will work to eliminate duplication from their respective exhibit lists and will endeavor to submit a list of Joint Exhibits prior to the Final Pretrial.

F.    **DEPOSITIONS, INTERROGATORIES AND ADMISSIONS:**

Plaintiff will utilize the depositions of Al Matheny and Donald Desseyn. Defendants have indicated that they will not accept service on behalf on these individuals, accordingly use of their deposition testimony may be necessary.

Defendants have informed Plaintiffs that a subpoena for the appearance of Mr. Matheny is not necessary, because they plan on calling him in their case in chief. Defendants have further informed Plaintiff that once she provides information as to the date and time she imagines calling Mr. Matheny in her case, Defendants will work with Mr. Matheny's schedule to have him available in person.

Because Defendants were only notified at 4:30 p.m. on May 19, 2005 that Plaintiff intended to perhaps present the testimony of Donald Dessyn and Al Matheny by deposition and because no specific segments of these depositions were identified by Plaintiff for use at trial, Defendants, at this time, object to the use of these deposition transcripts at trial in lieu of live witnesses.  Once Plaintiff has identified the specific sections of the deposition she intends to present, Defendants will be in a better position to offer more specific objections, in addition to this general objection.

G.    **<u>DISCOVERY</u>:**

Discovery has been completed, with the exception of those materials that are the subject of Defendants' Motion to Compel.

Plaintiff is opposing a recent Subpoena which has been served on the employer of Mary Lentz, GOTTSCHLICH & PORTUNE, LLP, and has filed a Motion to Quash the Subpoena.

H.    **PENDING MOTIONS:**

The following Motions are pending at this time:

Defendants' Motions *In Limine* as follows:

1)    Defendants' Motion In Limine To Bar References To Equal Pay Act Or Any Claims Related To Salary And/Or Promotion

2)    Defendants' Motion *In Limine* To Bar Improper "Similarly Situated" And Related Evidence

3)    Defendants' Motion *In Limine* To Bar Evidence Related To Mark Huller's Contacts With The Dayton Bar Association And Montgomery County Prosecutor's Office

4)    Defendants' Motion *In Limine* To Bar Any Evidence Of Or Reference To Alleged Conduct Of David Balzano Unrelated In Time Or Subject To The Claims Made By Plaintiff

5)    Defendants' Motion In Limine To Bar References To *Rochlin* Litigation

6)    Defendants' Motion *In Limine* To Bar Any Evidence And/Or References Related To Punitive Damages

7)    Defendants' Motion *In Limine* To Bar Irrelevant And Misleading Statistical Evidence Or References

8)    Defendants' Motion *In Limine* To Bar Witnesses From Offering Evidence Contrary To The Evidence They Provided To CIC At The Time Of The Termination Decision

9)    Defendants' Motion *In Limine* To Bar Any Evidence Or References Related To The Net Worth Of Defendants And /Or Regarding Conduct That Has No Nexus To The Harm Alleged By Plaintiff

10)    Plaintiff's Motion to Quash Subpoena Served on Plaintiff's Employer

11)    Defendants' Motion to Compel Production of Plaintiff's Wage and Earnings Records, Including Income Tax Forms

## V.    <u>SETTLEMENT EFFORTS</u>:

### Plaintiff's Statement Regarding Settlement Efforts

Plaintiff, Mary Lentz, expressed an interest in settling this case in a fair and equitable manner at the conclusion of all the discovery, and has set forth the amount of damages previously in the answers to interrogatories and initial disclosures.

Plaintiff has also made a demand for settlement of $375,000.00 in November of 2004 and there has been no response.

The Court had set this matter for a settlement conference utilizing Magistrate Black, however, personal family medical problems prompted Plaintiff's counsel to request a continuance. When the matter was presented for possible rescheduling, Plaintiff's counsel was informed by Defendants' counsel that there would be no money made available and no discussions until Plaintiff got reasonable. On the basis of that statement, Plaintiff's counsel informed the Court that it would probably not be productive at all. Plaintiff's counsel has suggested a private mediator known to both parties and that has been rejected.

### Defendants' Statement Regarding Settlement Efforts

Defendants prepared to attend the settlement conference before Magistrate Black that was cancelled at Plaintiff's request. Defendants responded to Plaintiff's counsel that his demand of $375,000 was unreasonable and that if that number represented a realistic expectation Plaintiff's part, settlement was not possible. Plaintiff's counsel said that he would not bid against himself. No further settlement discussions have occurred.

**IT IS SO ORDERED.**

_____
Michael H. Watson, Judge
United States District Court


_/S/ Michael K. Sutherlin per telephone authorization 5/19/05_____
Michael K. Sutherlin
Nicholas Conway
Michael K. Sutherlin & Associates
P.O. Box 441095
Indianapolis, IN 46244-1095
Telephone: (317) 634-6313
Facsimile: (317) 631-8818

Lynn D. Pundzak
Suite 999
Second National Bldg.
830 Main Street
Cincinnati, OH 45202
Telephone: (513) 564-9999
Facsimile:  (513) 345-4703

*/S/ Deborah S. Adams*
Deborah S. Adams (0005607)
Jack B. Harrison (0061993
FROST BROWN TODD LLC
2200 PNC Center
201 E. Fifth Street
Cincinnati, Ohio 45202-4182
Telephone:  (513) 651-6800
Telecopier:  (513) 651-6981
dadams@fbtlaw.com
jharrison@fbtlaw.com

**Counsel for Defendants**

**Appendix A**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| MARY E. LENTZ | : | Case No.: 01-CV-599 |
| | : | |
| Plaintiff, | : | Judge Watson |
| | : | |
| v. | : | **PLAINTIFF'S EXHIBIT LIST** |
| CINCINNATI INSURANCE | : | |
| COMPANY, et al. | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFF'S EXHIBITS

**Des.**                          **Description**                          **AD  ID  PROF**

1   Mary Lentz's application for employment with Berlon & Timmel.

2   Mary Lentz's resume submitted to Berlon & Timmel.

3   Mary Lentz's evaluations for 1997, 1998, and 1999.

4   Mary Lentz's charge of discrimination with the
    Ohio Civil Rights Commission.

5   Mary Lentz's Unemployment Ruling.

6   Ohio's Unemployment Request for Information
    completed by CIC representative.

7   Letter of January 26, 2004 to the Dayton Ethics Committee
    from Mark Huller.

8   Letter of February 23, 2002 to Dayton Ethics Committee,
    Joan Brunner, from Mark Huller.

9   Letter dated May 14, 1998 from Julia Gibson explaining
    how checks are to be made payable.

10  Letter dated February 23, 2000 from Roger Makley to the
    Ethics/Grievance Committee.

11  Letter dated April 18, 2000 to Joan Brunner from Roger Makley.

12    Memo dated January 10, 2000 of Mark Huller.

13    Letter dated March 4, 2000 from Mark Huller to Roger Makley.

14    Memo to Greg Ziegler from Hank Burlon - undated.

15    Email memo dated 12/29/99 to Dave Balzano from Al Matheny
      forwarded to Mark Huller.

16    Letter dated January 3, 2000 to Al Matheny from Paula Ruppert.

17    Termination Letter dated March 4, 2000.

18    Memo dated January 12, 2000 from Greg Lewis to Al Matheny.

19    Set of receipts for lunches and other office purchases.

20    Email dated January 24, 2000 to Al Matheny from Greg Lewis.

21    Exit interview of Joe Currin dated 3/07/2000.

22    Email regarding Joe Currin from Mark Huller dated 4/27/2000.

23    Letter to Mark Huller from Dayton Grievance Committee
      dated May 9, 2000.

24    Memo to file dated January 10, 2000 from Huller regarding
      Mary Lentz's prosecution.

25    Memo to Dave Balzano from Huller regarding billing dated March 2, 1999.

26    Performance reviews of Dave Balzano for 1997. 1998, 1999 and 2000.

27    Interview notes for performance review of Mark Huller when
      reviewing Mary Lentz.

28    Letter to Mary Lentz awarding bonus and setting forth salary for 2000.

29    CIC Annual Report 2000.

30    CIC Annual Report 2001.

31    CIC Annual Report 2002.

32    CIC Annual Report 2003.

33    CIC Annual Report 2004.

34    Letter from Huller to Mary Lentz File dated 12/30/1999

35    CIC Notice of Annual Stockholders Meeting March 21, 2005.

36    Letter Dated May 5, 1998 to Mary Lentz.

37    Bank Statement of Mary Lentz, September 1999.

38    Bank Statement of Mary Lentz, October 1999.

39    Bank Statement of Mary Lentz, November 1999.

40    Bank Statement of Mary Lentz, December 1999.

41    Handwritten Summary of Copy Monies Recaptured.

42    Letter from Dayton Ethics Committee to the Dayton Office of
      Berlon & Timmel.

43    Letter From Don Dessyn Dated June 19, 2000.

44    Letter from Mary Lentz to EEOC dated 2/9/01
      requesting Right to Sue letter.

45    Mary Lentz's EEOC Request for Withdrawal of
      Charge of Discrimination Form

46    EEOC Notice of Right to Sue

47    Letter to Frederic Young and Mary Lentz from Droder & Miller
      dated 10/2/1998

48    Letter to Frederic Young and Mary Lentz from Droder & Miller
      dated 10/23/1998

49    Letter from Phil Van Houten to Allen Matheny dated 1/4/2000

50    Handwritten statement of Mary Lentz's 2000 earnings

51    Statement of Mary Lentz's 2001 earnings

52    Statement of Mary Lentz's income and Tax Schedule K-1 Form 1065
      statements for 2002 and 2003

Plaintiff reserves the right to present additional evidence as necessary for purposes of impeachment or rebuttal.

**Appendix B**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| MARY E. LENTZ, | : | Case No.: 01-CV-599 |
| | : | |
| Plaintiff, | : | Judge Watson |
| | : | |
| v. | : | |
| | : | **DEFENDANTS' TRIAL EXHIBIT LIST** |
| | : | |
| CINCINNATI INSURANCE | : | |
| COMPANY, et al. | : | |
| | : | |
| Defendants. | : | |

       The following are the Exhibits that Defendants currently anticipate offering at trial in this matter. Defendants reserve the right to supplement this list after reviewing Plaintiff's Witness and Exhibit Lists. On May 16, 2005, Defendants received some additional documents from Plaintiff relating to Plaintiff's income and earnings which should have been, but were not previously produced. Defendants have not yet had sufficient time to review these documents and are waiting on Plaintiff to produce additional documents as well. Defendants also reserve the right to identify additional Exhibits for the purpose of rebuttal.

| Designation | Description | AD | ID | PROF |
|---|---|---|---|---|
| DX1 | Lentz Resume, CIC 000102-03 | | | |
| DX2 | Lentz Service Record | | | |
| DX3 | Lentz Acknowledgment of $600 advance, CIL 000122 | | | |
| DX4 | Termination Notice, CIC 000096 | | | |
| DX5 | EEO Policy | | | |
| DX6 | Materials Related to Plaintiff Lentz's Requests for Reimbursement, CIC 000013, 32-34, 37-45, 47, 50-63, 65, 89, 1 p. Def. Exh. 8 Lentz | | | |
| DX7 | Lentz Biography on Gottschlich & Portune's Website | | | |
| DX8 | 4/28/97 Lentz Application for Employment, CIC 000104-05 | | | |
| DX9 | 11/17/97 Letter from Huller/Lewis to Lentz, Pl. 051 | | | |
| DX10 | 7/15/98 Letter from Lentz to Schoenfeld, CIL 000030 | | | |
| DX11 | 11/12/98 Letter from Huller/Lewis to | | | |

| | | | | |
|---|---|---|---|---|
| | Lentz, Pl. 050 | | | |
| DX12 | 2/15/99 Letter from Lentz to Garofalo, CIL 000340 | | | |
| DX13 | 5/11/99 Letter from Lentz to Eddy, with Statement, Itemized List and Statement, CIL 000033-36 | | | |
| DX14 | 5/28/99 Letter from Lentz to Eddy, with Statement, CIL 000041-42 | | | |
| DX15 | 8/19/99 Letter from Lentz to Eddy, CIC 000061 | | | |
| DX16 | 9/99 Lentz Banking Statement | | | |
| DX17 | 10/99 Lentz Banking Statement | | | |
| DX18 | 11/15/99 Letter from Huller/Lewis to Lentz re Salary/Bonus Effective 11/99, CIL 000184 | | | |
| DX19 | 12/29/99 (9:52 a.m.) Email from Matheny to Benoski (Subject B&T (Lentz)), CIC 000047-50 | | | |
| DX20 | 2000-2004 Tax Returns for Lentz | | | |
| DX21 | 2001-2005 Wage/Earnings Documents for Lentz | | | |
| DX22 | Letter to Lentz re Salary/Bonus For 1997, CIL 000186 | | | |
| DX23 | Letter to Lentz re Salary/Bonus For 1998, CIL 000185 | | | |
| DX24 | Letter to Lentz re Salary/Bonus For 1999, Pl. 049 | | | |
| DX25 | 10/15/97 Letter from Gottschlich to Lentz re Lentz rejected offer , Pl. 023 | | | |
| DX26 | 9/26/99 Letter from Lentz to Lexis-Nexis re seeking legal consultant position, Pl. 009 | | | |
| DX27 | 6/26/00 Letter from Lentz to Major Legal Services re seeking full time position, Pl. 005 | | | |
| DX28 | 1/12/00 Memo from G. Gregory Lewis, Legal Department, to Al Matheny, SIU, CIC 000018-19 | | | |
| DX29 | 11/19/98 – Letter From Huller to Lentz | | | |