UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| MARY E. LENTZ, | : | Case No.: 01-CV-599 |
| | : | |
| Plaintiff, | : | (Judge Watson) |
| | : | |
| v. | : | |
| | : | |
| CINCINNATI INSURANCE CO. and | : | **DEFENDANTS' TRIAL BRIEF** |
| DAVID BALZANO, | : | |
| Defendants. | | |

Defendants Cincinnati Insurance Co. ("CIC") and David Balzano ("Balzano") (collectively, "Defendants") respectfully submit this trial brief for the remaining claims of Plaintiff Mary Lentz ("Plaintiff"), which include a federal claim for gender discrimination against CIC, an intentional infliction of emotional distress claim against Balzano, and a claim for tortious interference with a business relationship against Balzano, and for CIC's counterclaim against Plaintiff for conversion. The controlling authority and unrebutted record establish that Plaintiff's claims fail as a matter of law,[1] while CIC succeeds in its claim for conversion.

**I.   INTRODUCTION**

Plaintiff has sued CIC under Title VII, so she must prove she was fired because she is female. Also, she must prove Balzano caused her discharge, acted outside his employment in doing so, and intentionally committed extreme and outrageous conduct that caused nearly debilitating emotional distress. There is simply no evidence to support any of these claims.

Plaintiff's claims against Defendants fail because she has produced no relevant, admissible evidence to prove her allegations, refute the legitimate explanation for her discharge, or demonstrate the requisite conduct of Balzano. Instead, Plaintiff offers bare speculation,

---

[1] With respect, Defendants continue to believe that the Court's failure to grant summary judgment on all claims was error.

improper lay opinions, and irrelevant, incomparable employees. As this Court, the Sixth Circuit, and myriad courts across the country have held, none of the above can support Plaintiff's claims against Defendants.

The relevant facts of this case are simple. Balzano, acting within his scope of employment as her supervisor, reported to his boss, Mark Huller ("Huller"), a secretary's concern that Plaintiff directed that copy monies belonging to CIC be reimbursed by checks made payable to Plaintiff personally. When CIC investigated, Plaintiff admitted to secretly taking CIC's money, commingling it in her personal bank account, and spending the money on personal, non-office-related expenses. CIC fired her for this admitted conversion.[2] Plaintiff cannot and has not refuted any of this evidence. Accordingly, the Court should grant judgment in favor of Defendants on all claims.

## II.     ARGUMENT OF LAW

### A.     Plaintiff's Gender Discrimination Claim Against CIC Fails Because She Cannot Identify a Single Similarly Situated Male Employee Who Converted Money Like She Did But Was Treated More Favorably.

Plaintiff's arguments cannot obscure the legal burden of persuasion she must meet: she must produce evidence that she was fired **because she is female**. She cannot satisfy this burden with general allegations of mistake, unfairness, or even malice. She must demonstrate that the actual reason for discharge was not just pretext, but pretext for **gender discrimination**. A usual approach in an attempt to prove pretext is to argue that defendant treated plaintiff more harshly than a similarly situated male. Plaintiff Lentz cannot make that argument. No other CIC employee secretly placed money belonging to CIC in his or her personal bank account. The law

---

[2] The relevant facts have been presented to the Court previously in Motions in Limine currently pending before the Court, which Defendant's incorporate by reference here. Defendants also refer the Court to its Reply in Support of Motions in Limine (at 6-11), where Defendants outline these facts in more detail and explain by quoting from the record why these facts cannot honestly be disputed.

in the Sixth Circuit requires Plaintiff to prove that she was treated less favorably than a male who is "similarly situated in all respects." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992); *Vaughn v. Watkins Motor Lines*, Inc., 2000 U.S. Dist. LEXIS 22048, at *26-27 (S.D. Oh. Dec. 6, 2000). As a matter of Sixth Circuit law, to be deemed similarly situated, Plaintiff and her comparables must have engaged in the "same misconduct" with "comparable seriousness" and "without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell*, 964 F.2d at 583.

Plaintiff attempts to compare her conduct and treatment with that of Tom Ballato, an attorney who worked at CIC and was terminated two years after Plaintiff's termination. Ballato was discovered visiting raunchy sites on his work computer. When confronted he informed CIC that he was being medically treated for an addiction to pornography. CIC placed him on final warning, monitored his computer, and terminated him for viewing a negligee-clad woman on his work PC.[3] Plaintiff's characterization of Ballato's misconduct as "stealing" company time cannot convert completely different transgressions and mitigating factors into "similarly situated" misconduct under Sixth Circuit law. Courts within and outside the Sixth Circuit mandate that Plaintiff cannot be permitted to pretend that viewing suggestive images on a computer subject to an addiction is the "same conduct" as the commingling of monies. The controlling law simply does not allow it. *See, e.g., Mitchell*, 964 F.2d at 581-83 (no discrimination where African-American nurse was terminated for deliberately misplacing forms and white nurses were retained despite their misconduct of poor attendance and cursing; misconduct of alleged comparables was not legally "similar"); *Wilkins v. Eaton Corp.*, 790 F.3d 515 (6th Cir. 1986) (no discrimination where older pilot was fired for a stated refusal to fill out

---

[3] Defendant has previously demonstrated why Plaintiff's references to Ballato are both improper and irrelevant to determining whether Plaintiff was discriminated against. (See Document 105, Def.'s Mot. In Limine to Bar Improper Similarly Situated and Related Evidence and Def.'s Reply Supp. of Document 105.)

pre-flight checklist and to fly with checklist and younger pilot who did not use checklist was retained because younger pilot had stated disagreement but no outright refusal to comply); *Warfield v. Lebanon Corr. Inst.*, 181 F.3d 723 (6th Cir. 1999) (no discrimination where female prison guard terminated for failing to follow security procedures while male guards were retained who had also failed to follow security procedures but to a lesser degree); *Beene v. St. Vincent Mercy Med. Ctr.*, 111 F. Supp. 2d 931 (N.D. Oh. 2000) (no discrimination where African-American nurse terminated for what she alleged was the common practice of "charting ahead" on a medical chart and white nurses were retained despite serious mistakes, including improper insertion of IV line causing patient death and accidental suspension of cardiac alarms); *EEOC v. Sacco*, 102 F. Supp. 2d 382, 389 (E.D. Mich. 1999) (no discrimination where African-American cashier was terminated for violating the company's cash handling policy by **allegedly stealing** from "the cash till of another employee" where white cashiers who were not terminated for "leaving work without counting one's cash till" or "leaving one's cash till unattended" or "directing another to leave without counting her till" because, though violations of same policy, latter violations were **not of "equal significance"** to the terminated employee's); *Edwards v. Newport News Shipbuilding & Dry Dock Co.*, 1998 U.S. App. LEXIS 30857, at *6-7 (4th Cir. Dec. 7, 1998) (no discrimination where African-American employee was discharged for refusing to surrender his identification badge to the employer's security guard because, unlike white employees who had violated the same rule, the guards caught the discharged employee attempting to **steal company property** and then bribe them out of reporting him); *Britton v. City of Popular Bluff*, 244 F.3d 994, 997-98 (8th Cir. 2001) (no discrimination where female employee refused reinstatement for **"stealing a service"** from the employer and male employee only suspended for receiving "stolen property").

Defendant CIC respectfully submits that as a matter of law Plaintiff cannot establish that CIC retained any male employee similarly situated to her. As the case law demonstrates, Ballato is not a legally sustainable "comparable." Neither are the employees of the Dayton office who Plaintiff alleges knowingly participated in office lunches purchased with copy reimbursement money. Even accepting as true Plaintiff's overstated description of other employees' knowledge and participation, the other employees in the Dayton office were not "similarly situated" to Plaintiff, and CIC was entitled to treat them differently without creating any adverse inference of gender discrimination. The record remains unchallenged that:

- Plaintiff was the only attorney who requested that reimbursed checks for copies paid for by CIC be made out to her personally. (Lentz Dep. at 61.)

- Only Plaintiff and her secretary had access to the reimbursed monies that Plaintiff collected. (Id. at 219-20.)

- Neither Plaintiff nor her secretary made any attempt at accounting in connection with the "copy money." (Id. at 217-20.)

- Only Plaintiff took over $800 of the copy money and placed it in her personal bank account. (Id. at 14, 23.)

- Plaintiff was careful to tell no one – not Huller, not Balzano, not her Dayton colleagues – that she was commingling CIC's money in her own account. She kept that secret. (Id. at 41-42.)

- Huller fired Plaintiff when she admitted this commingling. He fired no one – male or female – for participating in office lunches paid for by copy monies parsed out by Plaintiff and her secretary. (Id. at 138, Huller Dep. at 177-79, 182, 189, 192, 210-13, 261.)

These unrebutted record facts destroy any proper comparison between Plaintiff and the remaining Dayton employees. Moreover, the employees who were unpunished by CIC for eating office lunches included females. Plaintiff cannot, as a matter of law, point to any evidence of sex discrimination by CIC.

**B.     Plaintiff's Gender Discrimination Claim Against CIC Also Fails Because She Cannot Show That CIC Did Not Honestly Believe Its Legitimate Reason For Terminating Her – That She Converted Money From CIC.**

   **1.    Plaintiff's disagreement with Huller's good-faith belief is irrelevant to the question of gender discrimination.**

Plaintiff admitted to CIC that she took company money, placed it in her bank account, and used some of it on personal expenses. She also admitted that no one else did this and that Huller fired her after her admission. (Lentz Dep. at 14, 138.) She admitted she could not dispute Huller's good-faith belief that she had converted and commingled CIC's money. (Id. at 135.) She merely asserts her opinion that he was mistaken and believed an inaccurate version of the facts. (Id. at 143-45.) That is simply not enough. That is not evidence of **gender** discrimination.

In *Braithwaite v. Timken Co.*, 258 F.3d 488 (6th Cir. 2001), the company proffered its legitimate, non-discriminatory reason for the discharge of Braithwaite, an African-American: striking a co-worker and threatening a co-worker, conclusions reached after an internal investigation. Braithwaite claimed the reason for the discharge was pretext or a cover-up of the real reason (race discrimination). Braithwaite denied that he had physically struck anyone and denied a serious intent to do so. The Sixth Circuit made clear that Braithwaite's claim failed because Braithwaite "must allege more than a dispute over the facts upon which his discharge was based. He must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Id.* at 494.

There is no evidence in this record to show that Huller did not "honestly believe" that Plaintiff had converted and commingled CIC's money. Indeed, Plaintiff admits Huller believed she did and admits that she did in fact put the money into her bank account. Plaintiff Lentz

6

offers nothing to challenge Huller's honest belief, his "'reasonable reliance' on the particular facts that were before [him] at the time the decision was made." *Id.*

Plaintiff essentially argues that she disagrees with Huller's judgment – she claims she meant to bring the money back and he should not have fired her. While Plaintiff's disagreement with her discharge is understandable, it is legally meaningless. Plaintiff cannot establish pretext by asserting disagreement with Huller's judgment. *See Peters v. Lincoln Elec. Co.*, 285 F.3d 456 (6th Cir. 2002) (belief of plaintiff accountant and his co-workers that he was performing satisfactorily is insufficient to establish inference of discrimination where employer offered unsatisfactory performance as a reason for adverse action); *Noble v. Brinker Int'l Inc.*, 391 F.3d 715, 723-24 (6th Cir. 2004) (mere speculation that one supervisor's "contaminated perception" of discharged employee was imputed to decisionmaker was insufficient to prove discharge because of race); *Gribcheck v. Runyon*, 245 F.3d 547, 552-53 (6th Cir. 2001) (blanket denial by discharged postal worker of employer's reason, inconsistencies in the statements given to employer, labeling a co-worker who provided a statement a "bold faced liar," and merely questioning the credibility of the employer's legitimate reason were all insufficient to prove pretext); *Garrison v. Nygren*, 2004 U.S. Dist. LEXIS 4269, at *6 (N.D. Ill. Mar. 18, 2004) ("Self-serving quarrels with the legitimacy of employer's conduct do not establish pretext."). The controlling authority demonstrates Plaintiff's evidence is woefully inadequate to prove that the true reason for her discharge was her gender.

### 2. Plaintiff's unsupported assertion that CIC's investigation was inadequate is irrelevant to the question of gender bias.

Plaintiff's conclusory and unsupported assertion that CIC did not turn over every stone in investigating Plaintiff's misconduct is irrelevant.[4] Even if the investigation into Plaintiff's admitted misconduct had been somehow imperfect, such evidence does not create evidence of discrimination under Title VII. In *Braithwaite*, a plaintiff accused management of "intentionally ignor[ing]" several statements that were favorable to him during its investigation of his misconduct. 258 F.3d at 495. The Sixth Circuit held there was "no doubt that [the employer] had a reasonable belief" the plaintiff committed the misconduct because the evidence before management at the time of the discharge either affirmed the plaintiff's guilt or failed to refute the allegations against him. *Id. See Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998) ("Courts do not require that the decisional process used by the employer be optimal or that it leave no stone unturned."). An "honest belief" exists where the employer "reasonably relied on the particularized facts before it at the time the decision was made." *See Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001); *see also Braithwaite*, 258 F.3d at. 494 (same); *McGruder v. Frank*, 825 F. Supp. 1300, 1310 (S.D. Oh. 1992) ("The **issue** in a discrimination case **is not whether** the basis on which the employer acted in taking a **personnel action is 'sound'**; rather, the issue is whether the reasons articulated by the employer are a pretext for gender discrimination). *See, e.g., Christenson v. Boeing Co.*, 2004 U.S. Dist. LEXIS 19406, at *24-25 (D. Ore. Sept. 22, 2004) (**quality and accuracy of the investigation** of plaintiff who was terminated for stealing was **immaterial** to the issue of pretext); *Vegas v. Sprint Corp.*, 2004 U.S. Dist. LEXIS, at *37-43 (D. Kan. Oct. 25, 2004) (**irrelevant** whether plaintiff

---

[4] There is no evidence that a "flawed" investigation led to Plaintiff's discharge, let alone discharge because she was female. Huller terminated Plaintiff for one reason: commingling. Plaintiff admitted commingling. No more reliable foundation for a discharge decision could exist.

8

was actually guilty of misrepresenting her expenses and **that the investigation was inadequate**; all that mattered was whether the employer believed the allegations were true). Certainly CIC possessed an honest belief that Plaintiff covertly placed CIC's money in her bank account without permission; she actually admitted doing so to Huller and the investigator, Al Matheny. Plaintiff has produced no evidence to prove that the commingling or the admission did not occur, or that CIC did not believe her admission. Accordingly, she has failed to prove she was discharged because she is a female.

> 3. **Plaintiff's unsupported allegation that Balzano disliked her is also irrelevant to the question of gender discrimination.**

Plaintiff's core theory of liability is that Huller made a mistake in firing her and that Balzano set the mistake in motion by reporting Brower's concern to Huller following a disagreement over the allocation of office resources. The proper legal response to that theory – taken as true – is: so what? Accepting the theory as having record support (which it does not), it creates absolutely no reasonable inference that Huller terminated Plaintiff **because she is female**. Plaintiff's own testimony establishes the absence of any triable inference of gender discrimination:

> Q: Give me each and every reason you have to say that you think you were fired because you were the only woman.
>
> A: I think, based on what I have testified to previously, there was a lot of friction between me and Dave, and I think that it's more than coincidental one month after he and I had this discussion, that I'm brought up on charges and turned into SIU for something that – I mean, it wasn't only because I had $800 of copy expenses or costs in my account. They were denying any knowledge of the use or existence of copy money at all. So when – from what I understand, and again, I don't know, I can only read what's put in front of me, in terms of discovery, that at some point Sandra Brower was going through the files or through the – I think we had a server problem. In any event, she saw one of these letters. All these letters were kept in the files on the computer. She brought it to Dave's attention one month – within a month of us having this discussion, rather

> heated discussion, and I'm turned in, and from there, I think Mark Huller and whoever these other gentlemen were that made this decision believed a distorted and dishonest account of what happened. Not just from me and not just from Paula Ruppert, but from Shelly Bascom, from Joe Currin, from Don Desseyn.
>
> * * *
>
> Q. So you're saying that the reason given to you by the company was pretext, a pretext for what?
>
> A. That Dave Balzano wanted to get rid of me, and painted this distorted and dishonest picture of what happened, and they believed it and they selectively believed him and chose not to believe everybody else that was talked to.

(Lentz Dep. at 434-44.) For argument's sake, take Plaintiff's assertion as "fact" – that Balzano called Huller because of the friction over office resources or even because he disliked her generally – the legal significance of that "fact" is zero. It adds nothing to the relevant inquiry – did Huller fire Plaintiff because she is female? The only reasonable answer to that question based on the record is "no."

First, even if Plaintiff could show (and she cannot) that CIC fired her because of her confrontation with Balzano over the allocation of office resources, that does not prove what is at issue here – **gender** discrimination. The alleged pretextual reason (i.e., commingling) must be a pretext for sex discrimination – not for another non-discriminatory reason. *See, e.g., Shah v. Gen. Elec. Co.*, 816 F.2d 264, 271 (6th Cir. 1987) (plaintiff's personality conflict with his supervisor and disagreement with his supervisor's evaluation of his performance was not sufficient to raise inference of discrimination); *Taber v. Christ Hosp.*, 723 F. Supp. 1236, 1242 (S.D. Oh. 1989) ("Although it appears **plaintiff's relationship with her superiors may have become strained, this Court is unwilling to speculate** on the reasons plaintiff was not selected to that position but does point out that for the purposes this matter is before the Court, the record

indicates that age was not a factor in that decision."). Plaintiff simply cannot rely upon allegations that CIC's investigation of her was somehow flawed by Balzano's alleged dislike of her. She must rebut the stated reason for discharge and show that the stated reason was a pretext for sex discrimination. She has done neither.

Second, the record is completely unrebutted that Balzano played no role whatsoever in Plaintiff's discharge. *See, e.g., Phelps v. Jones Plastic & Eng'g Corp.*, 20 Fed. Appx. 352, 357-58 (6th Cir. 2001) (nondecisionmaker's view of plaintiff as a "thorn in his paw" and alleged opinion that he wanted to get rid of plaintiff because he viewed him as too old for the job could not establish discharge was discriminatory). Huller made the decision. Moreover, Huller made the decision without relation to anything Balzano said or did. Huller fired Plaintiff because she admitted commingling. That eliminates any nexus whatsoever to Balzano because Plaintiff Lentz commingled in secret. Balzano had no knowledge of the commingling before Plaintiff's admissions to CIC's investigator and to Huller.

**C.    Plaintiff Cannot Establish Gender Discrimination Because The Same Person Who Hired Her Also Fired Her.**

Huller, the person who hired Plaintiff, was also the person who discharged her. Where the individual who hires a person is the same person who then fires them, there is a strong inference that discrimination did not motivate the discharge. *See Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 572 (6th Cir. 2003) (en banc); *Buhrmaster v. Overnite Transp. Co.,* 61 F.3d 461, 463 (6th Cir. 1995). In the context of this record, which lacks any evidence of sex discrimination, the Court should presume that Huller's decision to terminate Plaintiff was not based on her gender because Huller also hired her. Accordingly, Plaintiff's claim of gender discrimination against CIC fails.

**D.    Plaintiff's Tortious Interference Claim Against Balzano Fails Because Balzano Did Not Cause Her Termination – Her Own Admission To Commingling Did – And Balzano Was Acting Within His Role As A Supervisor When He Reported Her Practice of Requesting Checks Be Made Out To Her Personally.**

In order to prove tortious interference with a business relationship under Ohio law, Plaintiff must prove that Balzano, while acting outside of his role as a supervisor, induced or otherwise purposely caused CIC not to continue its business relationship with Plaintiff. *A&B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 651 N.E.2d 1283 (Oh. 1995). This record simply does not allow such a finding. First, Balzano's conduct did not cause Plaintiff's discharge. Balzano alerted his boss, Huller, that there was file correspondence in which Plaintiff requested that reimbursement checks be made out to her personally. That fact was true; that fact did not get her fired. Plaintiff's request for personal reimbursement – while odd – was not itself evidence of misconduct. Plaintiff could have (and should have) endorsed the check over to CIC. Al Matheny's (CIC investigator) inquiry went beyond the correspondence reported by Balzano: it was "did the money come in and what happened to it?" Only Plaintiff knew the answer to that question. Plaintiff admitted to Matheny and then to Huller that she had diverted over $2400 of CIC's money, $834 of which went to her personal bank account. It was that misconduct and that admission that caused her termination – nothing that Balzano did or said.

It is equally irrelevant that Plaintiff alleges that Balzano "lied" to CIC by not being fully forthcoming about the extent of his knowledge concerning the "copy fund." Even if true (and there is no evidence that it is) it simply does not figure in the proper legal inquiry. First, Plaintiff Lentz was not fired because of how "copy money" was used at the office. Whether Balzano lied through his teeth or spoke the unvarnished truth about the number of office lunches paid for by "copy money" made no difference to the reason for her discharge": she commingled.

Under Ohio law, a supervisor/employee cannot be liable for tortiously interfering with the business relationship of a co-worker and his employer if the action taken by the supervisor/co-worker occurs within the scope of his authority. *Anderson v. Minter*, 32 Ohio St. 2d 207, 291 N.E.2d 457 (1972); *see Mitchell v. Mid-Oh. Emergency Servs.*, 2004 Ohio 5264, P32 (Oh. App. 10th Dist. 2004) ("[A] person in a supervisory capacity or other position of authority over the employee cannot be held liable for interfering if it is that person's duty to monitor, supervise, or enforce."). *See, e.g., Contadino v. Tilow*, 68 Ohio App. 3d 463, 589 N.E.2d 48, 50-51 (1st. Dist. 1990) (director of crisis intervention did not intentionally interfere with a plaintiff's employment, even though director advocated plaintiff's dismissal, where director owed a duty to the program to advocate the dismissal if it was in the program's best interest).

Nor does it matter whether Balzano acted out of spite. Spite does not take Balzano out of the scope of his employment. Whatever his alleged motivation, Balzano was not acting outside of the scope of his duties as a supervisor when he reported the oddity in Plaintiff Lentz's correspondence to Huller. In *Anderson*, the Ohio Supreme Court dismissed an action where the complaint alleged that a supervisor maliciously suspended the plaintiff for five days. The court reasoned that a supervisor could not interfere with the business relationship between an employee and his employer if the action taken by the supervisor occurred within the scope of his delegated authority. 32 Ohio St. 2d at 213. The court stated that liability could not be "predicated simply upon the characterization of such conduct as malicious." *Id. See also Simpson v. Bakers/Local No. 57*, 1998 Ohio App. LEXIS 1855, at *13 (1st Dist. May 1, 1998) ("A complaint alleging that a supervisory employee maliciously induced an employer to discharge an employee under his supervision does not state a cause of action upon which relief can be granted if the supervisory employee was acting within the scope of his employment

13

duties."). *See, e.g., Duggan v. Orthopedic Inst. Oh., Inc.*, 2004 U.S. Dist. LEXIS 7583, at *8-12 (N.D. Oh. Apr. 8, 2004) (no tortious interference where administrative director maliciously reported plaintiff president's abusive behavior to other individual defendants; administrator made report in his professional capacity); *Phung v. Waste Mgmt., Inc.*, 40 Ohio App. 3d 130, 134, 532 N.E.2d 195 (6th Dist. 1988) (no tortious interference where supervisor reported information concerning the activities of the plaintiff, a subordinate, to his superiors while acting, even if maliciously, within the scope of the supervisor's duties)

Plaintiff has failed to show how Balzano took any action toward the Plaintiff that was outside the scope of his employment. Under *Anderson* and its progeny, it matters not that Balzano allegedly acted with malice. Consequently, Ohio law mandates judgment at law against Plaintiff.

**E.    Plaintiff Cannot Prove Balzano Intentionally Inflicted Emotional Distress Upon Her Because He Did Not Cause Her Termination, His Conduct Was Not Extreme And Outrageous, And She Produced Insufficient Evidence To Prove She Suffered Serious Emotional Harm.**

In order to establish the tort of intentional infliction of emotional distress ("IIED"), Plaintiff must show that: (1) Balzano intended or should have anticipated his actions would cause Plaintiff emotional distress; (2) Balzano's conduct was "so outrageous in character, and so extreme in degree that it transgressed all societal bounds of decency and should be regarded as atrocious, and utterly intolerable"; (3) Balzano's conduct proximately caused the emotional injury to Plaintiff; and (4) the emotional distress or injury was so serious that a reasonable person could not adequately cope with it. *See Yeager v. Local Union 20*, 6 Ohio St. 3d 369, 453 N.E.2d 666 (1983).

As stated above, Plaintiff's claim fails because Balzano did not proximately cause any injury to Plaintiff. CIC did not rely upon the report of Balzano to terminate Plaintiff. Instead,

Plaintiff was terminated because she admitted to "housing" CIC money in her personal bank account, unlike any other CIC employee.

Assuming Balzano did somehow cause injury to Plaintiff, her claim still fails as a matter of law. Even if one accepts that Balzano was motivated by some sort of malice or personal animus in reporting what Brower discovered, Plaintiff falls well short of overcoming the high standard for successfully proving IIED claims in the employment arena. *See Baab v. AMR Servs. Corp.*, 811 F. Supp. 1246, 1269 (N.D. Oh. 1993) ("To say that Ohio courts narrowly define 'extreme and outrageous conduct' would be something of an understatement."); *Wilson v. GTE N.*, 956 F. Supp. 707, 718-19 (N.D. Tex. 1996) (stating that only in the "most unusual cases" will conduct occurring in the employment context give rise to an independent IIED claim).

Even intentional discrimination does not constitute conduct so outrageous in character, and so extreme in degree, as to go beyond all societal possible bounds of decency. *See Yeager*, 6 Ohio St. 3d at 374-75. If that were true, "then every discrimination claim would simultaneously become a cause of action for the intentional infliction of emotional distress." *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 373 (6th Cir. 1999). *See Black v. Columbus Pub. Schs.*, 124 F. Supp. 2d 550, 558 (S.D. Oh. 2000) ("An adverse employment action, 'even if based upon discrimination,' does not amount to extreme and outrageous conduct without 'proof of something more.'"). Since intentional discrimination fails to establish the claim, then certainly the allegation that Balzano harbored resentment against Plaintiff because of an office run-in fails to show as a matter of law that Balzano engaged in "extreme and outrageous" conduct.

Even if Balzano made false statements to Plaintiff's detriment, Plaintiff would still have no cause of action for IIED. Courts universally conclude that false accusations about an employee cannot sustain a claim for IIED. The following is but a brief sample of this legal

axiom: *See Yeager*, 6 Ohio St. 3d at 374-75 ("It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort."); *see, e.g., Branan v. Mac Tools*, 2004 Ohio 5574, ¶¶ 7-8, 29-31 (Oh. App. 10th Dist. Oct. 21, 2004) (no IIED claim where company president **falsely accused plaintiff employee of "corporate espionage,"** interrogated him for several hours, denied him reprieve from the interrogation, "repeatedly called him a liar and a corporate spy," threatened that he would go unemployed and his children would starve, and even rummaged through his belongings and conducted surveillance of his home); *Worpenberg v. Kroger Co.*, 2002 Ohio 1030, 2002 Ohio App. LEXIS 978, at *10-13 (1st Dist. Mar. 8, 2002) (**knowingly false accusations of theft** and refusing to allay rumors of plaintiff's alleged theft were not outrageous, shocking to the conscience, or beyond the bounds of decency). Under the facts of this case, no court applying Ohio's exacting standards could hold that Balzano's actions were so outrageous as to exceed the bounds of societal decency.

Similar results were reached in other jurisdictions. *See, e.g., Williams v. Fed. Express Corp.*, 211 F. Supp. 2d 1257, 1260, 1267 (D. Or. 2002) (plaintiff's termination for fraudulently **stealing from the employer** was not severe and outrageous enough to justify an IIED claim, **despite alleged discriminatory comments by that supervisor and alleged unfair treatment by that supervisor** to the plaintiff); *Diamond Shamrock Ref. & Mktg. Co. v. Mendez*, 844 S.W.2d 198, 202 (Tex. 1992) (employer's conduct in discharging an employee and "**falsely depicting him in the community as a thief**" was not extreme and outrageous); *Batson v. Shiflett*, 602 A.2d 1191 (Md. 1992) (even though **accusations of conspiracy, perjury and**

16

**falsification of records** in labor dispute were defamatory, they did not satisfy **exacting standard** for extreme and outrageous conduct); *Duhammel v. Star*, 653 P.2d 15 (Ariz. App. 1982) (**false accusations** against police officer made to city council and newspaper reporters are not outrageous conduct justifying claim for emotional distress); *Benishek v. Cody*, 441 N.W.2d 399 (Iowa App. 1989) (accusing long-time employee of **embezzlement and firing her** was not extreme and outrageous conduct).

Lastly, Plaintiff's IIED claim fails for the additional reason that her uncorroborated and self-serving allegations of "severe emotional distress" are insufficient to prove the seriousness of her claim. Recent Ohio cases confirm that Plaintiff must produce some "guarantee of genuineness" to get to the jury. *Garrett v. Fisher Titus Hosp.*, 318 F. Supp. 2d 562, 578 (N.D. Oh. 2004). Ohio requires Plaintiff to present medical expert testimony or a third-party lay witness who is familiar with Plaintiff's emotional state and history and can testify to "marked changes" in Plaintiff. *Id.* Plaintiff's own self-serving, conclusory testimony that she suffered emotional distress is legally insufficient to prove "serious emotional distress". *See Powell v. Grant Med. Ctr.*, 148 Ohio App. 3d 1, 771 N.E.2d 874 (10th Dist. 2002); *Buckman-Pierson v. Brannon*, 159 Ohio App. 3d 12, 2004 Ohio 6074, 822 N.E.2d 830 (2d Dist. 2004) (concluding that plaintiffs in Ohio must present some evidence other than their own testimony as to what constitutes "severe emotional distress."). Because Plaintiff has produced no other testimony regarding the seriousness of her claim, her IIED claim fails as a matter of law.

**F.   CIC's Counterclaim Against Plaintiff For Unlawful Conversion Succeeds As A Matter Of Law Because Plaintiff Has Admitted To Taking Funds Belonging To CIC And Placing Them In Her Personal Bank Account.**

In order to prevail on its claim for conversion, CIC must prove that the funds received by Plaintiff were the property of CIC and that Plaintiff deprived CIC of its right to these funds by

placing them in her personal bank account without permission or authority. *See Joyce v. Gen. Motors Corp.*, 49 Ohio St. 3d 93, 96 (1990); *Bench Billboard Co. v. Columbus*, 63 Ohio App. 3d 421, 579 N.E.2d 240 (10th Dist. 1989).

Plaintiff admits that she requested checks for reimbursement of copying expenses be made out to her personally. (Lentz Dep. at 61.) She further admits that this copy money belonged to CIC, and that she secretly placed it in her personal bank account without any accounting of the copy money or any permission from CIC. (Id. at 14, 23-24, 141-42, 151, 217-20). She even admitted to a CIC investigator that she knew what she did was wrong and asked whether she would be "fired, disbarred or arrested." (Matheny Dep. at 103-04.) Although Plaintiff admits the money belongs to CIC, it remains even today in her possession. (Lentz Dep. at 10, 151.) These unrebutted record facts demonstrate Plaintiff has wrongfully deprived CIC of money belonging to CIC. Accordingly, CIC is entitled to judgment on its counterclaim against Plaintiff for conversion.

## III.  CONCLUSION

Plaintiff has failed to prove her claims for gender discrimination, intentional infliction of emotional distress, and tortious interference with a business relationship. Her own admissions defeat each and every one of her claims. Defendants renew their request that these claims be dismissed as a matter of law and request judgment on its counterclaim.

> */S/ Jack B. Harrison*
> Deborah S. Adams (0005607)
> Jack B. Harrison (0061993)
> FROST BROWN TODD LLC
> 2200 PNC Center
> 201 E. Fifth Street
> Cincinnati, Ohio 45202-4182
> Telephone:  (513) 651-6800
> Telecopier:  (513) 651-6981
> dadams@fbtlaw.com
> jharrison@fbtlaw.com
>
> Trial Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2005, a copy of Defendants' Trial Brief was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system and copies will be mailed via U.S. Mail to those parties who are not served via the Court's electronic filing system, if any. Parties may access this filing through the Court's system.

s/ *Jack B. Harrison*
Deborah S. Adams (0005607)
Jack B. Harrison (0061993)
Frost Brown Todd LLC
2200 PNC Center
201 East Fifth Street
Cincinnati, OH 45202-4182
(513) 651-6800 (telephone)
dadams@fbtlaw.com
jharrison@fbtlaw.com

Trial Attorneys for Defendants

CinLibrary 1509566v.4