**Exhibits A & A-1**

**Defendants' Counterdesignations to the Designations Submitted by Plaintiff**

Plaintiff's designations are shown in italics on the transcript.  Defendants' counter

designations are highlighted and shown in bold.


UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI


MARY E. LENTZ,            :
    Plaintiff          :
                :
  VS.                  : CAUSE NO. C-1-01-599
                :
CINCINNATI INSURANCE CO., A  :
SUBSIDIARY OF CINCINNATI    :
FINANCIAL CORPORATION;      :
DAVE J. BALZANO; MARK J.    :
HULLER; JAMES BENOSKI; TIM  :
TIMMEL; AND BRUCE FISHER,   :
    Defendants        :


DEPOSITION OF:  DONALD MAURICE DESSEYN

TAKEN BY:       PLAINTIFF

BEFORE:      SHERRI A. REITANO, RPR
        NOTARY PUBLIC

DATE:        OCTOBER 31, 2002, 1:30 P.M.

PLACE:        ARCHIVE REPORTING SERVICE
        2336 NORTH SECOND STREET
        HARRISBURG, PENNSYLVANIA

2

APPEARANCES:

MICHAEL K. SUTHERLIN & ASSOCIATES, P.C.
BY:  MICHAEL K. SUTHERLIN, ESQUIRE, VIA TELEPHONE

FOR - PLAINTIFF

FROST, BROWN, TODD, LLC
BY:  JACK B. HARRISON, ESQUIRE, VIA TELEPHONE

FOR - DEFENDANTS

ALSO PRESENT:
MARY LENTZ, VIA TELEPHONE
DAVE J. BALZANO, VIA TELEPHONE
MARK J. HULLER

1               I N D E X

2

3   DEPONENT                 EXAMINATION

4   Donald Maurice Desseyn

5     By Mr. Sutherlin            4

6     By Mr. Harrison            --

7

8

9

10

11

12

4

1       DONALD MAURICE DESSEYN, called as a

2    witness, being duly sworn, testified as follows:

3

4                   EXAMINATION

5

6    BY MR. SUTHERLIN:

7       Q    Mr. Desseyn, can you hear me?

8       A    Yes, sir.

9       Q    You're the important one who has to hear.

10    My name is Michael Sutherlin.  *I'm representing Mary*

11    *Lentz.  Could I have your full name for the record?*

12       *A    Donald Maurice Desseyn.*

13       Q    Okay.  Mr. Desseyn, have you been notified

14    of this deposition by any written form or just orally?

15       A    I received notice of a written form.

16       Q    You are aware then that this is a

17    deposition by notice and the date by agreement; is

18    that fair?

19       A    Well, I received a notice yesterday

20    indicating to be here today at this time.

21       Q    Okay.  *Have you done anything in*

22    *preparation for this deposition to refresh your memory*

23    *or to familiarize yourself with the facts of the*

24    *allegations in Mary Lentz's complaint?*

25        MR. HARRISON:  And at this point I'll

5

1    instruct the witness not to answer to the extent any

2    documents that he's reviewed, any discussions that

3    he's had with counsel, anything beyond that that you

4    may have looked at, Mr. Desseyn, on your own, please

5    answer the question.

6        MR. SUTHERLIN:  Go ahead, Mr. Desseyn.

7        *THE WITNESS:  I have not reviewed any*

8    *documents or spoken to anybody in preparation for this*

9    *deposition other than with counsel.*

10    BY MR. SUTHERLIN:

11        Q    Other than with counsel.  I'm sorry.  Which

12    counsel are we talking about?

13        A    Debbie Adams.

14        Q    Debbie Adams.  Okay.  You don't have

15    independent counsel, you're referring to Ms. Adams as

16    the person that you spoke with?

17        A    That's correct.

18      Q    Okay.  I wanted to clear that up.  I'm

19    going to go through my own particular habits or

20    practice in taking a deposition, Mr. Desseyn.  I'm

21    sure that you've given depositions -- taken

22    depositions before.  Have you submitted to a

23    deposition before?

24      A    On one occasion, yes.

25      Q    Okay.  Well, here is my practice.  I'm

6

1    going to ask you very few questions about your

2    background.  Then I'm going to focus on some events

3    pertaining to Mary Lentz's employment with the

4    Berlon & Timmel Law Office in Dayton, Ohio, a division

5    or part of the Cincinnati Insurance Company and your

6    knowledge of her extent -- having to do with -- having

7    to do with her employment.

8      A    I'm sorry.  Knowledge of what?

9      Q    Of her employment there and various issues

10    involving the operation of the office.

11    A    Okay.

12    Q    And if I ask a question that is unclear or

13    if you have any difficulty hearing me, I will be glad

14    to repeat it and speak louder or rephrase it.

15         If I ask a question that you don't readily

16    recall the answer to or you need to ponder a minute,

17    take as much time as you need to reflect as necessary.

18    I would like to have your best and most complete

19    answer.

20         If in the course of the deposition you

21    recall a day or more information or even a different

22    answer, please interrupt me and correct or modify your

23    answer so that you're not caught in an inadvertent

24    statement.  Do you agree with that?

25    A    Yes.

7

1    Q    Okay.  If you need to take a break at any

2    time, that's fine.  Just let us know.  We'll go off

3    the record and take a coffee break or bathroom break.

4        If Mr. Harrison makes an objection, let him

5    finish his objection; and we'll decide whether you

6    need to answer the question or not.  Is that

7    agreeable?

8    A    That's fine.

9    Q    Okay.  *I'd like to know what your current*

10   *position is with Cincinnati Insurance Company.*

11   *A    I'm staff counsel.*

12   *Q    And you're located in Harrisburg?*

13   *A    Well, we're at a Harrisburg office actually*

14   *located in Mechanicsburg, Pennsylvania.*

15   *Q    Okay.  And what is the official name of*

16   *your office there?*

17   *A    Well, we're staff counsel of Cincinnati*

18   *Insurance Company.*

19   *Q    And is that the name that appears on the*

20   *letterhead that you send out to opposing counsel or to*

21   *clients?*

22   *A    I believe it is, yes.*

23   Q    So could you describe the letterhead for

24   me, please?

25   A    Well, it has -- the letterhead I send out

8

1    has my name on it.  It has a listing of all of the

2    attorneys that are employed as staff counsel with

3    Cincinnati Insurance Company.

4            Generally then there is the standard

5    correspondence with the date as well as the heading

6    and the body of the letter.  At the bottom there is a

7    disclosure that we're a group of attorneys that are

8    employed by the Cincinnati Insurance Company and

9    represent Cincinnati and their insureds.

10    Q    Your name appears at the top in the center

11    of the page?

12    A    Center of the page.

13    Q    And that is in large print or bold print?

14    A    Well, it's dark print.

15    Q    What?

16    A    It's dark print.  Yeah, bold.

17    Q    In comparison to the print used to identify

18    all of the attorneys who are staff counsel, does your

19    name appear in a larger or bolder-type face?

20    A    Yes, it does.

21    Q    Thank you.  And you said it lists all of

22    the attorneys that are employed by Cincinnati as staff

23   counsel.  Does that include attorneys outside of the

24   Harrisburg office?

25        A    Yes, it does.

9

1        Q    Does it include the name of Arlene Rochlin?

2        A    I don't know.

3        Q    Okay.  *How long have you been staff*

4   *counsel?*

5        *A    Little over five years.*

6        *Q    And tell me when you first joined the*

7   *employment of Cincinnati Insurance Company.*

8        *A    July 16th, 1997, I believe.*

9        Q    Okay.  All right.  Do you have any notes or

10   documents in front of you, Mr. Desseyn, that you're

11   referring to?

12        A    No, I don't.

13        Q    Okay.  So July 16th, 1997; is that correct?

14        A    I'm sorry.  I didn't hear you.

15        Q    I said -- I was trying to confirm the date

16   that you gave me when you joined as staff counsel.

17        A    With all due respect, you're cutting in and

18   out.  July 16th, 1997 was the day I gave you.

19    Q    Okay.  You say we're cutting in and out?

20    A    Yes.

21    Q    Okay.  I picked up the phone.  I'm not even

22    on speaker phone anymore because I was having

23    difficulty hearing.  So if you don't hear everything

24    that I say, please let me know and I'll repeat it.

25    A    Okay.


10

1    Q    And where were you actually living when

2    you -- specifically living when you decided to join

3    Cincinnati Insurance Company as staff counsel?

4    A    Well, when I came with the company, I was

5    living in a temporary residence in Miamisburg, Ohio.

6    Q    And did you purchase a house after joining

7    Cincinnati Insurance Company?

8    A    Yes.

9    Q    Where was that home located?

10    A    Miamisburg, Ohio.

11    Q    Okay.  *And what office of Berlon & Timmel*

12    did you join?

13    A    What office did I --

14    *Q    Were you assigned to work from?*

15    *A    Dayton, Ohio.  Dayton office.*

16    Q    The Dayton office.  Okay.  That's where you

17    began to work as soon as you were employed as a staff

18    attorney or was there any other location?

19    A    I'm sorry.  Could you repeat that?

20    Q    Yes.  *When you were hired as staff*

21    *attorney, is that where you began your employment or*

22    *were you assigned to another location prior?*

23    *A    That's where I began my employment.*

24    *Q    Okay.  And who was the office manager when*

25    *you started working there?*

11

1    *A    The managing attorney?*

2    *Q    Yeah.*

3    *A    Was Dave Balzano.*

4    Q    Did he hire you?

5    A    Did he hire me?

6    Q    Yeah.

7    A    I believe -- well, Mr. Huller is the one

8    who extended me the offer.

9    Q    We'll go through the hiring process then.

10    Who did you interview with, who do you believe was

11    involved in the decision to hire you?

12        A    Well, I could tell you who I interviewed

13    with; but I don't remember who was involved in the

14    hiring process or the decision to hire me.

15        Q    Okay.  Just tell me who you interviewed

16    with.

17        A    I interviewed with Mark Huller, Dave

18    Balzano, and I don't recall.  There may have been one

19    other individual but I don't recall.

20        Q    Did you ever receive any indication from

21    Mr. Balzano that he was going to recommend that you be

22    given an offer to be employed as staff counsel?

23        A    No, sir, I didn't.  Not that I can recall.

24        Q    Okay.  Did you interview with Mr. Balzano

25    and Mr. Huller at the same time in the same room or

                              12

1    were they separate?

2        A    Yes, I interviewed with them at the same

3    time.

4        Q    Okay.  And they extended you an offer to

5    work at the Dayton office; is that right?

6        A    Mr. Huller extended me an offer to work in

7    the Dayton office. I don't know how long after the

8    interview. It may have been three or four months

9    after the interview.

10    Q    Okay. Did you have any concerns about the

11    conditions that you expressed during that interview

12    about your employment?

13    A    What do you mean by concerns or conditions?

14    Q    Such as where you might be transferred or

15    how long you might be located in the Dayton office,

16    that kind of thing.

17        MR. HARRISON: Objection to the form but

18    you can answer it.

19        THE WITNESS: Well, I don't think that

20    there was any discussion as to a time frame I would be

21    in the Dayton office. Basically, it was my

22    understanding when the offer was made that I was going

23    to work in Dayton, Ohio.

24    BY MR. SUTHERLIN:

25    Q    Okay. Can you tell me what happened at

13

1    some point that brought about your transfer or your

2    relocating to the Harrisburg office area?

3    A    Well, there was a decision that was made to

4    open up an office in Pennsylvania.  I had taken the

5    bar exam and was licensed to practice in Pennsylvania.

6    I had a discussion with my spouse.  Our parents are

7    located in Virginia.  My spouse has family that's east

8    of Harrisburg.

9         And so we made a decision that I would

10   contact Mr. Huller and offer to move to relocate to

11   the Harrisburg office.

12   Q    Okay.  And what was Mr. Huller's response

13   to that?

14   A    We discussed the matter and there were

15   people being interviewed for the position and he

16   indicated he would take it under consideration.

17   Ultimately there was a managing attorney that was

18   hired and an offer was given to me to relocate to the

19   Harrisburg office.

20   Q    When did these discussions with Mr.

21   Huller, when did they begin about the possibility of

22   you transferring to the new office in Harrisburg?

23   A    I'd probably say around -- it was several

24   months, maybe four to six months after being in the

25   Dayton office.

14

1    Q    Okay.  So sometime in either late '97 or

2    early '98.  Did you follow that?

3    A    I think that's a reasonable estimate, yes.

4    Q    Okay.  Let me back up a little bit.  Tell

5    me when you graduated from law school, what law school

6    you graduated from, and what bar examinations you took

7    and passed.

8    A    I graduated from Duquesne University School

9    of Law.  I believe it was June 1993.  I sat for the

10   Pennsylvania bar exam, was admitted to practice in the

11   Commonwealth of Pennsylvania as well as the Western

12   District, US District Court, Western District of

13   Pennsylvania.

14       I went to work in Cleveland, Ohio.  I sat

15   for the bar exam I believe in February of the

16   following year and was admitted to practice in 1994 in

17   the Commonwealth of Ohio -- or excuse me, the State of

18   Ohio as well as the US District Court for the Northern

19   District of Ohio.

20   Q    Tell me what your practice arrangement

21   was or how you were practicing law in the Cleveland

22    area.

23        A    Cleveland area, I worked for a defense firm

24    for approximately 40, 45 attorneys at the time.  The

25    name of the firm was Gallagher, Sharp, Fulton &

15

1    Norman.  My area of practice involved insurance

2    defense as well as railroad litigation.

3        Q    Okay.  Tell me generally why you decided to

4    leave that area of practice and that practice

5    arrangement and do something else.

6        A    Basically, for personal reasons.  I wanted

7    to spend more time with my family and that was the

8    primary motivating factor.

9        Q    Okay.  Do you have children?

10        A    Yes, I have two children.

11        Q    Can you give me their names and ages just

12    for background purposes?

13        A    Name, ages, and what?

14        Q    Just for background purposes.

15        A    Adam is my son, 6 years old.  He'll be

16    seven in January.  Danielle, my daughter, is 4 years

17    old.

18    Q    Okay.  Thank you.  Have you spoken to Mr.

19    Dave Balzano say in the last year or two -- well,

20    since Mary Lentz filed her lawsuit about these

21    matters?

22            MR. HARRISON:  Again, to the extent the

23    witness has had any conversations in the presence of

24    counsel, I'll instruct the witness not to answer.  If

25    you had conversations outside of the presence of

16

1    counsel with Mr. Balzano, you can answer.

2            THE WITNESS:  I've only seen Dave a couple

3    of times in the last couple of years, and I don't

4    believe that we had any conversations regarding Mary

5    Lentz or the lawsuit.

6    BY MR. SUTHERLIN:

7    Q    Has Mr. Balzano at any time whether he was

8    in the presence of counsel or not expressed a

9    different version of something that you understood to

10    happen?

11            MR. HARRISON:  Again, I'll instruct the

12    witness to the extent that he's had any conversations

13    in the presence of counsel not to answer.  Again, if

14    you had conversations that are responsive to the

15    question outside of the presence of counsel, please

16    answer.

17          THE WITNESS:  Yeah.  I don't recall having

18    any conversations with Dave Balzano about Mary Lentz

19    or the lawsuit since it's been filed.

20    BY MR. SUTHERLIN:

21     Q    Okay.  At any time?

22     A    At any time.

23     Q    All right.  Thank you.  Let me go back then

24    to the days of Dayton when you practiced there in

25    Dayton.  And you said, sir, Dave Balzano was the

17

1    managing attorney.  Can you recall the names of the

2    other attorneys who were working there when you joined

3    that group?

4     A    Mary Lentz was in the office.  I believe it

5    was Susan Silverbush and myself and I think that was

6    it.

7     Q    Tell me names of any staff people,

8    secretaries and so forth or law clerks if you

9    remember.

10     A    I think Joe Currin may have been working

11    there as a law clerk at that time.  With regards to

12    secretaries when I first got there, I don't recall.  I

13    think Sandra Brower may have been there at the time I

14    got there.

15          Oh, there was -- I did have a secretary

16    there, and I can't remember her name right now.  But

17    she subsequently left once I was there.

18        Q    Okay.  And was Fred Young there at any time

19    when you first arrived?

20        A    Not when I first arrived.  No, he wasn't

21    there.

22        Q    He did come back later?

23        A    He came back at a later date, yes.

24        Q    And you were still there at the Dayton

25    office when he came back?

                              18

1        A    I'm sorry.  Still at the Dayton office when

2    he came back?

3        Q    Yes.

4        A    Yes, sir.  I was.

5        Q    I'm sorry.  Is that correct?

6        A    That's correct, yes.

7        Q    Okay.  Thank you.  It is not a perfect

8    arrangement here, Mr. Desseyn.  So I appreciate your

9    patience, Mr. Desseyn.

10        A    Understand I'm not trying to be difficult

11    here.  I'm just trying to understand the question.

12        Q    It is cutting out sometimes in short words.

13    I'm sorry.  You're not being difficult.  It is just

14    the mechanics of getting this thing done.

15            When you came into the office, can you tell

16    me what your perception was with regards to how well

17    the staff was getting along?  Let's talk about the

18    support staff and their relationship to Mr. Dave

19    Balzano first.

20            MR. HARRISON:  Objection to the form and

21    foundation, but you can answer the question.

22            THE WITNESS:  First of all, I don't

23    remember who the secretaries were that were there when

24    I arrived there.  I do know that there was a secretary

25    there that I was assigned to with Dave Balzano.  I

19

1    can't remember her name right now.  But she had been

2    there for some years.  And -- and I don't know.  What

3    else do you want to know?

4    BY MR. SUTHERLIN:

5        Q    Well, if I was to go into any sort of

6    business, I would have a perception of how smoothly

7    the office ran, how well people got along.  I could

8    sense tension.  I could sense all sorts of I guess

9    office dynamics.

10            And I was just wondering if you could tell

11    me what your perception was with regard to the

12    relationship between Mr. Balzano and secretaries that

13    he ostensibly supervised when you came in there in

14    those first months?

15            MR. HARRISON:  Same objection, but you can

16    answer the question.

17            THE WITNESS:  Well, with the initial

18    secretaries I thought the office dynamics was okay.

19    You had some personality conflicts which I think are

20    inherent in most offices.

21    BY MR. SUTHERLIN:

22        Q    What were those personality conflicts that

23    you observed?

24        A    Well, I know in my case the secretary that

25    he and I were sharing, my work was put aside until

                            20

1    Dave's work was done.  And he was the managing

2    attorney and I understood that.  But she and I didn't

3    get along too well.

4        Q    If I understand your answer, you shared an

5    attorney with Mr. Balzano?

6        A    Secretary.

7        Q    Secretary.  I'm sorry, secretary.  And that

8    there were times when you perceived that she would

9    give preference to his work over yours?

10       A    She would?

11       Q    She would, yeah.

12       A    Yes.

13       Q    Okay.  Did you bring this issue up with Mr.

14    Balzano?

15       A    No, because he was the managing attorney.

16    And as long as my work got done, I didn't have any

17    problems with his being done first.

18       Q    Okay.  Any other things about personality

19    conflicts that you can think of?

20       A    Not right now because I can't remember who

21    the secretaries were.

22            MR. SUTHERLIN:  Okay.  I'm looking through

23    my notes.  We may have to go back to that.  I'll tell

24    you what.  Mary, help me with that.  Do you remember

25    the secretaries?

1         MS. LENTZ:  When Donald first came?

2         MR. SUTHERLIN:  Yes.  Charlene Barlow.

3         THE WITNESS:  Charlene is the one that I

4    was talking about sharing the secretary with Dave

5    Balzano.

6         MS. LENTZ:  Vicki Walker would have been

7    there and Julia Gibson.

8         MR. SUTHERLIN:  Thank you.

9    BY MR. SUTHERLIN:

10        Q    Okay.  Does that help refresh your memory

11   about the secretaries?

12        A    Well, it helps me with the secretaries.  I

13   thought that Julia Gibson had come after I was there

14   but, you know, perhaps I'm wrong.  Vicki Walker was an

15   older lady that I don't know if she was there when I

16   got there.  But, yeah, she was working there as a

17   secretary shortly after I was there.

18        *Q    Did you ever hear any talk about -- when*

19   *you came in there, Mr. Desseyn, did you ever hear any*

20    *talk about Fred Young being accused by two secretaries*

21    *of playing with himself or the euphemism was*

22    *inappropriately touching himself while he was talking*

23    *to them?  Did you ever hear any accusations or talk*

24    *about that?*

25        MR. HARRISON:  Objection to the

22

1    characterization but you can answer.

2        *THE WITNESS:  You're talking about the time*

3    *I had first came to work there?*

4    *BY MR. SUTHERLIN:*

5        *Q    I'm asking if you had any knowledge about*

6    *that incident or those accusations after you came to*

7    *work there.*

8        *A    At any time after I came to work at Dayton?*

9        *Q    Yeah.*

10        MR. HARRISON:  Same objection but you can

11    answer, Mr. Desseyn.

12        *THE WITNESS:  I heard or was told -- I was*

13    *told by someone -- who I don't know -- that there was*

14    *some type of a problem with the secretary and Fred*

15    *Young prior to him coming back to the Dayton office.*

16    *BY MR. SUTHERLIN:*

17    *Q    You can't recall who said that to you?*

18    *A    No, I don't recall who said that to me.*

19    *Q    Okay.  Did you ever talk about this with*

20    *Dave Balzano before Mr. Young came back?*

21    *A    Not to my knowledge, no.*

22    **Q    Okay.  Tell me what you recall about Mr.**

23    **Balzano assigning the cases to the various attorneys,**

24    **cases that were sent to the Dayton office.**

25          MR. HARRISON:  You mean at any point in

23

1    time while he was there?

2          MR. SUTHERLIN:  Yeah.  If it changed how

3    they were assigned or changed for any reason or

4    whatever, let me know.  But I'd like to hear how you

5    describe your point of view how he was assigning cases

6    to you and other attorneys.

7          **THE WITNESS:  Well, when I first got there**

8    **I have no clue as to how he was assigning cases.**

9    **Obviously, a new person to a new environment, I just**

10    **took the work that was assigned to me and was doing**

11    **the work that I was provided.**

12          **After Fred Young was hired, it appeared**

13    **that Fred would get more cases involving slip and fall**

14   cases than the other attorneys would get in the

15   office.  It is my understanding Mary I guess based

16   upon her background was getting most of the dental

17   malpractice cases.

18   BY MR. SUTHERLIN:

19        Q    Okay.  What about cases that were regarded

20   as more routine, were they assigned to one attorney as

21   opposed to more complex cases that required two

22   attorneys?

23        A    What do you mean by more routine?

24        Q    Oh, I don't know.  I guess a

25   straightforward rear-end crash or slip and fall,

                              24

1   something that didn't involve what I would regard as

2   complex litigation.

3            MR. HARRISON:  Objection to the

4   characterization of retaining complex.  But to the

5   extent you understand the question, please answer it.

6            THE WITNESS:  Well, it was my

7   understanding -- at least it was my impression with

8   regards to auto accidents that those were being

9   assigned among the various attorneys.

10   BY MR. SUTHERLIN:

11    Q    Do you know whether there was any stated

12    reason for cases being assigned to attorneys, for

13    example with Mr. Balzano and Fred Young working on

14    cases together?

15    A    It was my understanding if a case was more

16    serious as far as maybe a damage aspect or the work

17    that was going to be involved in the case, that it

18    would be assigned usually to two attorneys.

19    Q    Do you recall whether there is more common

20    arrangements being made say Dave and Fred working on a

21    case together more often than any other pairing?

22        MR. HARRISON:  Objection to the foundation

23    but you can answer.

24        THE WITNESS:  My personal knowledge, no, I

25    don't recall that.

25

1    BY MR. SUTHERLIN:

2    Q    Did you have any sort of staff meetings on

3    a regular basis or irregular basis, Mr. Desseyn, where

4    attorneys talked about the cases that were -- they

5    brought issues to the table for input from other

6    attorneys or anything like that?

7    A    We had meetings on occasion in there

8    usually held in the conference room.  And generally,

9    Dave being the managing attorney would disseminate

10   information maybe with regards to procedure or

11   something.

12          During those periods of time, we might have

13   talked about a case.  But essentially, if -- I mean if

14   there was a problem with the case, most of the time at

15   least speaking for myself I would just walk into

16   another person's office, indicate that I'd like to

17   talk with them about a matter, and sit down and

18   discuss basically what was at issue.

19       Q    And did you do this with Mark Huller as

20   well if you had a question?

21       A    I'm sorry.

22       Q    Did you also contact Mark Huller from time

23   to time if you had a question about a case?

24       A    I very seldom talked to Mark Huller on a

25   case.  Usually I went to Dave or one of the others in

                           26

1    the office.

2           If it was something that maybe I wanted

3    somebody with a little bit more experience, I might

4    call Greg Lewis on the matter.  But I very seldom

5   called Mark Huller on a case.

6      Q    Okay.  Thank you.  When you -- *did you ever*

7   *work on any cases with Mary Lentz?*

8      *A    Yes, I did.*

9      *Q    Can you recall the first case that you*

10   *worked?*

11      *A    I can recall two cases I worked with Mary.*

12      *Q    Can you give me those names?*

13      *A    I can't for the first one.  The first one*

14   *involved a -- I believe it was a slip and fall case at*

15   *a parking lot or gas station or something of that*

16   *nature.*

17      *Q    Okay.*

18      *A    And the second case if my memory serves me*

19   *correctly involved a case that I think an individual*

20   *fell off of a truck and was injured.  I might have*

21   *helped her on some other cases.  I don't recall.*

22      *Q    With this last case that you mentioned, was*

23   *this the one that you continued to assist or work with*

24   *her on after you were transferred to Harrisburg?*

25      *A    Yes.  And, in fact, that's primarily when I*

27

1   *got involved with it is once I got into the Harrisburg*

2   *office.  That's when I really began assisting her on*

3    *that case.*

4    *Q   Do you remember talking to Mary Lentz I*

5    *guess it would be long distance by then about a*

6    *problem or concern that was raised when a claims*

7    *supervisor by the name of O'Hara was concerned about*

8    *disclosure of an incident report?*

9         MR. HARRISON:  Objection to foundation but

10    you can answer.

11        *THE WITNESS:  I remember there being some*

12    *issue, but I don't recall off the top of my head what*

13    *it was.*

14    *BY MR. SUTHERLIN:*

15    *Q   You don't remember the claims supervisor*

16    *was concerned about disclosure of this incident report*

17    *and wondered whether or not it had been changed?*

18        MR. HARRISON:  Same objection but you can

19    answer.

20        *THE WITNESS:  I remember Mary speaking to*

21    *me on that and basically relaying what you just said,*

22    *yes.*

23    *BY MR. SUTHERLIN:*

24    *Q   When she was relaying it to you, did she*

25    *tell you that she had also spoke to Mark Huller about*

28

1   *it?*

2       *A   I don't recall that, no.*

3       *Q   What was your reaction or your input to*

4   *this discussion with Mary Lentz about it?*

5       *A   Well, if I recall correctly, she had told*

6   *me she had reached an opinion that she couldn't change*

7   *the report.  And I basically agreed with her that she*

8   *couldn't change the information on the report.*

9       *Q   Did you have any discussion about the*

10  *ethics of the claims adjuster -- claims manager*

11  *wanting to change it?*

12          MR. HARRISON:  Objection as to the

13  competence of this witness to talk about the ethics of

14  the claims adjuster but go ahead and answer it.

15          *THE WITNESS:  It seemed to me we had some*

16  *type of discussion.  The question was when that was*

17  *raised, I think I recall asking Mary whether he was*

18  *serious or he was in jest when it was raised.  But*

19  *regardless, it wasn't appropriate to even consider*

20  *that.*

21  BY MR. SUTHERLIN:

22      **Q   Okay.  Now, Mr. Desseyn, I'm asking**

23    open-ended questions and I understand that, you know,

24    you may be hesitant in sort of volunteering the

25    information.

29

1       A    I'm telling you what I know, sir.

2       Q    I understand.  And I'm not trying to, you

3    know, I don't know if accuse is the word any more than

4    I would with anyone else.  So if I'm not asking a

5    question that you understand, I'll be glad to rephrase

6    it.

7          So tell me what -- tell me everything that

8    you remember then about this conversation or this

9    whole episode involving O'Hara, this inquiry as to

10    whether or not the incident report was to change.

11       A    Essentially, I just told you that.  *And*

12    *you've basically refreshed my recollection to a number*

13    *of things there.*

14          *But I do recall Mary calling me.  I do*

15    *recall her asking or telling me that there was a*

16    *question raised whether or not incident report*

17    *information should be changed on an incident report.*

18          *I remember asking her whether or not this*

19    *was asked in jest or if it was serious.  And I*

20   *remember Mary saying she didn't even bother to ask*

21   *that, that she basically told him that we couldn't*

22   *change the report.  And I told her that she was*

23   *absolutely correct.*

24        Q    Okay.  **Do you remember her mentioning --**

**25    let me see if I can refresh your memory.  Did she**

30

**1    mention to you that she had brought this concern to**

**2    the attention of Mark Huller?**

3            MR. HARRISON:  Objection.  Asked and

4    answered but the witness can answer again.

**5            THE WITNESS:  Like I said, I have no**

**6    recollection of that.**

**7    BY MR. SUTHERLIN:**

**8        Q    Did you ever talk to anyone else about this**

**9    matter of changing an incident report?**

**10       A    No.**

**11       Q    Do you regard that, Mr. Desseyn, as sort of**

**12    an ethical issue; that is, to request a change on an**

**13    incident report?**

14            MR. HARRISON:  Objection to form.

**15            THE WITNESS:  First of all, it is my**

**16    understanding supervisors aren't bound by a code of**

17     ethics as attorneys are.

18          Second of all, I had asked and Mary

19     indicated that she didn't know whether the guy was

20     serious or not.  She said she wasn't going to change

21     the report.  She didn't change the report, and I

22     agreed with that.  So as far as I was concerned, you

23     know, that was the end of the subject.

24     BY MR. SUTHERLIN:

25     Q     I understand.  I'm just talking about --

31

1     let's just say it was not in jest, it was a serious

2     inquiry.  Would you have regarded that as an ethical

3     issue worthy of reporting?

4          MR. HARRISON:  Objection as to form.

5     Ethical as to who and reporting as to who but you can

6     answer.

7          THE WITNESS:  Well, that's what I was going

8     to ask.  First of all, again, I don't think that

9     supervisors are bound by the code of ethics.  But

10     assuming it was an ethical issue, I'm not sure who you

11     would report that to.

12          You could go to the supervisor, but I

13    certainly wasn't going to report something that I

14    didn't know if the guy was speaking in jest or not or

15    if he was serious or not.

16    BY MR. SUTHERLIN:

17        Q    I'm really talking hypothetically, Mr.

18    Desseyn.  I'm just trying to sort of gauge what you

19    saw or what you -- this may come up more than once.

20    Certainly in the practice of law, you have clients or

21    witnesses who wonder how critical it is that they

22    stick to their story or can they change their story.

23    As lawyers we tell them unequivocally tell the truth

24    whether it is good or bad.  I would assume that

25    applies to claims adjusters as well.  And I know what

32

1    you say to a witness or client.

2        Do you have any training as an attorney

3    either in-house or at any other time if you were

4    confronted with a witness or somebody involved in a

5    case that they want to change a story?  Do you have

6    any training on what to do with those ethical

7    questions?

8        MR. HARRISON:  Objection to form but you

9    can answer if you understood the question.

10          THE WITNESS:  To the extent that I'm

11   representing a client and the client tells me that

12   they want to change their story and to change the

13   facts or the circumstances of the case, I instruct

14   them that under oath they are instructed to tell the

15   whole truth, the truth, and nothing but the truth.

16          If I know that they do not tell the truth,

17   then I believe that I have an ethical duty to report

18   that to the court if, in fact, their testimony is not

19   truthful.

20   BY MR. SUTHERLIN:

21      Q    All right.  Now in your situation in

22   working for Cincinnati Insurance Company who is the

23   client?

24      A    I'm sorry.  You're breaking up.

7       Q    You're correct in that.  There are two

8    groups, Mr. Desseyn, generally.  What would the role

9    of the claims manager or claims supervisor be in

10   dealing with you or any other staff attorney with

11   regard to incident reports?

12      A    What is their role?

13      Q    Yeah.  Why is the claims manager concerned

14   about an incident report if your client is the

15    insured?

16        MR. HARRISON:  Objection.

17        THE WITNESS:  I don't know, sir.  You're

18    asking me why he was concerned.  I don't know.

19    BY MR. SUTHERLIN:

20        Q    Okay.  Let's go back to later on in your

21    employment with Dayton at the Berlon & Timmel office.

22    Did you ever observe any tension or friction between

23    Dave Balzano and any of the other attorneys?

24        A    Yeah.  I got to ask you, you broke up in

25    there.  You asked going back to my --

34

1        Q    Right back to Dayton.

2        A    Dayton, okay.

3        Q    Dayton and the Berlon & Timmel office

4    there.

5        A    Okay.

6        *Q    During your entire time that you were in*

7    *Dayton, did you observe any tension between Dave*

8    *Balzano and any of the other attorneys?*

9        *A    Yes.*

10        *Q    Tell me about each and every instance that*

11    *you can recall and the names of the attorneys and some*

12    *details about the issues.*

13       *A    I don't remember, sir.  I don't know*

14    *specific instances.  I have been away from that office*

15    *for more than three years.  I do know that there was*

16    *tension between Fred Young, Mary Lentz, and Dave*

17    *Balzano.*

18       *Q    Okay.  Can you tell me what you thought or*

19    *what you observed the tension to be based upon?*

20       *A    Well, with regards to Fred and Mary, I*

21    *believe it was due in part to the fact that Mary did*

22    *not wish to have Fred come back to the Dayton office.*

23       *Q    Did you ever learn why or did Mary ever*

24    *tell you why she didn't want Fred to come back?*

25       *A    No, sir.  I don't believe we had ever had a*

35

1    *discussion as to the specifics as to why she didn't*

2    *want him to come back.*

3       *Q    Did you ever have any knowledge of why she*

4    *didn't want Mr. Young to come back?*

5          MR. HARRISON:  Objection as to how this

6    witness has knowledge of why if Mary didn't tell

7    anybody.  Go ahead and answer it.

8          *THE WITNESS:  The only thing that I can*

9      *recall is I believe that Mary may have worked with*

10     *Fred at another law office and was not impressed with*

11     *his work.*

12     BY MR. SUTHERLIN:

13         Q    Okay.  What about the tension?  **Was there**

**14     any tension between Fred Young and Dave Balzano?**

**15         A    Not that I'm aware of.**

16         Q    Was there --

17         A    Well -

18         Q    Go ahead.

19         A    Strike that.  *There was at one time that I*

20     *recall.  Dave was going to remove a secretary from*

21     *Fred.  And it is my understanding that Fred got upset,*

22     *and there may have been some tension as a result of*

23     *that.*

24         *Q    Okay.  I was going to ask you specifically*

25     *about that.  You were there I think.  Isn't it true*

                              36

1      *that -- let me see if I can refresh your memory.  They*

2      *had a secretary that both of them were I guess using.*

3      *And when Mr. Young left the office for a period of*

4      *time, Dave Balzano took the secretary and assigned*

5    *that secretary to himself.  And when Mr. Young came*

6    *back, he became angry and resigned.*

7        A    I'm sorry, sir.  He assigned him to who --

8    assigned her to whom?

9        Q    That when Mr. Balzano -- I'm sorry.  When

10   Mr. Young left the office, Mr. Balzano had assigned a

11   secretary that had originally been working for Fred

12   Young -- I think her name was Julia -- to himself.

13   That was the basis for the argument and that Mr. Young

14   actually resigned.

15        MR. HARRISON:  Objection to the

16   characterization, but you can answer that question.

17   BY MR. SUTHERLIN:

18       Q    Does that refresh your memory?

19       A    *First of all, I don't recall who Dave*

20   *assigned the secretary to.  Second of all, I was out*

21   *at a deposition that day.  And I just heard from*

22   *another party that that's what transpired, but I have*

23   *no direct knowledge of that.*

24       *Q    I'm not asking about direct knowledge.*

25   *We're actually talking about what you are aware of*

                              37

1    *from any source about the tension here.  I'm not*

2    *interested in you being an eyewitness to things.*

3     A     Well, I thought you just asked me if, in

4     fact, I was aware that Fred Young resigned.

5     Q     Well, aware doesn't require you to be an

6     eyewitness, does it?

7          MR. HARRISON:  Do you have a question, Mr.

8     Sutherlin?

9          MR. SUTHERLIN:  I'm trying to clarify the

10     witness' perception here.  I'm asking if you have any

11     knowledge about what the difference of the tension was

12     between Mr. Fred Young and Mr. Dave Balzano.  And I've

13     attempted to refresh your memory.

14          So if you have any knowledge of what

15     occurred or what the basis for this tension was, Mr.

16     Desseyn, I'd like you to share that with me even if

17     you were out of the office for a period of time.

18          *THE WITNESS:  Well, I was out of the*

19     *office, came back in the office from a deposition.  I*

20     *don't know if it was that day or the next day, I was*

21     *told that Fred got upset, said he was resigning, and*

22     *then changed his mind.*

23     BY MR. SUTHERLIN:

24     Q     Do you know whether he had actually boxed

25     up his materials, his personal items in his office?

38

1    A    No, I don't have any knowledge of that.

2    Q    None at all?  No knowledge, none at all?

3    A    No.

4         MR. HARRISON:  Objection, asked and

5    answered but you can answer it again.

6    BY MR. SUTHERLIN:

7    Q    You said he had changed his mind.  Do you

8    know why he changed his mind?

9    A    I was told that.  I don't know if he ever,

10   in fact, said he resigned.

11   Q    I know.  Okay.  Do you have any knowledge

12   of why he may have changed his mind?

13        MR. HARRISON:  Objection.  The witness

14   answered the question, but you can answer it again.

15        THE WITNESS:  I don't have any personal

16   knowledge, but it may have been that Julia was

17   reassigned back to him.

18   BY MR. HARRISON:

19   Q    Did you ever discuss the matter directly

20   with Fred Young as to what was behind all of this?

21   A    No, I didn't.

22    Q    **How about Dave Balzano?**

23    A    **No, I didn't discuss the matter with Fred**

24    **Young.**

25    Q    **Or Dave Balzano?**

39

1    A    **I didn't discuss the matter with Dave**

2    **Balzano.**

3    Q    When you had these staff conferences, was

4    there any discussion at any time about this sort of

5    issue that come up as a topic or anything that Mr.

6    Balzano wanted to talk to the entire staff about?

7         MR. HARRISON:  Objection to the form but

8    you can answer if you understand the question.

9         THE WITNESS:  About Fred allegedly

10    indicating he wanted to resign?

11         MR. SUTHERLIN:  Yes.  Or anything like

12    that, difficulty with the secretary issue or anything

13    like that.

14         MR. HARRISON:  Same objection but you can

15    answer it if you understand the question.

16         THE WITNESS:  Well, I think at some point

17    in time and I don't know if it was at one of the

18    meetings, lunch meetings or not, Dave did make it

19    clear that he was the managing attorney.  And he was

20    trying to manage the office and trying to work out

21    assignments for secretaries and attorneys which he

22    thought would work best for the office.

23    BY MR. SUTHERLIN:

24        Q    Okay.  Were you there when Paula Ruppert

25    was there?

**40**

1        A    Yes.  Paula Ruppert was my secretary for a

2    period of time.

3        Q    Okay.  Did you get along with her?

4        A    Yes.

5        Q    And did she get along with the other

6    secretaries and the other attorneys?

7        A    Not very well.  Not that I recall.

8        Q    Who did she have most difficulty with or

9    any difficulty with?

10        A    Who did she have most difficulty with or

11    any difficulty with?

12        Q    I thought you said -- I asked if she got

13    along with them.

14        A    With me?

15        Q    With you.

16    A    Yes, she got along with me.

17    Q    Did she have any problems getting along

18    with the other attorneys?

19    A    And I said, yes, I thought -- well, she

20    didn't have any problems with Mary.

21    Q    Okay.  And then I said, well, can you tell

22    me who she didn't get along with?

23    A    Okay.  And I was just trying to clarify

24    your question there.

25    Q    Okay.

41

1    A    Well, she and Fred didn't get along so

2    great.  And there was some tension there between her

3    and Dave Balzano.

4    Q    Do you know what that was about?

5    A    Paula was a pretty strong-willed,

6    strong-minded individual.  And I really don't know

7    what the conflict was between her and Dave in

8    particular.

9    Q    Okay.  Were you aware that Mr. Young from

10    time to time would like to take Fridays off and claim

11    to have a deposition out of the office on Fridays?

12    A    No, I wasn't aware of that.

13      Q    You didn't observe his leaving the office

14    on a regular basis on Fridays?

15          MR. HARRISON:  Objection, asked and

16    answered but the witness can answer it again.

17          THE WITNESS:  No, not while I was there.  I

18    mean I didn't observe that or observe a regular

19    pattern.

20    BY MR. SUTHERLIN:

21      Q    You didn't notice it one way or the other?

22      A    No.

23      Q    Did you ever have a conversation with Mary

24    Lentz in which you reminded her -- I'm going back to

25    talking about this copy money.

                              42

1      A    Copy money.

2      Q    Okay.  Do you recall having a conversation

3    with Mary Lentz sometime after she left Berlon &

4    Timmel and you reminded her about a lunch that you

5    were present and Dave Balzano was present and this was

6    discussed?

7          MR. HARRISON:  Objection as to the

8    characterization but go ahead.

9          THE WITNESS:  What was discussed?

10   BY MR. SUTHERLIN:

11      Q    Let me repeat the whole question.  Do you

12   remember having a conversation with Mary Lentz after

13   she left Berlon & Timmel in which you reminded her

14   about a lunch in which Dave Balzano was present and he

15   stated and admitted about his knowledge of using copy

16   money and that claims did not want to deal with it?

17         MR. HARRISON:  Objection to the

18   characterization but the witness can answer to the

19   extent he recalls such a conversation

20         *THE WITNESS:  I'm having difficulty with*

21   *the question.*

22         MR. SUTHERLIN:  Okay.

23         THE WITNESS:  You're saying that I had a

24   conversation with Mary after she left Berlon & Timmel

25   and it involved a luncheon with Dave Balzano?

43

1   BY MR. SUTHERLIN:

2      *Q    Let me state it again.  Do you remember*

3   *having a lunch -- I'm sorry, having a conversation*

4   *with Mary Lentz and talking about the copy money issue*

5   *and her termination from Berlon & Timmel?  Did you*

6   *ever talk to her at any time about that?*

7     A    *I may have had a brief conversation with*

8     *her shortly after she left the company.*

9     Q    *Okay.  And where did you have this brief*

10    *conversation?  Was it in person or by telephone?*

11    A    *By phone.*

12    Q    *Do you recall the reason for that phone*

13    *call or what prompted your talking to her at that*

14    *time?*

15    A    *I had heard that she had left the company*

16    *or was leaving the company or was possibly terminated.*

17    Q    *How did you hear of this?*

18    **A    I don't know.**  *Someone told me that they*

19    *had heard a rumor or something about the Dayton*

20    *office.*

21    Q    *Do you remember calling Mary when you*

22    *learned about this?*

23    A    *I called Mary directly, yes.*

24    Q    *And what did you say to her?*

25    A    *I said, Mary, what's going on?*


                              44

1     Q    *And what did she say to you?*

2     A    *I don't recall specifically.  I think she*

3    *said that she had some checks that were in a drawer*

4    *and that the Christmas holidays were coming up and she*

5    *deposited them in her account.  And before she could*

6    *withdraw the money, that some charges were brought*

7    *against her.*

8        *Q    Did she talk about copy money?*

9        *A    Did she talk about copy money?*

10       *Q    Yeah.*

11       *A    That's the money that was in the drawer.*

12       *Q    Okay.  Well, you just mentioned checks, but*

13   *you didn't mention copy money.*

14       *A    I'm sorry.  The checks were for copy money.*

15       *Q    Okay.  And tell me what else she said about*

16   *that.*

17       *A    That's about all I can recall of the*

18   *conversation.*

19       Q    Okay.  Did she tell you that Dave had any

20   knowledge of the copy money and the copy money checks?

21           MR. HARRISON:  Objection but you can answer

22   it again.

23           THE WITNESS:  I apologize, sir.  You keep

24   breaking up here.  Did she disavow -- did Dave disavow

25   any knowledge?