45

1    BY MR. SUTHERLIN:

2        Q    Did she tell you during that conversation

3    that you had --

4        A    Yes.

5        Q    -- that Dave Balzano denied or disavowed

6    any knowledge of the copy money?

7            MR. HARRISON:  Same objection.

8            THE WITNESS:  I think she said that he

9    indicated that he was aware of it occurring that one

10   time.

11   BY MR. SUTHERLIN:

12       Q    All right.  And what did you -- what did

13   you tell her to remind her that Dave knew about Dayton

14   headquarters not wanting to deal with the money?

15       A    I reminded her of an earlier conversation

16   that we had in the office where Mary indicated to me

17   that money generated from copying files in the office

18   were to be kept in the office and allocated for office

19   use.  And I turned to Dave and I looked at him and he

20   said, yeah, that's right.

21       Q    Okay.  And do you know when that

22   conversation that you're now referring to occurred?

23      *A   It occurred before Mary went out on*

24    *maternity leave.  I think it was 1997 or 1998.  1998 I*

25    *believe.*

46

1       **Q    And did you, in fact, remind Mary of that**

2     **earlier luncheon meeting with Dave Balzano when you**

3     **called her on this occasion?**

4       **A    It wasn't a luncheon meeting, sir.  It was**

5     **just a conversation we had at the copy machine, and I**

6     **very well may have.  As we sit here right now, I have**

7     **no specific recollection of that.**

8       Q    Okay.  *But it is your recollection today*

9     *that there was a discussion at some point in the*

10    *office between you, Mary Lentz, and Dave Balzano in*

11    *which Dave Balzano acknowledged that if any money was*

12    *generated for copying documents and paid by opposing*

13    *or co-counsel, that that money was to be kept in the*

14    *office for office purposes?*

15        MR. HARRISON:  Objection to the

16    characterization of the witness' testimony.  But go

17    ahead.

18        *THE WITNESS:  It was my understanding that*

19    *Mary informed me that the copying money -- if you*

20    *generated money by copying documents on a file, that*

21    *they had attempted to contact a supervisor to*

22    *determine how to handle that money.  And the*

23    *supervisor indicated that there was no way for them to*

24    *credit that money and that the money should be kept in*

25    *the office for office use.*

47

1    BY MR. SUTHERLIN:

2    *Q    Okay.  And did you ever see anything in*

3    *writing, Mr. Desseyn, at all which dealt with that*

4    *issue about that policy of how to handle copy money?*

5    *A    No, sir.*

6    *Q    Were you ever there when the copy money was*

7    *used for pizza or lunches for your office staff?*

8    *A    Was I ever aware of it?*

9    *Q    Were you aware of it?*

10    *A    Yes, sir.*

11    *Q    And can you tell me how -- with what*

12    *frequency that copy money was used for these office*

13    *luncheons or these pizzas that were purchased?*

14    *A    While I was there?*

15    *Q    Yeah, while you were there.*

16    A    I only recall it occurring a few times.

17    Q    Okay.  And tell me what the process was for

18    people participating in these lunches; who took orders

19    and that sort of thing.

20    A    Well, Paula Ruppert the times that it

21    occurred that I'm aware of -- actually, there were two

22    times that I recall where she came into my office and

23    said there is going to be an office meeting and we're

24    going to use copy money to buy a lunch, what do you

25    want to order.  And she took orders.

48

1    Q    Okay.  And that happened a couple of times

2    as to your recollection?

3    A    At least twice, yeah.  A third time there

4    was another lunch that I understand copy money was

5    used on the day that I left the Dayton office.

6    Q    And do you know whether Dave Balzano sat in

7    for this staff meeting and participated in the lunch

8    that was purchased with copy money?

9    A    Do I know if Dave Balzano did what?

10    Q    Sat in on this staff meeting or meeting

11    that you just referred to.  Did he sit in on that

12    meeting and participate in the lunch that was

13    *purchased with copy money?*

14      **A   I believe he did on a couple of them, yes.**

15      *Q   How about Fred Young?*

16      **A   Yes.**

17      *Q   And the other secretaries?*

18      *A   I believe so, yes.*

19      *Q   Was there any question that this money was*

20    *copy money that was purchasing the lunches?  I mean*

21    *did you see anybody pay for example?  Anybody talk*

22    *about it and say, hey, it's copy money, great?*

23          MR. HARRISON:  Objection to the form but

24    you can answer if you understood the question.

25          *THE WITNESS:  There was no discussion in*

49

1    *that nature.  And I don't know what Paula conveyed to*

2    *the other individuals.  There was no question in my*

3    *mind, but I can't speak for the other people.*

4    BY MR. SUTHERLIN:

5      **Q   Did you ever hear anybody say I don't want**

6    **to have lunch unless it is copy money lunch or**

7    **anything like that?**

8      **A   No.  I don't recall that specifically, no.**

9    Q    Okay.

10    A    Could we take a quick break here, sir?

11        MR. SUTHERLIN:  Sure.  Go right ahead.

12        THE WITNESS:  Five minutes?

13        MR. SUTHERLIN:  Yeah.

14        (Break.)

15        (Question and answer read.)

16    BY MR. SUTHERLIN:

17    Q    Any time you want to take a break, that's

18    fine.  I guess this will probably go, oh, maybe not

19    even another hour.

20    A    All right.

21    Q    I'm looking at the notes that I have.  And

22    I understand, Mr. Desseyn, that you were in the

23    military.

24    A    Yes, I was.

25    Q    Which branch?

                        50

1    A    United States Air Force.

2    Q    Okay.  How long were you in the Air Force?

3    A    Four years active duty.

4    Q    When was that?

5    A    When was that?

6    Q    Yeah.  When were you in the Air Force?

7    A    1982.  May 1982 to May 1986.

8    Q    I was a Navy man myself.  Okay.  When you

9    had this conversation with Mary Lentz, did you also --

10   were you calling to inquire about how to do the same

11   thing in the Harrisburg office?

12         MR. HARRISON:  Objection as to form.

13         MR. SUTHERLIN:  How to use the copy money

14   is what I'm referring to.

15         THE WITNESS:  Well, I'm not sure in what

16   context you're talking about when I called Mary.  When

17   I called Mary when I found out that she had either

18   left or been terminated from the company, it wasn't in

19   regards to any copying, as to the use of any copying

20   money.

21   BY MR. SUTHERLIN:

22   Q    Okay.  *Did you call anybody at the Dayton*

23   *office to find out how to use copy money?*

24   A    *I left Dayton in I believe it was January*

25   *of 1999.  I went to Harrisburg in February of 1999.*

51

1    *At that time it was my understanding that the policy*

2    *was if we were to issue a subpoena and obtain records*

3    *in a case and there were multiple parties involved and*

4    *that we copied the documents in-house and sent those*

5    *documents as a courtesy out to the other Defendants or*

6    *other parties, that the moneys charged would be --*

7    *would come into the office and be placed into an*

8    *account and that those funds were to be used for*

9    *office purposes.*

10        *And I probably called Julia Gibson to*

11    *inquire as to how they were to endorse the checks if,*

12    *in fact, they established that type of a fund.*

13    *Q    Okay.  Did you ever discuss this copy money*

14    *issue with Mark Huller at any time after Mary left?*

15    A    Did I ever discuss the --

16    *Q    Copy money issue or the checks that were*

17    *made out with Mark Huller.*

18        MR. HARRISON:  Objection to form.  But go

19    ahead and answer if you understand the question.

20        *THE WITNESS:  I had a conversation with*

21    *Mark Huller sometime after Mary left about copy money*

22    *as a result of funds being generated from copying*

23    *documents in the office, yes.*

24    BY MR. SUTHERLIN:

25    Q    Can you give me an idea or maybe you know

52

1    the exact date when you called?

2        A    No.  I'm sorry, sir.  I don't know the

3    exact date.

4        Q    Was it after the first of the year?

5        A    First of what year?

6        Q    Let me help you out here.  Mary Lentz was

7    informed on December 29th, 1999, she was going to be

8    terminated.  There was some -- there was action on the

9    part of CIC to present information to the Dayton Bar

10   Association disciplinary body.  And that was mid to

11   late January to give you some points of reference

12   here.

13          **Do you know whether or not in your**

14   **conversation with Mark Huller whether it was in that**

15   **time frame after January 1 of 2000 and before mid**

16   **January of 2000?**

17          MR. HARRISON:  Objection to form.  If you

18   understand what the question is at this point, you can

19   answer it.

20          **THE WITNESS:  I believe the conversation I**

21   **had with Mark Huller occurred after that time frame.**

22   BY MR. SUTHERLIN:

23       Q    Okay.  *Tell me what you said to him and*

24    *what he said to you.*

25        *A    I don't recall specifically what was said.*

53

1    *But in generic terms, I called Mark and indicated that*

2    *I might have some information that might be germane to*

3    *Mary's situation because I had been at the Dayton*

4    *office up until I think it was January of 1999.*

5        *Q    Okay.*

6        *A    And he basically asked me what that*

7    *information was.  And as far as I remember, I*

8    *basically told him what I've told you today about in*

9    *this particular case that copies were to be made*

10    *in-house, that the funds collected for those copies*

11    *were to be deposited in the account; and that to my*

12    *knowledge it was occurring on a file called Henny*

13    *Penny at the Dayton office before I left in January of*

14    *1999.  And that I believe that some funds had been*

15    *used to purchase some meals in conjunction with a*

16    *meeting at the office.*

17        *Q    Did you also tell Mr. Huller that Dave*

18    *Balzano was aware of this practice and had explained*

19    *how this began?*

20        MR. HARRISON:  Objection to form and

21    foundation, but you can answer the question if you

22    understand it.

23        *THE WITNESS:  Well, I don't exactly*

24    *understand what you mean explain how it began.  As I*

25    *said previously, there was a conversation where I was*

                                54

1    *near the copier.  Mary was in the office.  Dave*

2    *Balzano was over near Paula Ruppert's desk.*

3        *And Mary proceeded to tell me that copies*

4    *that were generated by the attorneys in the office for*

5    *the benefit of other attorneys on the file would be*

6    *sent out with a charge.*

7        *And the moneys that came in from those*

8    *files would be put into an account for the office, for*

9    *the use of the office because there was no way for*

10   *them to credit those in Cincinnati.*

11       *Dave Balzano -- I looked at him and he*

12   *said, yeah, that's right.  And that was basically the*

13   *conversation.*

14   *BY MR. SUTHERLIN:*

15       *Q    And you shared that information with Mr.*

16   *Huller?*

17       *A    You know, as I sit here today, I can't*

18    *recall specifically whether I specifically told him*

19    *that or not.  I believe I probably did.*

20        *Q    Okay.  And what was Mr. Huller's response?*

21        *A    What was his response?*

22        *Q    His response.*

23        *A    Well, he thanked me for calling him and*

24    *basically told me that, you know, things were being*

25    *investigated and that was the end of the conversation.*

55

1        Q    Did he tell you that somebody dropped the

2    ball by not contacting --

3        A    I'm sorry.

4        *Q    Did he mention -- did he state that*

5    *somebody had dropped the ball by not contacting you?*

6        *A    He asked me if there was an individual that*

7    *was investigating the matter that contacted me.  And I*

8    *told him, no.  And that was basically the extent of*

9    *the conversation.*

10        Q    Were you ever contacted by anyone who was

11    investigating this?

12        A    I -- well, I spoke with an attorney on this

13    matter.

14            MR. HARRISON:  Again, to the extent you had

15    conversations with counsel, I would instruct you not

16    to answer.  If you had conversations with persons

17    other than counsel, you can answer.

18        THE WITNESS:  And I also spoke with Mr.

19    Huller on it.

20    BY MR. SUTHERLIN:

21    Q    Okay.  Well, I'm not talking about in-house

22    counsel.  I'm actually talking about -- to give you

23    some -- did anybody by the name of Greg Lewis contact

24    you about this?

25    A    Not that I recall.  I don't ever recall

56

1    speaking with Greg Lewis on this matter.

2    Q    Or Al Matheny?

3    A    No, I don't ever recall speaking with -- Al

4    Matheny?

5    Q    Al Matheny.  He's with the special

6    investigative.

7    A    I don't ever recall speaking with a Mr.

8    *Matheny.*

9        Q    Or with Phil VanHouten, did you ever speak

10    with him?

11        A    Not my knowledge.

12        Q    But you did speak with Mark Huller when you

13    called him.  Did you ever speak to any other person

14    about this?

15        A    I spoke with counsel after this.

16        Q    I'm not talking about counsel.  That would

17    be either Jack or Debbie Adams I'm assuming.  Did you

18    talk to Mr. Huller?

19        A    I talked to Mark Huller, and then the next

20    conversation I had was with Debbie Adams.

21        Q    Thank you.  Were you aware that Mr. Huller

22    indicated that he was going to refer this matter to

23    the disciplinary commission?

24        A    No.

25        Q    Did he mention he was going to refer the

                                    57

1    matter to the prosecutor?

2        A    No.  I didn't ask and he never volunteered

3    that.

4        Q    Okay.  Did you ever observe -- let me go

5    back to another topic that we already touched on.

6    **Have you ever observed any arguments or hear of any**

7    **arguments between Dave Balzano and Mary Lentz?**

8        **A    Not that I can recall, no.**

9        **Q    Okay.  You said there was some tension**

10    **between the two of them.  Do you recall what that was**

11    **based on, what you observed the tension to be caused**

12    **by?**

13        **A    Well, I think a lot of it had to do with --**

14    **I think some of it had to do with Mary's secretary**

15    **Paula Ruppert and the assignment of work or something**

16    **to her.**

17        *Q    Did you ever have to stick up for Paula*

18    *Ruppert on any work issues?*

19        *A    Seems to me there was a couple of times*

20    *that I had to speak on Paula's behalf, but I don't*

21    *recall exactly what that was for.*

22        *Q    Did you find that Paula was a hard-working*

23    *individual?*

24    *A    Yes.*

25        *Q    Did you find that she was an ethical and*
                                58

1    *professional person?*

2        MR. HARRISON:  Objection as to the

3    foundation, competence of this witness.  But you can

4    go ahead and answer.

5        *THE WITNESS:  Well, in regards to any work*

6    *with me I would say that's true, any work she*

7    *performed for me.*

8    *BY MR. SUTHERLIN:*

9        *Q    Okay.  Did you work with Mary Lentz on any*

10   *cases together?*

11       *A    I answered that previously.  I know of at*

12   *least two cases, and I believe there was several*

13   *others where we worked peripherally together* **where she**

14   **may have asked me to prepare a motion in limine or**

15   **something for her.**

16       Q    Okay.  You're right.  I'm sorry.  *Did you*

17   *ever observe her ask any other attorneys for*

18   *assistance and observe where they were unwilling to*

19   *help support the prosecution of a particular case?*

20       *A    I don't recall observing her asking anybody*

21   *to that effect.  But she indicated to me that she had*

22   *some difficulty in getting assistance on a file or*

23   *two.*

24       **Q    Did she tell you any more than that?  Did**

25   **she tell you whether she had gone to Dave for**

59

1    assistance and wasn't getting any support?

2        A    She may have.  As we sit here, I don't have

3    any specific recollection.

4        Q    Were you aware that Dave Balzano wanted to

5    be transferred to go to Cincinnati?

6        A    At what point in time?

7        Q    According to Mr. Balzano, he made that

8    aware from the very beginning.  So I guess do you have

9    any knowledge of that while you were there?

10        A    I do recall after having a specific

11    conversation with Dave Balzano after I became aware

12    that the position in Harrisburg had been offered to

13    me, that he had made a request to Mark Huller to

14    relocate to Cincinnati.  And the basis I believe was

15    because he had a couple of children down in that area.

16        Q    Okay.  Were you aware that Mary Lentz

17    expressed an interest in being managing attorney of

18    that office if Dave Balzano left?

19        MR. HARRISON:  Again, do you mean at any

20    point in time?

21        MR. SUTHERLIN:  Yes.

22        THE WITNESS:  She may have expressed an

23    *interest to me.  But as we sit here, I don't*

24    *specifically recall when that would have been; if it*

25    *was before I left or after I left.*

60

1    BY MR. SUTHERLIN:

2      Q    Okay.  *When you worked with Mary on these*

3    *cases, did you find her to be diligent in the*

4    *prosecution of her cases?*

5      A    I'm sorry.  When I worked on --

6      *Q    When you were working with Mary, did you*

7    *find her to be diligent in the prosecution and*

8    *management of her cases?*

9      A    Did I find her diligent in the prosecution

10   and what of her cases?

11        MS. LENTZ:  Management.

12        THE WITNESS:  I'm sorry, sir.  You're

13   breaking up again.  The question is, was she diligent

14   in the management of her cases?

15   BY MR. SUTHERLIN:

16     *Q    Did you observe that she was diligent in*

17   *the management and prosecution of cases?*

18     *A    Yes.*

19     *Q    Okay.  Did you find her to be hard working?*

20     A    Yes.

21     Q    Did you have any questions about her

22    professionalism or her ethics?

23     A    Myself, no.  I didn't have any problem

24    with -- any questions with regards to her

25    professionalism or her ethics.

61

1     Q    Okay.  That's what I'm asking.  Do you

2    remember anything about Mary saying how or why she put

3    these checks into her account?  You said something

4    about Christmas.  Do you remember the amount of the

5    checks or the amount was too much for her to cash and

6    leave in the office over the holidays?

7          MR. HARRISON:  Objection as to form and

8    foundation, but the witness can answer to the extent

9    he understands the question.

10          THE WITNESS:  No, sir.  I don't recall any

11    amounts being discussed.  All I recall is that there

12    was some concern that there was checks being left in

13    the office over the holidays.  And for that reason,

14    she had deposited them.

15          MR. SUTHERLIN:  Okay.  Sherri, why don't

16    you put us on mute and I'm going to talk to Mary.

17     MR. HARRISON:  I'm not sure you will be

18   muted as to me, Mike.  You may want to do it on

19   another line.

20     MR. SUTHERLIN:  I'll do it on another line.

21     (Break.)

22   BY MR. SUTHERLIN:

23     Q   Mr. Desseyn, I am going to ask you a couple

24   of things.  A couple more things and we're probably

25   done.  Were you aware that there was some tension

62

1   between Dave Balzano and Paula?

2     A   Yes.

3     Q   Do you know what that was over, the cause

4   of that?

5     A   I'm not exactly sure.  I think part of it

6   dealt with work assignments I think when Mary went out

7   on maternity leave.

8     Q   Okay.  Did you assist in resolving any of

9   that?

10     A   Well, at some point in time Paula was

11   assigned to me or I was assigned to Paula.  And I

12   tried to -- Paula was a good worker and I did not want

13   to see her leave and I tried to resolve any tensions

14    there were between her and Dave.

15      Q    Okay.  How did you go about doing that?

16      A    Just by talking.  Basically, I talked with

17    Paula about what the problems were and then went and

18    talked with Dave.

19          And I can't specifically recall what

20    problems there were.  But just basically tried to

21    maybe act as a sounding board for both sides so that

22    we could try to ease the tension a little bit.

23      Q    Did you -- let me see if this helps to

24    refresh your memory of that in more detail.  Do you

25    remember that when Mary went out on maternity leave

                            63

1    that David agreed that Paula was supposed to do

2    overflow work for you -- I guess for you?

3      A    Yeah.  I think that's correct, yes.

4      Q    And then he changed his mind as soon as

5    Mary left?

6          MR. HARRISON:  Objection to form and

7    foundation, but you can answer if you have any

8    knowledge.

9          THE WITNESS:  I don't specifically recall

10    that.  I do know at some point Paula was doing all of

11    my work.

12    BY MR. SUTHERLIN:

13        Q    Okay.  *Did you have an occasion to write a*

14    *letter of recommendation for Mary Lentz after she was*

15    *fired from Berlon & Timmel and Cincinnati Insurance?*

16        *A    Mary requested I write a letter of*

17    *recommendation on her behalf which I did so.  I don't*

18    *know if, in fact, that I was aware that she was*

19    *terminated from Berlon & Timmel.  But I did write the*

20    *letter.*

21        *Q    Okay.  She didn't tell you that she had*

22    *been fired?*

23            MR. HARRISON:  At any point or before the

24    letter?

25            *MR. SUTHERLIN:  Before the letter.*

                              64

1            *THE WITNESS:  She may have.  I don't*

2    *recall.*

3            MR. SUTHERLIN:  Okay.  That may be it.

4    Hold on one second.  I may have one more question.

5    Hold on.

6            **THE WITNESS:  Can I clarify that answer?**

7            (Break.)

8          MR. HARRISON:  Just hold it, Donald, until

9    he comes back.

10          THE WITNESS:  All right.

11          MR. HARRISON:  Mr. Sutherlin, before you

12    ask another question, I think Mr. Desseyn has a

13    clarification to his last answer.

14          MR. SUTHERLIN:  Okay.

15          **THE WITNESS:  I just wanted to clarify that**

16    **last answer.  I wrote a letter of recommendation on**

17    **behalf of Mary based upon my perceptions with regards**

18    **to our working together while I was in the Dayton**

19    **office.**

20          **If, in fact, she told me she was terminated**

21    **from Berlon & Timmel, I have no knowledge as to what**

22    **the basis of the termination was other than it had to**

23    **do something with the copy money.**

24          MR. SUTHERLIN:  I wasn't asking you what it

25    was based on actually.  They are not --

                                    65

1          COURT REPORTER:  Please repeat your last

2    statement.

3          MR. SUTHERLIN:  They are not even sure.

4          MR. HARRISON:  It doesn't really matter.

5   Mr. Sutherlin is just testifying.

6          MR. SUTHERLIN:  I just want to make sure

7   I'm recorded accurately if I'm testifying.

8          MR. HARRISON:  Well, let's get you under

9   oath then.

10         MR. SUTHERLIN:  If you'll let me testify,

11  I'll be glad to.

12         MR. HARRISON:  I'm sure that you would.

13         THE WITNESS:  Is there another question?

14         MR. SUTHERLIN:  We've had that kind of fun

15  off and on for several days.

16         THE WITNESS:  I've seen it before.

17         MR. SUTHERLIN:  We all have.

18         THE WITNESS:  There's a lot of testosterone

19  flying around.

20  BY MR. SUTHERLIN:

21     Q    Okay.  I think that's it.  I think that's

22  all I can think of here.  Let me cover a couple

23  things.  *You think you went to at least one lunch,*

24  *maybe more?*

25     A    *I said I believe I went to two or three.*

                          66

1   *Two I believe that Dave was present, the third one I*

2    *know he wasn't present. It was my last day at the*

3    *office.*

4      *Q    Okay. And were these lunches in the office*

5    *or out of the office?*

6      *A    In the office in the conference room.*

7      *Q    Okay. Were you aware that Paula was*

8    *keeping track of the copy money when it was being used*

9    *for these lunches?*

10        MR. HARRISON:  Objection to form and

11    foundation, but you can answer it if you have any

12    knowledge.

13        *THE WITNESS:  Well, I have no -- I don't*

14    *have any knowledge as to who was -- you know, as far*

15    *as the accounting of the money.*

16        *I do know that Paula would take the order.*

17    *And I guess when she paid for it, she indicated to me*

18    *that she would write down on the receipt who ordered*

19    *what.*

20    *BY MR. SUTHERLIN:*

21      *Q    Okay. Did you ever observe that she kept*

22    *any receipts or any of these orders in an envelope in*

23    *her drawer?*

24        MR. HARRISON:  Objection to form and

25    foundation.  If you have any knowledge, you can answer

67

1    the question.

2        *THE WITNESS:  I don't specifically recall*

3    *seeing any or seeing the envelope.  But she told me*

4    *she did, and I took her at her word for it.*

5    BY MR. SUTHERLIN:

6        Q    Did anybody ever tell you about two

7    different accounts that were I guess opened up and

8    available to Berlon & Timmel attorneys there in

9    Dayton?

10        A    I don't know what you mean by made

11    available for attorneys.

12        Q    Well, let me ask it this way.  Maybe that

13    wasn't a good question.  Were you aware there was a

14    trust account there?

15        A    It is my understanding -- yes -- well, I

16    don't know if it was a trust account.  There was an

17    account open for moneys, checks to be written on files

18    I think for an amount of less than 24.99.

19        Q    So there was an account to write checks on.

20    Did you ever deposit any money yourself into any of

21    those accounts?

22        MR. HARRISON:  Objection.  I think the

23    witness has only identified one account.

24        MR. SUTHERLIN:  Into that account, into the

25    expense account.


                        68

1        THE WITNESS:  I don't recall ever

2    depositing any moneys into that account, no.

3    BY MR. SUTHERLIN:

4      Q    Do you recall anybody explaining to you any

5    other accounts other than that one account that you

6    just mentioned where you could write a check for

7    24.99?

8      A    As I sit here, I don't recall an account.

9    I recall if amounts were required in excess of that,

10    generally we ask the supervisor on the file to issue a

11    draft.

12        MR. SUTHERLIN:  That's all I have.  Thank

13    you very much, Mr. Desseyn.

14        MR. HARRISON:  Mr. Desseyn will read and

15    will not waive signatures.

16        MR. SUTHERLIN:  I'm signing off.

17        (The deposition concluded at 3:12 p.m.)

18

19

20

21

22

23

24

25

69

1    COUNTY OF DAUPHIN          :
                             : SS
2    COMMONWEALTH OF PENNSYLVANIA :

3        I, Sherri A. Reitano, Notary Public,

4    authorized to administer oaths within and for the

5    Commonwealth of Pennsylvania and take depositions in

6    the trial of causes, do hereby certify that the

7    foregoing is the testimony of

8            DONALD MAURICE DESSEYN.

9        I further certify that before the taking of

10   said deposition, the witness was duly sworn; that the

11   questions and answers were taken down stenographically

12   by the said Sherri A. Reitano, Notary Public, approved

13   and agreed to, and afterwards reduced to typewriting

14   under the direction of the said Reporter.

15        I further certify that the proceedings and

16   evidence are contained fully, accurately in the notes

17   taken by me on the within deposition, and this copy is

18   a correct transcript of the same.

19            In testimony whereof, I have hereunto

20   subscribed my hand this 2nd day of December, 2002.

21           _____
                    Sherri A. Reitano
22                  Notary Public
        My commission expires
23      on August 28, 2003.

24

25