UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| MARY E. LENTZ, | ) | |
| | ) | Cause No. 1:01-cv-599 MHW |
| Plaintiff, | ) | |
| | ) | (Watson, J.) |
| v. | ) | |
| | ) | |
| CINCINNATI INSURANCE | ) | |
| COMPANY, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT BALZANO'S RENEWED MOTION
FOR JUDGMENT AS A MATTER OF LAW**

Comes now Plaintiff, by counsel, and hereby respectfully files her Response to Defendant David Balzano's Motion for Judgment as a Matter of Law as to Claim For Intentional Interference With Employment Relationship.

Defendant David Balzano has renewed his motion under Fed. R. Civ. Proc. 50(b) following a full jury trial and verdict. Two tort claims were brought against Defendant Balzano as an individual, and Plaintiff was successful in one: Intentional Interference with an Employment Relationship. The jury found in Plaintiff Lentz' favor on this claim. Without considering lost wages as damages, the jury awarded no other compensatory damages.[1] Plaintiff presented more than sufficient evidence at trial to support the jury's decision. Defendant Balzano's tortious actions were malicious and outside the scope of his employment, and thus there is no 'supervisory immunity' for Defendant here. Furthermore, the jury specifically found

---

[1] The Court has not yet ruled on Plaintiff's Motion for Hearing on Back Pay and Front Pay Damages.

that Defendant acted with malice in his actions, and there was more than sufficient evidence to support that finding. Finally, the jury properly found that Defendant's actions proximately caused Plaintiff to suffer damages via her termination.

For these reasons, which are explained more specifically below, Plaintiff respectfully requests that the Court deny Defendant's motion in its entirety.

### **Legal Standard**

A court can render judgment as a matter of law only when "a party has been fully heard on an issue and there is <u>no</u> legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. Proc. 50(a) and (b) (emphasis added). "In entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record. In doing so, however, *the court must draw all reasonable inferences in favor of the nonmoving party*, and *it may not make credibility determinations or weigh the evidence*." <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 150 (2000) (emphasis added). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." <u>Id.</u> (citing to <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986)). "Thus, although the court should review the record as a whole, *it must disregard all evidence favorable to the moving party that the jury is not required to believe*." <u>Id.</u> (citation omitted).

Under these standards, Plaintiff prevails against Defendant's Rule 50 motion, and his motion should therefore be denied.

**Argument.**

I. **The jury found that Defendant Balzano's tortious actions were outside the scope of his employment, and the evidence supports this finding.**

Defendant states, "Ohio law permits employees to maliciously interfere with one another, *so long as they are acting within the scope of their employment*." Memorandum in Support, Document #165, p. 6 (emphasis added). The operative language is that actions must be "within the scope of employment" for a supervisor to have a qualified immunity towards a tort claim for intentional interference with an employment relationship. Plaintiff has shown that Defendant Balzano was *not* operating within the scope of his employment when he interfered in the business relationship between Mary Lentz and Cincinnati Insurance Company, because CIC did not authorize employees to lie or provide inaccurate information to their superiors, and Balzano thus acted outside the scope of his employment when he provided inaccurate and untruthful information to his boss, Mark Huller.

Defendant Balzano spends five pages arguing about an exception to liability for supervisors under claims of intentional interference with an employment relationship. The entire doctrine is based upon the premise that the supervisor[2] is acting within the scope of his employment at the time of his interfering actions. See Buchko v. City Hosp. Ass'n, 1996 WL 34914 at *6 (6th Cir. 1996) (unpublished decision) ("[W]hen under Ohio law an alleged 'interferer' with another's contractual relationships has an employment relationship with the

---

[2] Defendant dedicates a portion of his argument to the proposition that co-workers, too, are protected by an immunity defense in Ohio. See Moses v. Budd Co., 1993 WL 496639 (Ohio Ct. App. 1993). The holding of Moses has not been adopted by the majority of Ohio courts. Nevertheless, Plaintiff asserts that Balzano was Plaintiff's supervisor and that this argument is therefore irrelevant. Balzano was not, however, acting in his supervisory capacity when he tortiously interfered in Plaintiff's employment relationship with Cincinnati Insurance Company.

3

other, the question of privilege is essentially one of whether the 'interferer's' employment duties included the duty to report the perceived derelictions of the other person to outsiders having a contractual relationship with that person. If so, and if the report was neither intentionally nor recklessly false, making such a report would be privileged. If there is no such duty, or if in the particular case, it is improperly performed, such a report would not be 'privileged.'")[3] (citing to Contadino v. Tilow, 589 N.E.2d 48 at 50-51 (Oh. App. 1990). *See also* Robinson v. Springfield Local School Dist. Bd. Of Education, 2002 WL 462860 at *9 (Ohio App. 2002) (unreported decision) ("An employee's interference may be justified and not actionable when it comes within the scope of duties and is not malicious. Where, however, the employee has acted outside the scope of employment he may be liable for tortious interference.") (citing to Anderson v. Minter, 291 N.E.2d 457 (1972)).

Despite the clear limitations of the doctrine, Defendant Balzano fails to even once point out to this Court that the jury specifically found that he "acted outside the scope of his employment when he engaged in his interfering acts…" Jury Instructions, p. 10, and Special Interrogatories ("Plaintiff proved…the Defendant David Balzano intentionally interfered with her employment relationship with Defendant CIC, as defined in the jury instructions."). The jury instructions laid out this requirement with specificity, and there was more than sufficient evidence to support the jury's affirmative finding in this regard.

At trial, Mark Huller, to whom Defendant Balzano reported, was asked: "Are your employees authorized as part of their job to lie to a superior if they're involved in the course of

---

[3] Although Buchko dealt with a claim of tortious interference with contractual relations, Ohio courts generally do not distinguish between that claim and the one at issue here in 'scope of employment' matters, as Defendant recognizes when he cites to similar cases such as Rayel v. The Wackenhut Corp., 1995 Ohio App. LEXIS 2389 (8th Dist. June 8, 1995) (tortious interference with contract); Erebia v. Chrysler Plastic Products Corp., 891 F.2d 1212 (6th Cir. 1989) (tortious interference with business contract).

4

an investigation regarding a fellow employee's suspicion of misconduct?" Huller responded, "We certainly don't authorize employees of the Cincinnati Insurance Company to lie to superiors." Transcript of Trial, p. 908.

In fact, Defendant Balzano did testify that he had an obligation to provide accurate information during investigations:

```
Q [by Plaintiff's counsel]: And it was your duty to supervise and direct
   staff, including attorneys, when they had questions, isn't
   that correct?

A [by David Balzano]: Sure.

Q: You had a duty to address any unethical or improper conduct
   in your office of someone as you became aware of it; isn't
   that correct?

A: I'm not sure what you're asking me.

Q: If you became aware of any unethical or improper conduct in
   your office, you had a duty to report it or investigate;
   isn't that correct?

A: Are you talking about regarding other attorneys?

Q: I'm talking about anything that occurs in your office.

A: Well, as an attorney, I have an ethical obligation to report
   dishonest things that other attorneys do.

Q: As a Dayton managing attorney, you also had responsibility to
   help the company investigate any claims of unethical conduct
   of employees in the Dayton office, isn't that correct, Mr.
   Balzano?

A: I wouldn't say I would be involved in the investigation, no.

Q: You had a responsibility to participate in the investigation;
   isn't that correct, Mr. Balzano?

A: I would do whatever the company wanted me to do in that
   regard, sir.

Q: You had a duty and responsibility to provide accurate
   information to the company personnel responsible for
```

5

>investigating claims of unethical conduct; isn't that correct?

A: ***Certainly.***

Transcript of Trial, pp. 869-871 (emphasis added).

Furthermore, both Balzano and Huller testified that, when relaying information to superiors or investigators by necessity, Cincinnati Insurance Company imposed an affirmative duty to relay information that is 'accurate' and truthful, as shown by the testimony above. Therefore, relaying inaccurate or untruthful information would be outside the scope of Balzano's employment. The evidence viewed in the light most favorable to Plaintiff shows that Balzano acted outside of the scope of his employment when he gave inaccurate and untruthful information to Mark Huller when reporting Mary Lentz.

Reading from Plaintiff's Exhibit 29[4], Balzano revealed that he had untruthfully reported relevant facts to Mark Huller when making his report regarding Plaintiff:

Q: When CIC investigated Ms. Lentz, you told Mark Huller on December 29th that you had no knowledge of copy fund money; isn't that correct?

A: That's incorrect, sir. On December 7th —

Q: Now the question was, on December 29th didn't you tell Mr. Huller that you had no knowledge of copy money? I call your attention to, if you would look at Plaintiff's Exhibit 29.

…

Q: Would you look at the second page?

A: (witness complied) Okay.

Q: What does it say?

…

---

[4] The Court should note that this Exhibit was admitted and that Defendants stated no objection. Tr. Trans., p. 873.

```
A: "After speaking with Mary, I [Mark Huller] spoke briefly with
Dave Balzano privately.  I informed him Mary stated that he had
full knowledge of the copy money and knew where it came from.
Dave said he had no knowledge of the fund and had never received
a lunch or any money from the fund."…
```

Transcript of Trial, pp. 871-872.

The evidence shows that David Balzano told Huller that he (Balzano) "had no knowledge of the fund and had never received a lunch or any money from the fund." Id.  However, the evidence shows that this statement was completely inaccurate and untruthful, because Balzano did indeed receive meals and had knowledge of a copy money fund.  Tr. Trans., p. 872.  Balzano was acting outside the scope of his employment when he failed to give truthful information in his report to Huller.

Defendant will no doubt protest that Balzano 'clarified' the discrepancy by testifying that he had informed Huller of the copy money and his lunches previously.  The crux of the matter, however, is that *the evidence shows that Mark Huller stated in writing that Balzano had not made such a disclosure*.  Neither Balzano nor Huller's testimony to the contrary can change that. "*[T]he court must draw all reasonable inferences in favor of the nonmoving party*, and *it may not make credibility determinations or weigh the evidence…. it must disregard all evidence favorable to the moving party that the jury is not required to believe*." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000) (emphasis added) (citations omitted).

Under the standard of law that this Court is obligated to follow, the evidence fully supports a finding by the jury that Balzano acted outside the scope of his employment by making untruthful statements in the course of the ensuing investigation.  Because these actions were outside the scope of Defendant's employment duties, Defendant's motion for judgment as a matter of law on this issue must fail.

7

**II.    The jury found clear and convincing evidence that Defendant Balzano acted with actual malice, and the evidence supports this finding.**

As shown above, Balzano is not protected by any supervisory or immunity privilege because he acted outside the scope of his employment in his tortious actions. Balzano retains no other qualified immunity, because he acted with actual malice[5] in doing so. The jury properly relied on evidence in the record showing that Balzano acted with actual malice in reporting Lentz to Huller, in holding back relevant information about his full knowledge of Plaintiff's actions and the reasons therefore, and in holding back exculpatory information about his own actions. Because there was more than sufficient evidence showing that Balzano acted with actual malice, the jury properly found in favor of Plaintiff in this regard, and Defendant's motion must be denied.

The jury in this case specifically found that "Plaintiff proved by clear and convincing evidence that Defendant Balzano acted with actual malice, as defined in the jury instructions." Jury Verdict Finding for Plaintiff, Special Interrogatories, Document 156. The jury instructions stated, in relevant part, "Plaintiff must show by clear and convincing evidence that the communications were made with 'actual malice,' that is, with knowledge that the statements were false or with reckless disregard of whether they were false or not. To be 'clear and

---

[5] The definition of "actual malice" in context of this claim is that the Defendant made statements "with knowledge that the statements were false or with reckless disregard of whether they were false or not," which is correctly conveyed in the Jury Instructions and in the case law. However, "Malice, in this context, does not require a showing of ill will or hatred for [the plaintiff]." Doyle v. Fairfield Machine Co., Inc., 697 N.E.2d 667, 684 (Ohio App. 1997) (citing to Smith v. Ameriflora, Inc., 644 N.E.2d at 1043. Defendant, in his argument, seems to forget this fact when he arbitrarily chooses Plaintiff's evidence for this argument as showing only that Balzano "feared" for his job or that he "harbored a grudge against Plaintiff," Memorandum, document 165, p. 10, or that he "acted maliciously against her out of revenge," Id., p. 11. While the evidence does indeed seem to show this, it is utterly irrelevant to Defendant's Rule 50 motion, because **the standard here is whether Balzano made his statements "with knowledge that the statements were false or with reckless disregard of whether they were false or not," which he did.**

convincing' the evidence must have more than simply a greater weight than the evidence opposed to it and must produce in your minds a firm belief or conviction about the truth of the matter." Jury Instructions, Document 159, p. 10.[6]

Defendant attempts to frame his malicious acts as only including 'reporting Plaintiff's letters to Huller,' Memorandum, document 165, p. 9. This is not the case. Other actions relevant here include Balzano's holding back relevant information about his full knowledge of Plaintiff's actions and her reasons, and in his holding back exculpatory information about his own actions. Viewed in whole, Balzano's actions easily rise to the level of actual malice supporting Plaintiff's intentional interference with employment relationship claim against Defendant.

As an initial matter, Plaintiff must address an outright impropriety by Defendants that will directly effect the Court's determination on this issue. Defendant states without reservation that a case from the Ohio Supreme Court, Hahn v. Kotten, which deals with an action for slander, 331 N.E.2d 713 (1975), "stat[es] that the qualified privilege standard and the malice requirement are the same for tortious interference and defamation claims." Memorandum, document 165, p. 10. This is utterly and completely wrong. The word "tortious" does not appear in Hahn, nor even the word "interference." 331 N.E.2d 713. The case makes no absolutely no mention of tortious interference cases or claims, nor does it even refer to or cite to such cases. **The proposition for which Defendant claims Hahn stands does not exist.**

Next, Defendant claims that an Ohio Appellate Court decision, Ohio State Home Serv., Inc. v. BBB Akron, Inc., 627 N.E.2d 602 (Ohio App. 1993), says the same thing. BBB Akron is

---

[6] Defendants did not object to either the 'actual malice' instruction or the 'clear and convincing' standard instruction. As for the 'actual malice' definition, this wording is actually identical to the wording submitted in Defendant's proposed jury instructions submitted prior to trial. See Defendant Balzano's Proposed Jury Instructions, pp. 11-12. Defendant Balzano has therefore waived any other language or citations on these issues.

9

an appeal from a summary judgment dismissing claims of, *inter alia*, defamation and tortious interference with business relationships.  While the two sentences of dicta which Defendant must be referring to in BBB Akron might appear at a cursory glance to support that proposition, BBB Akron does not hold such.  BBB Akron only holds that because the defamation claim in that case was appropriately dismissed on summary judgment since the only statements at issue were *true* (thus providing a complete defense to defamation), then the same standard would apply to the tortious interference claim, and thus that claim was appropriately dismissed on summary judgment as well.  *Why* were defamation and tortious interference comparable in that case?  The claims could be compared because *both* claims require that the statements or actions at issue be *knowingly or recklessly false*.  If the statements were true, then a tortious interference claim would not lie, because falsity is an essential element of the claim.  This is a legal truism, but it does not support the vastly broader holding which Defendant has posited.

Defendant has thus cited to two cases that do not support his legal argument.  Defendant has *not* provided case law showing that defamation and tortious interference claims can be compared when talking about 'actual malice.'  Since it his burden to do so, this argument fails.

Nevertheless, Defendant goes on to tell the Court that a jury cannot legally infer malice from *any* evidence.  Memorandum, document 165, p. 11.  For this proposition, Defendant cites to three cases: Contadino v. Tilow, 589 N.E.2d 48 (Ohio App. 1990), Smith v. Ameriflora, 644 N.E.2d 1038 (Ohio App. 1994), and Jacobs v. Frank, 573 N.E.2d 609 (Ohio 1991).  **Each of these cases is one involving defamation, not tortious interference.  Nowhere in his argument does Defendant tell this to the Court.**  Defendant has not provided any support (other than the completely false legal conclusions discussed above) to show that these cases even apply here.  Even if they did, all three cases deal with claims in which there was *no* actual evidence of malice

on the part of the defendant in that defamation claim. The crux of the cases is that personal animus between the parties cannot show malice *in regards to* the tortious acts, nor can personal belief on the part of a plaintiff. In other words, as the Ohio Supreme Court stated, "It is not sufficient for a libel plaintiff to show that an interpretation of facts is false; *rather, he must prove with convincing clarity that defendant was aware of a high probability of falsity*." Jacobs, 573 N.E.2d at 616. This Plaintiff has done. The evidence at trial easily supported a jury finding that Balzano was aware of the falsity, or reckless falsity, of his statements and actions.

Furthermore, it is absolutely ridiculous for Defendant to tell the Court that actual malice cannot be inferred from evidence. As any first year law student is aware, actual malice, i.e., '*knowledge* of falsity,' is a *mental state* or an *intention* (in the world of criminal law it would be referred to as *mens rea*), and such states of mind *always* have to be inferred from a defendant's actions or statements. There is no other way to show knowledge.

Therefore, it is not Plaintiff's 'subjective belief' of Balzano's malice that is important, but rather her testimony regarding his *actions* and *statements* (as well as testimony from all the other witnesses who spoke at trial regarding Defendant Balzano).

Mark Huller's notes on Balzano's statements to him, which were admitted at trial, showed that he (Balzano) stated he "had no knowledge of the fund and had never received a lunch or any money from the fund." Tr. Trans., pp. 871-872.[7] The evidence shows that this statement was completely inaccurate and untruthful, because Balzano did indeed receive meals and had knowledge of a copy money fund, to which he himself testified. Tr. Trans., p. 872.

---

[7] Plaintiff again stresses the fact that "the court must draw all reasonable inferences in favor of the nonmoving party…" Reeves, 530 U.S. at 150. *Even if* this were the only piece of evidence showing that Balzano lied to Huller about the circumstances of Plaintiff, the copy money, and office policy on the matter (and it is not the only evidence here), this would be enough for the jury to find in Plaintiff's favor.

Other witnesses revealed that Balzano had indeed knowingly participated in lunches bought with copy money. *See* testimony of Don Desseyn (Tr. 1088); testimony of Shelly Bascom (Tr. 801-802). Both Plaintiff and Paula Ruppert testified at trial that Defendant lied about his knowledge of copy money and lunches. Id., p. 541.

Plaintiff testified that when she went to Balzano for the first time in March of 1998 to ask about what to do with a 'copy money' check, Balzano told her to cash it and use it for office purposes. Tr. Trans., 500. She further testified that Balzano was present during one or more dinner conversations in which she explained that she was cashing copy money checks and not forwarding them to the central office, and that Balzano did not object to anything said at those conversations. Tr. Trans., 502. Plaintiff further testified that Balzano was present during a conversation between Don Desseyn and herself, at which she explained that copy reimbursement funds were being used in ways outside of the cases themselves, and Balzano did not object. Tr. Trans., 732. Al Matheny backed up Plaintiff's story, testifying that Plaintiff had indeed indicated to him that Defendant Balzano told her to take copy reimbursement money and place it in her personal bank account. Tr. Trans., p. 1149.

Plaintiff testified that when she was first brought to meet with CIC's investigator, Al Matheny, she explained that it was the general understanding in the Dayton office that the home claims office did not have a mechanism to earmark recaptured copy funds to specific files and thus did not want to deal with such funds, and Balzano verbally agreed. Tr. Trans., 504-505. However, when Matheny asked where Plaintiff had gotten her authority for using such funds, Balzano disclaimed all knowledge, saying, by Plaintiff's testimony, "Well, I'm glad you said that, Mary, because I didn't know this was going on, I didn't know anything about this." Id., 506.

Clearly, the jury chose to believe that Defendant Balzano intentionally concealed important and pertinent information to several key players at CIC: Al Matheny, the investigator in the matter, and Mark Huller, his own boss and the final decision-maker regarding hiring and firing. There was plenty of evidence to allow the jury to find that Balzano's omissions were indeed made with actual malice – since, in this case, 'actual malice' meant that Balzano had made those statements "with knowledge that the statements were false or with reckless disregard of whether they were false or not." The evidence here, viewed in the light most favorable to Plaintiff, clearly demonstrates that material statements of Balzano's reports regarding Mary Lentz were knowingly or recklessly false. Because of this, Defendant's motion for judgment notwithstanding the jury's verdict must be denied.[8]

### III. The jury found that Defendant Balzano proximately caused Plaintiff's termination of employment with CIC, and the evidence supports this finding.

In this case, the Court instructed the jury, "Proximate cause it that which, in a natural and continued sequence, contributes to produce the result, and without which it would not have happened." Jury Instructions, document 159, p. 10.[9] This comports with instructions by the Ohio state courts. In a case based on claims of tortious interference with employment

---

[8] Defendant's final argument on this issue, that the Court denied a punitive damages instruction which would require a showing of malice and thus that this claim, requiring malice, should also have not been presented to the jury, is misplaced. First, Plaintiff herself has already filed a Motion for New Trial in which she asserts that the Court's denial of a punitive damages instruction was erroneous (the Court has yet to rule on this motion). Second, the very fact that the jury, which was properly instructed in all regards on this issue, *did* find malice on this issue, throws a wrench into Defendant's argument that simply cannot be ignored.

[9] As a short aside, Defendant complains about counsel for Plaintiff's analogy of causation showing Balzano "pushing a sled down a hill into traffic." Defendant's discussion of this analogy is so abstract and confusing, however (*see* Memorandum, document 165, p. 14 n. 3 and p. 17), that it would be best to simply ignore it. At any rate, Defendant did not object to this analogy at trial, so any complaint is waived.

relationship, intentional and negligent misrepresentation, and defamation, the court affirmed a $1.4 million jury verdict against a defendant, and stated, "Proximate cause has been defined as follows: '[A]n act or failure to act which in the natural and continuous sequence directly produces the [injury] claimed, and without which it would not have occurred. Cause occurs when the [injury] is the natural and foreseeable result of the act or failure to act.'" Doyle v. Fairfield Machine Co., Inc., 697 N.E.2d 667, 679 (Ohio App. 1997) (citing to 11 Ohio Jury Instructions (1995) 171, Section 11.10(2)).[10]

Furthermore, 'proximate cause' does *not* mean that Balzano's reports and omissions regarding Plaintiff had to be the only thing that led to her termination. "[T]he term 'proximate cause,' is often difficult of exact definition as applied to the facts of a particular case. However, it is generally true that, where an original act is wrongful * * * and in a natural and continuous sequence produces a result which would not have taken place without the act, proximate cause is established, *and the fact that some other act unites with the original act to cause injury does not relieve the initial offender from liability*." Doyle, 697 N.E.2d at 679 (quoting Strother v. Hutchinson, 423 N.E.2d 467, 471 (Ohio 1981)) (emphasis added). "There may be more than one proximate cause of an injury." Doyle, 697 N.E.2d at 679 (citing to Taylor v. Webster, 231 N.E.2d 870, 873 (Ohio 1967)).

Even if Plaintiff's action, or Mark Huller's actions, or Al Matheny's actions arguably interfered in the casual link between Defendant Balzano's actions and Plaintiff's termination, "[w]here there are facts that could lead reasonable minds to conclude differently regarding whether the intervening cause broke the causal link, the question should be submitted to the jury,

---

[10] Defendant objected to the Court's proximate cause instruction, but as the Ohio case law and Ohio Jury Instructions printed here clearly show, presenting that issue "for purposes of preserving the record for appeal," Memorandum, document 165, p. 14 n. 2, would be frivolous.

14

and summary judgment is not appropriate." Doyle, 697 N.E.2d at 697 (citing to Cascone v. Herb Kay Co., 451 N.E.2d 815, 819 (Ohio 1983)).  Since "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same,' Reeves, 530 U.S. at 150 (citations omitted), the jury has already spoken on this issue, and it is not appropriate for Defendant to ask the Court to reconsider its judgment on this issue.

Contrary to Defendant's assertions, the trial testimony regarding Balzano was replete with evidentiary support showing that Balzano's actions proximately caused the termination of Mary Lentz.  CIC's investigator, Al Matheny, spoke with Balzano regarding the investigation into the allegations brought against Mary Lentz prior to her termination, Tr. Trans. p. 1157, and the evidence viewed in the light most favorable to Plaintiff shows that Balzano fed Matheny misinformation about his role in and knowledge of Lentz' behavior.  Balzano portrayed to Mark Huller that he could not shed any light on his allegations of Mary's behavior, Tr. Trans. p. 1174, although the evidence favorable to Ms. Lentz showed that he could have done so but did not.  In Plaintiff's first meeting with Al Matheny, at which Balzano was in attendance, when Matheny asked where Plaintiff had gotten her authority for using such funds, Balzano falsely disclaimed all knowledge of his prior statements and permission to Lentz, saying, by Plaintiff's testimony, "Well, I'm glad you said that, Mary, because I didn't know this was going on, I didn't know anything about this."  Tr. Trans., p. 506.  Mark Huller's notes on Balzano's statements to him, which were admitted at trial, showed that he (Balzano) stated that he "had no knowledge of the fund and had never received a lunch or any money from the fund."  Tr. Trans., pp. 871-872.  The evidence shows that this statement was completely inaccurate and untruthful, because Balzano did indeed receive meals and had knowledge of a copy money fund, to which he himself

15

testified. Tr. Trans., p. 872. In short: the acts, statements, and omissions of Balzano clearly amounted to a proximate cause of Plaintiff's termination, because Huller relied on Balzano's misinformation and on Matheny's report (which was tainted by Balzano's misinformation) in making the decision to terminate Plaintiff from her employment.

Lastly, there is an even more fundamental reason that Balzano proximately caused Plaintiff's termination: Not only did he report Mary Lentz for her actions of requesting copy reimbursement monies, not sending such checks into the central office, personally cashing such checks, and depositing those checks into a personal bank account, but *evidence at trial showed that Plaintiff did these things based on her reliance of what Balzano told her to do in the first place.* In fact, it is undisputed that Balzano himself did the same in relation to the first three allegations of impropriety listed above. When the evidence viewed in the light most favorable to Plaintiff shows that Balzano told Plaintiff to 'A, B, C, and D', and then reported Plaintiff to her superiors for doing 'A, B, C, and D' as if those actions were improper or unethical, without informing his superiors about his role in the matter, there can be no doubt that Balzano's actions and statements were the proximate cause of the termination of the employment of Mary Lentz from the Cincinnati Insurance Company.

Since the jury properly found that Balzano proximately caused Plaintiff's termination, his motion must be denied.

### IV.     Conclusion.

For all the reasons stated above, Defendant has failed in his burden of showing that the jury improperly adjudged its verdict in favor of Plaintiff Mary Lentz on her claim of intentional interference with employment relationship against Defendant Balzano.  Because he has failed to meet that burden, Defendant's Motion for Judgment as a Matter of Law as to Claim For Intentional Interference With Employment Relationship must be denied.

Respectfully Submitted,

s/[Michael K. Sutherlin]
Michael K. Sutherlin
Attorney for Plaintiff

MICHAEL K. SUTHERLIN & ASSOCIATES
P.O. Box 441095
Indianapolis, IN 46244-1095
Phone: (317) 634-6313
Fax: (317) 631-8818
msutherlin@michaelsutherlin.com

**CERTIFICATE OF SERVICE**

I hereby certify that on July 27, 2005, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

    Deborah S. Adams
    Jack B. Harrison
    FROST BROWN TODD, LLC
    2200 PNC Center
    201 East Fifth Street
    Cincinnati, OH 45202
    dadams@fbtlaw.com
    jharrison@fbtlaw.com

                                          s/[Michael K. Sutherlin]
                                          Michael K. Sutherlin
                                          Attorney for Plaintiff

MICHAEL K. SUTHERLIN & ASSOCIATES
P.O. Box 441095
Indianapolis, IN 46244-1095
Phone: (317) 634-6313
Fax: (317) 631-8818
msutherlin@michaelsutherlin.com